## COURT OF COMMON PLEAS
## HAMILTON COUNTY

| | |
|---|---|
| VERSATEX, LLC, and<br>XLC SERVICES, LLC, | )<br>)<br>)    NO.: _____ |
| Plaintiffs, | ) |
| v. | )<br>)    JURY TRIAL DEMANDED |
| DURACELL MANUFACTURING, LLC, and<br>THE DURACELL COMPANY, | )<br>) |
| Defendants. | ) |

### COMPLAINT

Plaintiffs, Versatex, LLC ("Versatex") and XLC Services, LLC ("XLC") (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Duracell Manufacturing, LLC ("DML") and The Duracell Company ("Duracell Co.") (collectively, "Defendants"), for breach of contract and unjust enrichment.

### PARTIES

1.     Plaintiff Versatex, LLC, is an Ohio limited liability company with its principal place of business at 324 West 9th Street, Cincinnati, Ohio 45202.

2.     Plaintiff XLC Services, LLC is an Ohio limited liability company with its principal place of business at 324 West 9th Street, Cincinnati, Ohio 45202.

3.     Defendant Duracell Manufacturing, LLC is a Delaware limited liability company with its principal place of business at 14 Research Drive, Bethel, Connecticut 06801.

4.     Defendant The Duracell Company is a Delaware corporation with its principal place of business at 14 Research Drive, Bethel, Connecticut 06801.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action because the matter in controversy exceeds $15,000, exclusive of interest and costs.

6.     This Court has personal jurisdiction over the Defendants under the Master Professional Services Agreement ("Agreement") between The Procter & Gamble Company ("P&G") and Versatex dated October 1, 2014, which provides at Section 19.2:

> Each Party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively in state or federal courts located in Cincinnati, Ohio, and each Party irrevocably submits to the sole and exclusive jurisdiction of these courts in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other Party.

The present action arises out of the Agreement, which is attached (sans schedules) as **Exhibit A**, and on information and belief, the Defendants have fully assumed all of P&G's obligations under the Agreement, such that the Defendants have "submit[ted] to the sole and exclusive jurisdiction" of this Court.

7.     Venue is likewise proper in this Court based on Section 19.2.

## FACTUAL BACKGROUND

8.     The Plaintiffs are both wholly-owned subsidiaries of d.e. Foxx & Associates, Inc., a minority-owned company based in Cincinnati, Ohio.

9.     The Plaintiffs provide a variety of services to their customers, including supply chain services and management of temporary labor services.

10.     Starting in 2012, the Plaintiffs provided temporary labor services (the "Services") to P&G under a series of long-term master services agreements, including the Agreement, and under statements of work issued under the Agreement.

2

11.     In Section 11.1(a) of the Agreement, P&G agreed that, "[i]n consideration of [Versatex's] performance of the Services, P&G agrees to pay [Versatex] the applicable Charges."

12.     At the time that the Agreement was executed in 2014, P&G owned Duracell International, Inc.

13.     Shortly after executing the Agreement, on or about November 13, 2014, P&G publicly announced plans to divest Duracell International, Inc. to Berkshire Hathaway, Inc.

14.     On or about February 29, 2016, P&G divested Duracell International, Inc. to Berkshire Hathaway, Inc. (the "Divestment").

15.     On information and belief, as part of the Divestment, the Defendants fully assumed all of P&G's obligations under the Agreement.

16.     Prior to the Divestment, the Plaintiffs had provided the Services, pursuant to the Agreement and statements of work issued under the Agreement, to the Defendants or their predecessors at facilities located in LaGrange, Georgia and Lancaster, South Carolina, and the Plaintiffs continued to provide the Services to the Defendants following the Divestment.

17.     After providing Services to the Defendants or their predecessors, the Plaintiffs submitted invoices for payment.

18.     The Defendants and/or their predecessors did not pay some of the Plaintiffs' invoices.  Attached as **Exhibit B** is a list of fully and partially unpaid invoices, which are now long-past due.

19.     At various times, the Plaintiffs attempted in good faith to resolve informally the present dispute with the Defendants.  The Plaintiffs demanded in person and in writing that the Defendants pay the amounts owed under the unpaid invoices, and the Plaintiffs repeatedly provided the Defendants with summaries of the dispute and with supporting documentation.

20.     On March 8, 2021, prior counsel for the Plaintiffs sent a letter to the General Counsel for the Duracell Co., demanding payment of all of the yet unpaid invoices.

21.     On May 21, 2021, the Defendants responded to the March 8, 2021 letter through outside counsel.  The Defendants did not agree to pay any of the outstanding invoices, but they requested additional documentation substantiating the Plaintiffs' claims.

22.     Plaintiffs provided requested information to the Defendants which substantiate Plaintiffs' claims.

23.     The parties have agreed to various tolling agreements to toll the applicable statutes of limitations while the parties negotiated and exchanged information.

24.     On March 17, 2023, the parties' tolling agreement expires.

## COUNT I: BREACH OF CONTRACT
### (Versatex v. the Defendants)

25.     The allegations of Paragraphs 1 through 24 are incorporated by reference as if fully set forth herein.

26.     Versatex and P&G entered into a binding and enforceable contract—the Agreement.

27.     On information and belief, the Defendants fully assumed all of P&G's obligations under the Agreement, such that all terms and conditions of the Agreement became binding and enforceable upon the Defendants.

28.     Versatex fulfilled all necessary contractual obligations under the terms of the Agreement.

29.     Despite Versatex fulfilling all of its contractual obligations, the Defendants breached the Agreement, including at least Section 11.1(a), without legal excuse, by failing to pay the invoices that Versatex submitted for the Services.

30.     The Defendants' breaches of contract have proximately caused damages to Versatex in an amount to be determined at trial, but in excess of $540,000.

### COUNT II: UNJUST ENRICHMENT
**(The Plaintiffs v. the Defendants)**

31.     The allegations of Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

32.     Versatex asserts Count II in the alternative to Count I.

33.     The Defendants received and retained the benefit of the Services provided by the Plaintiffs at the LaGrange and Lancaster facilities.

34.     The Defendants knew that they had received the benefit of the Plaintiffs' Services because the Defendants had requested that the Plaintiffs provide the Services and the Plaintiffs' submitted invoices to the Defendants for the Services or were unable to submit invoices because of Defendants failure to timely amend the purchase order.

35.     The Defendants have not compensated the Plaintiffs for the benefit of the Services.

36.     It would be inequitable for the Defendants to receive and retain the benefit of the Services without compensating the Plaintiffs.

37.     The Defendants' misconduct has proximately caused damages to the Plaintiffs in an amount to be determined at trial, but in excess of $540,000.

### COUNT III – QUANTUM MERUIT
**(The Plaintiffs v. the Defendants)**

38.     The allegations of Paragraphs 1 through 37 are incorporated by reference as if fully set forth herein

39.     Versatex asserts Count III in the alternative to Counts I and II.

40.    Plaintiffs have conferred a benefit on Defendants without receiving payment from Defendants for the full value of the benefit.

41.    Defendants knew of the benefit conferred by Plaintiffs.

42.    Defendants have retained the benefit under circumstances it would be unjust to do so without compensation.

43.    Defendants proximately caused damages to the Plaintiffs in an amount to be determined at trial, but in excess of $540,000.00.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter judgment in their favor and against the Defendants, and request the following relief:

A.    An award of all damages available under Ohio law;

B.    An award of interest, including prejudgment and post judgment interest at the statutory rate;

C.    An award of the Defendants' costs in this action; and

D.    Such other and further equitable and legal relief as the Court deems appropriate.


Respectfully submitted,


/s/ Brian Giles
Brian Giles (0072806)
GILES & HARPER, LLC
7247 Beechmont Ave.
Cincinnati, Ohio 45230
(513) 379-2715
Brian@gilesfirm.com
*Attorney for Plaintiffs*

6

# <u>Exhibit A</u>

# MASTER PROFESSIONAL SERVICES AGREEMENT

between

## THE PROCTER & GAMBLE COMPANY

and

## VERSATEX, LLC

**Effective as of October 1, 2014**

DCDB01 20932031.1 14-Jul-09 09:51

## SCHEDULES AND ATTACHMENTS

Schedule A   Definitions
Schedule B   Service Description
　　　　　　　Attachment B.1　　P&G Rules
　　　　　　　Attachment B.2　　P&G Code of Conduct
　　　　　　　Attachment B.3　　Change Control Procedures
Schedule C   Services
　　　　　　　Attachment C.1　　Key Measurements
　　　　　　　Attachment C.2　　Satisfaction Survey
Schedule D   Pricing and Financial Provisions
　　　　　　　Attachment D.1　　Pricing Forms
　　　　　　　Attachment D.2　　Financial Responsibility Matrix
　　　　　　　Attachment D.3　　Administered Expenses/Out-of-Pocket Expenses
　　　　　　　Attachment D.4　　Insurance
Schedule E   Transition Plan
Schedule F   P&G Facilities
Schedule H   Software
Schedule J   Third Party Contracts
Schedule M   Dispute Resolution Procedures
Schedule R   Form of Non-Disclosure Agreement
Schedule T   Perfect Invoice Form

## MASTER PROFESSIONAL SERVICES AGREEMENT

This Master Professional Services Agreement ("**Agreement**") is entered into effective October 1, 2014 (the "**Effective Date**") by and between The Procter & Gamble Company, an Ohio corporation having a principal place of business in Cincinnati, Ohio ("**P&G**"), and **Versatex, LLC**, an Ohio limited liability company having a principal place of business in Cincinnati, Ohio___ ("**Provider**"). WHEREAS, P&G and Provider have engaged in extensive negotiations, discussions and due diligence that have culminated in the formation of the contractual relationship described in this Agreement; and

WHEREAS, P&G desires to procure from Provider, and Provider desires to provide to P&G and the Eligible Recipients, certain services described in this Agreement and the Schedules and Attachments hereto, on the terms and conditions specified herein;

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valid consideration, the receipt and sufficiency of which is hereby acknowledged, P&G and Provider (collectively, the "**Parties**" and each, a "**Party**") hereby agree as follows:

**1    INTRODUCTION**

1.1    **Performance and Management by Provider.** P&G desires that certain temporary labor services presently performed and managed by or for P&G and the Eligible Recipients, as each is described in this Agreement and the Schedules and Attachments hereto, be managed by Provider. Provider has carefully reviewed P&G's requirements, has performed all due diligence it deems necessary, and desires to manage such temporary labor services for P&G and the Eligible Recipients.

**2    DEFINITIONS**

2.1    **Definitions.** Except as otherwise expressly provided in this Agreement, all capitalized terms used in this Agreement shall have the meanings set forth in **Schedule A**.

2.2    **Other Terms.** The terms defined in **Schedule A** include the plural as well as the singular and the derivatives of such terms. Unless otherwise expressly stated, the words "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, Subsection or other subdivision. Article, Section, Subsection, Schedule and Attachment references refer to articles, sections and subsections of, and schedules and attachments to, this Agreement. The words "include" and "including" shall not be construed as terms of limitation. Unless otherwise specified, the words "day," "month," and "year" mean, respectively, calendar day, calendar month and calendar year. As stated in **Section 21.3**, the words "notice" and "notification" and their derivatives mean notice or notification in writing. Other terms used in this Agreement are defined in the context in which they are used and have the meanings there indicated.

**3    TERM**

3.1    **Term, Extension.** The initial term of this Agreement shall commence as of 12:00:01 a.m., Eastern Time on October 1, 2014 and continue until 11:59:59 p.m., Eastern Time, on June 30, 2017( the "Term").

P&G Confidential Information

## 4  SERVICES

### 4.1  Overview.

(a) **Services.** Commencing on the date on which Provider assumes responsibility for the Services in question, Provider shall provide the Services to P&G, and, upon P&G's request, to Eligible Recipients and Authorized Users designated by P&G. The "**Services**" shall consist of the services, functions and responsibilities described in this Agreement and its Schedules and Attachments, including as described on Schedule C hereto, as they may evolve during the Term of this Agreement or be supplemented, enhanced, modified or replaced. If any services, functions or responsibilities not specifically described in this Agreement are a necessary part of the Services or are required for proper performance or provision of the Services in accordance with this Agreement, they shall be deemed to be included within the scope of the Services to be delivered for the Charges, as if such services, functions or responsibilities were specifically described in this Agreement. Provider shall be the only provider of the Services to P&G or the Eligible Recipients in North America according to the site onboarding schedule and agreed upon timing for the respective sites within the scope of this agreement

(b) **Required Resources.** Except as otherwise expressly provided in this Agreement, Provider shall be responsible for providing the facilities, personnel, Equipment, Software, technical knowledge, expertise and other resources necessary to provide the MSP Services. Provider is a vendor neutral managed service provider, who will not self perform any of the vendor services at the sites. Provider will be responsible for the labor and equipment necessary to effectively perform the Services. **Provider Responsibility.** Provider shall be responsible for the provision of the Services in accordance with this Agreement and the applicable Key Measurements even if, by agreement of the Parties, such Services are actually performed or dependent upon services performed by Subcontractors.

### 4.2  Transition Plan

**Transition.** During the Transition Period, Provider shall perform the Transition Services and provide the deliverables described in the Transition Plan. The Parties will develop the Transition Plan within thirty (30) days after the Effective Date and such Transition Plan shall be attached upon completion to this Agreement as **Schedule E**. The Transition Plan specifies (i) the transition activities and deliverables to be completed by Provider, P&G or the Eligible Recipients, and (ii) the date(s) by which each is to be completed ("**Transition Milestones**").[ If any services, functions or responsibilities not specifically described in the Transition Plan are an inherent, necessary or customary part of the Transition Services or are required for the proper performance of the Transition Services in accordance with this Agreement, they shall be deemed to be included within the scope of the Transition Services to be delivered for no additional charge, as if such services, functions or responsibilities were specifically described in the Transition Plan. During the Transition Period, P&G will perform those tasks which are designated to be P&G's responsibility in the Transition Plan, provided however P&G shall not be obligated to perform any tasks during the Transition Period that are not set forth in such Transition Plan. Unless otherwise agreed, P&G shall not incur any charges, fees or expenses payable to Provider or third parties in connection with the Transition Services, other than those charges, fees and **expenses** specified in **Schedule D** and those incurred by P&G in connection with its performance of tasks designated in the Transition Plan as P&G's responsibility.

(a) **Performance.** Provider and P&G shall perform the Transition Services described in the Transition Plan in accordance with the schedule and the Transition Milestones set forth therein. Provider shall perform the Transition Services in a manner to minimize any (i) disruption or adverse impact on the business or operations of P&G or the Eligible Recipients and (ii) degradation of the Services then being received by P&G or the Eligible Recipients, except as may be otherwise provided in the Transition Plan. Provider and P&G shall identify and resolve, with the other Party's reasonable assistance, any problems that may impede or delay the timely completion of each task in the Transition Plan that is such Party's responsibility and shall use all commercially reasonable efforts to assist the other Party with the resolution of any problems that may impede or delay the timely completion of each task in the Transition Plan.

(b) **Delay of Transition Activities.** P&G may delay the transition of all or any part of the Transition Services for cause as described in this subsection. Before P&G elects to exercise such right, P&G shall give Provider 30 days notice of the intent to exercise this right, and a reasonable opportunity to cure. . P&G's decision to delay the

P&G Confidential Information

Transition Services shall be based, at least in material part, on reasonable concerns about Provider's ability to perform the Services or Provider's failure to perform its obligations under this Agreement. P&G shall not incur any additional Charges or reimbursable expenses in connection with such a decision. However, P&G acknowledges that if it delays any part of the Transition Services, the Savings Guarantees will be appropriately adjusted by Provider.

4.3 Termination Assistance Services.

(a) **Availability.** As part of the Services, and for the Charges set forth in **Sections 4.3(b)(2) and Schedule D, Provider shall provide** to P&G, the Eligible Recipients and/or their designee(s) the termination assistance services described in **Section 4.3(b)** (the "**Termination Assistance Services**").

    (1) **Period of Provision.** Provider shall provide such Termination Assistance Services to P&G, the applicable Eligible Recipient(s) and/or their designee(s) (i) commencing upon notice from P&G up to six (6) months prior to the expiration of the Term or on such earlier date as P&G may reasonably request and continuing for up to twelve (12) months following the effective date of the expiration of the Term (as such Term may be extended pursuant to **Section 3.1**), (ii) commencing upon any notice of termination (including notice based upon breach or default by P&G, breach or default by Provider or termination for convenience by P&G, of the Term with respect to all or any part of the Services and continuing for up to twelve (12) months following the effective date of such termination, or (iii) commencing upon notice of termination of all or part of the Services to an Eligible Recipient and continuing for up to twelve (12) months following the effective date of such termination.

    (2) **Firm Commitment.** Provider shall provide Termination Assistance Services to P&G, the Eligible Recipients, and/or their designee(s), regardless of the reason for such expiration or termination; provided that, if this Agreement is terminated by Provider under **Section 20.1(b)** for P&G's failure to pay undisputed amounts, Provider may require P&G to pay in advance for Termination Assistance Services to be provided or performed under this **Section 4.3**. At P&G's request, Provider shall provide Termination Assistance Services directly to an Eligible Recipient or an Entity acquiring Control of an Eligible Recipient.

    (3) **Performance.** All Termination Assistance Services shall be provided subject to and in accordance with the terms and conditions of this Agreement. Provider shall perform the Termination Assistance Services with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and resource efficiency as it provided and was required to provide the same or similar Services during the Term. To the extent P&G requests the continuation of all or part of the Services in accordance with **Section 4.3(b)(2)**, the quality and level of performance of such Services following the expiration or termination of the Agreement or Provider's receipt of a notice of termination or non-renewal shall continue to meet or exceed the Key Measurements and shall not be degraded or deficient in any respect. . **Advance Payment.** If P&G is obligated under **Section 4.3(a)(2)** to pay in advance for Termination Assistance Services, Provider shall present an invoice for the estimated Charges as soon as reasonably practicable prior to the provision of such Services . Subject to **Section 12.4.** P&G shall then pay such Charges on or before the first day of the month in which such Services are to be provided. The estimated Charges shall then be reconciled with the actual Charges for Termination Assistance Services provided in such month, and any additional Charges or credits will be reflected on the next invoice delivered.

(b) **Scope of Termination Assistance Services.** At P&G's request, the Termination Assistance Services provided by Provider shall include the services, functions and responsibilities as described below:

    (1) **General Support.** At P&G's request, Provider shall (i) assist P&G, **an Eligible** Recipient and/or their designee**(s) in developing** and implementing a written transition plan for the transition of the Services to P&G, such Eligible Recipient, or their designee(s), (ii) perform programming and consulting services to assist in implementing such transition plan, (iii) **train person**nel designated by P&G, an Eligible Recipient and/or their designee(s) in the use of any business processes, work instructions and work procedures and any Equipment, Software, Systems, Materials and tools used in connection with the provision of the Services, (iv) catalog all business processes, work instructions, work procedures, Software, P&G Data, Equipment, Materials, Third Party Contracts used to provide the Services, (v) provide machine readable and printed listings and associated documentation for source code for Software owned by any Eligible Recipient and source code to which any

       P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

Eligible Recipient is entitled under this Agreement and assist in its re-configuration, (vi) provide technical documentation for Software used by Provider to provide the Services, (vii) assist in the execution of a parallel operation, data migration and testing process until the successful completion of the transition of the Services to P&G or its designee(s), (viii) create and provide copies of the P&G Data in the format and on the media reasonably requested by P&G, an Eligible Recipient and/or their designee(s), (ix) provide a complete and up-to-date, electronic copy of the Policy and Procedures Manual and applicable business processes, work instructions and work procedures in the format and on the media reasonably requested by P&G, and (x) provide other assistance requested by P&G.

(2) **Extension of Services**. At P&G's request, Provider shall provide to P&G and/or the Eligible Recipient(s) any or all of the Services being performed by Provider prior to the expiration or termination date for a period of up to twelve (12) months following such date. The requested Services shall be provided by Provider subject to and in accordance with the terms and conditions of this Agreement and P&G shall pay Provider the Charges specified in **Schedule D** that P&G would have been obligated to pay Provider for such Services if the Agreement had not yet expired or been terminated. To the extent P&G requests a portion of the Services included in a particular Charge, the amount to be paid by P&G will be equitably adjusted to reflect the portion of the Services included in such Charge that Provider will not be providing or performing.

(3) **Hiring**. Subject to **Section 4.3(b)(8)**, P&G and its designee(s) shall be permitted to undertake, without interference from Provider, Provider Subcontractors or Provider Affiliates (including counter-offers), to hire, effective after the date when Provider ceases provision of the Services, any Provider personnel primarily assigned to the performance of the Services during the twelve (12) months preceding such date except that this section shall not apply to Provider's key personnel set forth on Schedule **K**. Provider shall waive, and shall cause its Subcontractors (as contemplated in **Section 4.3(b)(7)** below) and Affiliates to waive, their rights, if any, under contracts with such personnel restricting the ability of such personnel to be recruited or hired by P&G or its designee(s). P&G shall endeavor to conduct the above-described hiring activity in a manner that is not unnecessarily disruptive of the performance by Provider of its obligations under this Agreement. Provider shall not be held liable if P&G's hiring of such Personnel inhibits Provider's ability to provide the Services hereunder, but, rather, shall be relieved of its obligation to perform the Services. Further, in such case, Provider shall not be required to hire replacement personnel in order to perform the Services.

(4) **Software**. As provided in **Section** O, Provider shall provide, and hereby grants certain license, sublicense and/or other rights to certain Software and other Materials used by Provider, Provider Affiliates or Subcontractors in performing the Services, to the extent that Provider holds said license, sublicense or other right to Software. P&G shall be responsible for any cost incurred in said transfer **P&G Facilities, Equipment and Software**. Provider shall vacate the P&G Facilities and return to P&G, if not previously returned, any P&G owned Equipment, P&G leased Equipment, P&G Owned Materials and P&G licensed Third Party Materials (including Software), in condition at least as good as the condition when made available to Provider, ordinary wear and tear excepted. Provider shall vacate such P&G Facilities and return such Equipment, Materials and **Software after the Services requiring** such P&G Facilities, Equipment, Materials and Software are no longer being provided by Provider.

(5) **Provider Subcontractors and Third Party Contracts**. Provider shall provide prompt notice to P&G of all subcontracts and Third Party Contracts used by Provider, Provider Subcontractors or Provider Affiliates to perform the Services. Subject to **Section** O, Provider shall, at P&G's request, cause any such Subcontractors, Provider Affiliates, or third party contractors to permit P&G or its designee(s) to assume prospectively any or all such contracts or to enter into new contracts with P&G or its designee(s) on substantially the same or more favorable terms and conditions, including price. Provider shall so assign the designated subcontracts and Third Party Contracts or cause such contracts to be assigned to P&G or its designee(s) after the Services requiring such subcontracts or Third Party Contracts are no longer being provided by Provider. Unless otherwise agreed by P&G pursuant to **Section 6.5**(b), there shall be no charge or fee imposed on P&G or its designee(s) by Provider or its Subcontractors, Affiliates or third party contractors for such assignment. Provider shall (i) represent and warrant that it is not in default under such subcontracts and Third Party Contracts and that all payments have been made thereunder through the date of assignment, and (ii) notify P&G of any Subcontractor's or third party contractor's default with respect to such subcontracts and Third Party Contracts of which it is aware at the time.

P&G Confidential Information

(6) **Rights from Subcontractors.** With respect to Subcontractors, Provider shall use all commercially reasonable efforts to (A) obtain for P&G and its designee(s) the rights specified in this **Section 4.3**, and (B) ensure that such rights are not subject to subsequent Subcontractor approval or the payment by P&G or its designee(s) of any fees. If Provider is unable to obtain any such rights with respect to a Subcontractor, it shall notify P&G in advance and shall not use such Subcontractor without P&G's approval (and absent such approval, Provider's use of any such Subcontractor shall obligate Provider to obtain or arrange, at no additional charge to P&G, the rights specified in this **Section 4.3**, for P&G and its designee(s) upon removal, expiration or termination).

(7) **Rates and Charges.** Except as provided below and in **Section 4.3(b)(2)**, to the extent the Termination Assistance Services requested by P&G can be provided by Provider using personnel and resources already assigned to P&G, there will be no additional charge beyond those currently authorized to be charged by Provider under this Agreement to P&G for such Termination Assistance Services. If material Termination Assistance Services requested by P&G cannot be provided by Provider using Provider Personnel then assigned to P&G without adversely affecting Provider's ability to meet its performance obligations, P&G, in its sole discretion, may forego or delay any work activities or temporarily or permanently adjust the work to be performed by Provider, the schedules associated therewith or the Key Measurements to permit the performance of such Termination Assistance Services using such personnel. To the extent P&G authorizes Provider to use additional Provider Personnel to perform material Termination Assistance Services requested by P&G, and for those services described in Section 4.3(b)(1), P&G shall pay Provider the rates and charges specified in **Schedule D**, or, if no such rates and charges are specified in **Schedule D**, a negotiated fee which shall be no less favorable to P&G than the lower of the most favorable rates available under then-current P&G/Provider contracts for comparable services or Provider's then current commercially available rates, for the additional Provider Personnel required to perform such Termination Assistance Services (but only if Provider notifies P&G in advance of such Charges, obtains P&G's approval prior to incurring such Charges, and uses commercially reasonable efforts to minimize such Charges). Provider shall invoice P&G separately for any Termination Assistance Services described in this paragraph and P&G shall pay such charges upon receipt of an accurate invoice.

4.4 **New Services.**

(a) **Procedures.** If P&G requests that Provider shall perform any New Services , Provider shall promptly prepare a New Services proposal for P&G's consideration. Provider shall prepare such New Services proposal at no additional charge to P&G and shall deliver such proposal to P&G within ten (10) business days of its receipt of P&G's request; provided, that Provider shall use commercially reasonable efforts to respond more quickly in the case of a pressing business need or an emergency situation. P&G shall provide such information as Provider reasonably requests in order to prepare such New Service proposal. P&G may accept or reject any New Services proposal in its sole discretion and Provider shall not be obligated to perform any New Services to the extent the applicable proposal is rejected. Unless the Parties otherwise agree, if P&G accepts Provider's proposal, Provider will perform the New Services and be paid in accordance with the proposal submitted by Provider and the provisions of this Agreement. Upon P&G's acceptance of a Provider proposal for New Services, the scope of the Services will be expanded and this Agreement will be modified to include such New Services. Notwithstanding any provision to the contrary, (i) Provider shall act reasonably and in good faith in formulating its pricing proposal, (ii) Provider shall use commercially reasonable efforts to identify potential means of reducing the cost to P&G, including utilizing Subcontractors as and to the extent appropriate, (iii) such pricing proposal shall be no less favorable to P&G than the pricing and labor rates set forth herein for comparable Services, and (iv) such pricing proposal shall take into account the existing and future volume of business between P&G and Provider.

(b) **Use of Third Parties.** P&G may elect to solicit and receive bids from third parties to perform any New Services. If P&G elects to use third parties to perform New Services, (i) such New Services shall not be deemed "Services" under the provisions of this Agreement, and (ii) Provider shall cooperate with such third parties as provided in **Section 4.6**.

(c) **Services Evolution and Modification.** The Parties anticipate that the Services will evolve and be supplemented, modified, enhanced or replaced over time to keep pace with technological advancements and improvements in the methods of delivering Services and changes in the businesses of P&G and the Eligible Recipients. The Parties

-5-                                      P&G Confidential Information

acknowledge and agree that these changes will modify the Services and will not be deemed to result in New Services unless the changed services meet the definition of New Services.

(d) **Authorized User and Eligible Recipient Requests.** Provider shall promptly inform the P&G Global Relationship Manager or his or her designee of requests for New Services from Authorized Users or Eligible Recipients, and shall submit any proposals for New Services to the P&G Global Relationship Manager or his or her designee. Provider shall not agree to provide New Services to any Authorized Users or Eligible Recipients without the prior written approval of the P&G Global Relationship Manager or his or her designee. Provider fails to strictly comply with this **Section 4.4(d)**, it shall receive no compensation for any services rendered to any Authorized User or Eligible Recipient in violation of such provision.

**4.5 Billable Projects, Additional Work or Reprioritization.**

(a) **Procedures and Performance.** Provider shall perform Projects requested and approved by P&G in accordance with **Schedule D**. A "Project" is a discrete unit of non-recurring work that is not an inherent, necessary or customary part of the day-to-day Services, and is not required to be performed by Provider to meet the existing Key Measurements (other than Key Measurements related to Project performance). A Project may consist of or include work that would otherwise be treated as New Services. The Provider Personnel assigned to perform such Projects shall possess the training, education, experience, competence and skill to perform such work. The P&G Global Relationship Manager or his or her designee shall request, define and set the priority for such Projects. Provider shall maintain appropriate continuity of personnel assigned to perform Projects. Provider shall provide a proposal within a reasonably negotiated timeframe.

(b) **Additional Work or Reprioritization.** The P&G Global Relationship Manager or his or her designee may identify new or additional work activities to be performed by Provider Personnel (including work activities that would otherwise be treated as New Services) or reprioritize or reset the schedule for existing work activities to be performed by such Provider Personnel. To the extent the work activities requested by P&G can be provided by Provider using personnel already assigned to this engagement without impacting the established schedule for other tasks or the performance of the Services in accordance with the Key Measurements, there will be no additional charge to P&G for such work. If the work activities requested by P&G cannot be provided by Provider using personnel then assigned to P&G without such an impact, P&G, in its sole discretion, may forego or delay any work activities or temporarily or permanently adjust the work to be performed by Provider, the schedules associated therewith or the Key Measurements to permit the performance by Provider of such work activities using Provider Personnel already assigned to perform the Services.

**4.6 Right to In-Source or Use of Third Parties; Cooperation.**

(a) **Provider Cooperation.** Provider shall fully cooperate with and work in good faith with P&G, the Eligible Recipients or third parties with whom P&G or the Eligible Recipients obtain other services (each, a "**Third Party Contractor**") **as described in Schedule B** or requested by P&G and at no additional charge to P&G. Such cooperation may include: (i) timely providing access to facilities being used to provide the Services as and to the extent provided in **Section 6.4**; (ii) timely providing reasonable electronic and physical access to the business processes and associated Equipment, Software **and/or Systems** being used by Provider in connection with the exercise of P&G's rights or the conduct of activities associated with this Agreement; (iii) timely providing written requirements, standards, policies or other documentation for the business processes and associated Equipment, Software or Systems procured, operated, supported or used by Provider in connection with the Services; (iv) at P&G's request, providing access to P&G Data to the Eligible Recipients and/or Third Party Contractors in the same manner and to the same extent access to such data is provided to P&G, (v) timely providing cooperation and assistance in accordance with **Section 4.3** to facilitate the orderly transfer of terminated Services from Provider to P&G, the Eligible Recipients and/or Third Party **Contractors**, or (vi) any other cooperation or assistance reasonably necessary for P&G, the Eligible Recipients and/or Third Party Contractors to perform the work in question. P&G personnel and Third Party Contractors shall comply with Provider's reasonable security and confidentiality requirements, and shall, to the extent performing work on Software, Equipment or Systems for which Provider has operational responsibility, comply with Provider's reasonable standards, methodologies, and procedures.

P&G Confidential Information

**Notice by Provider.** Provider shall immediately notify P&G when it becomes aware that an act or omission of a Third Party Contractor will cause, or has caused, a problem or delay in providing the Services, and shall use commercially reasonable efforts to work with P&G, the Eligible Recipients and the Third Party Contractor to prevent or circumvent such problem or delay. Provider shall cooperate with P&G, the Eligible Recipients and Third Party Contractors to resolve differences and conflicts arising between the Services and other activities undertaken by P&G, the Eligible Recipients or Third Party Contractors. Subject to **Section 10.2**, any notification provided by Provider in accordance with this **Section 4.6(b)** shall not excuse Provider from the performance of any of its obligations under this Agreement.

(b) Eligible Recipient. All Services shall be provided by **Versatex, LLC** or the applicable Affiliate of **Versatex, LLC** pursuant to this Master Agreement or an executed Companion Agreement. Unless and to the extent an individual Companion Agreement expressly provides otherwise, each Companion Agreement shall incorporate by reference the terms and conditions of this Master Agreement and shall not be construed as altering or superseding the rights and obligations of the Parties under this Master Agreement. Unless and to the extent otherwise agreed, the form of the Companion Agreement shall be as set forth in **Schedule S**.

(c) Notwithstanding the foregoing, **Versatex, LLC** shall be responsible for any failure by an Affiliate of **Versatex, LLC** to perform in accordance with a Companion Agreement executed by such Affiliate or to comply with such Affiliate's duties or obligations under such Companion Agreement to the same extent as if such failure to perform or comply was committed by **Versatex, LLC** including, subject to **Section 18.3**, any damages incurred by P&G or an Eligible Recipient as a result of any such failure to perform or comply.

(d) The Provider Account Manager (and his or her designees(s)) shall remain responsible for the administration of this Master Agreement and the individual Companion Agreements on a day-to-day basis on behalf of Provider (including decisions, consents, notices, acceptances and approvals) and only the Provider Account Manager (and his or her designees(s)) shall be authorized to act on behalf of Provider or to amend, modify, change, waive or discharge their rights and obligations under this Master Agreement or such Companion Agreements.

(e) The P&G Global Relationship Manager (and his or her designees(s)) shall remain responsible for the administration of this Master Agreement and the individual Companion Agreements on a day-to-day basis on behalf of P&G and the Eligible Recipients (including decisions, consents, notices, acceptances and approvals) and only the P&G Global Relationship Manager (and his or her designees(s)) shall be authorized to act on behalf of P&G and the Eligible Recipients or to amend, modify, change, waive or discharge their rights and obligations under this Master Agreement or such Companion Agreements.

## 5   REQUIRED CONSENTS/TERMINATIONS.

### 5.1   Administrative Responsibility.

(a) At no additional charge to P&G, Provider shall undertake all administrative activities necessary to obtain all Required Consents/Terminations with respect to third party licenses and contracts provided by Provider or its Subcontractors or Affiliates, as well as any third party licenses or contracts provided by P&G or an Eligible Recipient that are identified on **Schedules H** or **J** as Provider's responsibility. At Provider's request, P&G will cooperate with Provider in obtaining such Required Consents/Terminations by executing appropriate P&G approved written communications and other reasonable documents prepared or provided by Provider.

(b) P&G shall undertake all administrative activities necessary to obtain all Required Consents/Terminations with respect to third party licenses and contracts provided by P&G or an Eligible Recipient that are identified on **Schedules H** or **J** as P&G's responsibility. At P&G's request, Provider will cooperate with P&G in obtaining such Required Consents/Terminations by executing appropriate Provider approved written communications and other reasonable documents prepared or provided by P&G.

### 5.2   Financial Responsibility.

With respect to third party licenses and contracts provided by Provider or its Subcontractors or Affiliates, that are identified in **Schedules H** or **J** , Provider shall pay all transfer, re-licensing or termination fees or expenses

DCDB01 20932031.1 14-Jul-09 09:51

associated with obtaining any Required Consents or terminating any licenses or agreements as to which Provider is unable to obtain such Required Consents. With respect to third party licenses and contracts provided by P&G or Eligible Recipients, that are identified in **Schedules H** or **J** , P&G shall pay all transfer, re-licensing or termination fees or expenses associated with obtaining any Required Consents or terminating any licenses or agreements as to which P&G is unable to obtain such Required Consents.

**5.3    Contingent Arrangements.**

If, despite using commercially reasonable efforts, Provider or P&G is unable to obtain a Required Consent/Termination for which it is responsible, the responsible Party shall use commercially reasonable efforts to determine and adopt, subject to the other Party's prior approval, such alternative approaches as are necessary and sufficient to provide the Services without such Required Consent/Termination. If such alternative approaches are required for a period longer than sixty (60) days following the Commencement Date, the Parties shall equitably adjust the terms, prices or Savings Guarantees specified in this Agreement to reflect any additional costs being incurred by P&G or Provider as a result of the  failure to obtain a Required Consent/Termination for which a Party was responsible and any Services not being received by P&G and the Eligible Recipients.

## 6    FACILITIES, SOFTWARE, EQUIPMENT, CONTRACTS AND ASSETS ASSOCIATED WITH THE PROVISION OF SERVICES

**6.1    Equipment.**

**Provider's Responsibilities.** Except as provided in **Schedule F**, Provider shall be responsible for providing all furniture, fixtures, Equipment, space and other facilities required to perform the Services and all upgrades, improvements, replacements and additions to such furniture, fixtures, Equipment, space and facilities.

**6.2    P&G Facilities.**

(a)  **Access and Use.**  P&G shall provide Provider with access to and the use of the P&G Facilities (or equivalent space) specified in **Schedule F** for the periods specified therein solely as necessary for Provider to perform its obligations under this Agreement.  THE P&G FACILITIES ARE PROVIDED BY P&G TO PROVIDER ON AN AS-IS, WHERE-IS BASIS.  P&G EXPRESSLY DISCLAIMS ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO THE P&G FACILITIES, OR THEIR CONDITION OR SUITABILITY FOR USE BY PROVIDER.

(b)  **P&G Rules and Compliance.**  In performing the Services, Provider shall observe and comply with all P&G policies, rules, and regulations applicable to P&G Facilities or the provision of the Services, including those set forth in **Attachment B.1** and those communicated to Provider or Provider Personnel in advance by the means generally used by P&G to disseminate such information to its employees or contractors (collectively, **"P&G Rules"**). Provider shall be responsible for the promulgation and distribution of P&G Rules to Provider Personnel.  In addition, Provider and Provider Personnel shall be responsible for familiarizing themselves with the premises and operations at each P&G Facility at, to or from which Services are rendered and the P&G Rules applicable to each such Site or Facility.  Additions or modifications to the P&G Rules may be (i) disclosed to Provider and Provider Personnel in writing, (iii) conspicuously posted at a P&G Facility, (iv) electronically posted, or (ii) communicated to Provider or Provider Personnel by means generally used by P&G to disseminate such information to its employees or contractors.  Provider and Provider Personnel shall observe and comply with such additional or modified P&G Rules. At P&G's request, Provider Personnel shall participate in P&G provided training programs regarding P&G Rules.

**6.3    P&G Networks.** To the extent any Equipment used by Provider or Provider Personnel is, with P&G's approval, to be connected directly to the network(s) of P&G or an Eligible Recipient, such Equipment (and all Software installed thereon) shall be and remain in strict compliance with all applicable P&G Standards unless and to the extent deviations are approved in advance by P&G.

Provider shall promptly report any security breach of the network(s) of P&G or an Eligible Recipient and shall cooperate with and fully support P&G's investigation of each such security breach. In addition, Provider shall promptly investigate any other security breach associated with Provider Personnel and/or the performance of the Services.  Provider shall

P&G Confidential Information

notify P&G and permit P&G to participate in the investigation of each such security breach. Provider shall promptly (i) report the findings of any such investigation to P&G, (ii) provide P&G with a copy of any written report prepared in connection therewith, and (iii) to the extent in Provider's areas of responsibility and control, prepare and (following P&G approval) implement a remediation plan to remediate the effects of the security breach and prevent its recurrence.

6.4 **Provider Facilities.** During the Term, Provider shall provide to P&G and at P&G's request to the Eligible Recipients or Third Party Contractors, at no additional charge, (i) reasonable access to and use of Provider Facilities from which the Services are being performed for audit purposes and (ii) reasonable access to reasonable work/conference space at such Provider Facilities, in each case for the exercise of P&G's rights or the conduct of activities associated with this Agreement.

6.5 **Software, Equipment and Third Party Contracts.**

(a) **Financial Responsibility.** Each Party shall be responsible for any third party fees or expenses associated with Software, Equipment, Equipment leases and Third Party Contracts for which such Party is financially responsible under **Attachment D.2**. Each Party also shall be responsible for any third party fees or expenses associated with new, substitute or replacement Software, Equipment, Equipment leases or Third Party Contracts (including Upgrades, enhancements, new versions or new releases of such Software or Equipment) for which such Party is financially responsible under **Attachment D.2**. With respect to Third Party Software licenses, Equipment leases and Third Party Contracts that are transferred to Provider by P&G or for which Provider otherwise assumes financial responsibility under this Agreement, Provider shall (i) pay all amounts becoming due under such licenses, leases or contracts, and all related expenses, for periods on or after the Commencement Date (or, if later, the date on which Provider assumes responsibility for the Services in question in accordance with the Transition Plan); (ii) refund to P&G any prepayment of such amounts in accordance with **Section 11.5**; (iii) pay all modification, termination, cancellation, late payment, renewal or other fees, penalties, charges, interest or other expenses relating to periods on or after the Commencement Date (or, if later, the date on which Provider assumes responsibility for the Services in question in accordance with the Transition Plan); (iv) pay all costs associated with the transfer of such licenses, leases and contracts to Provider, including all taxes associated with such transfer; and (v) be responsible for curing any defaults in Provider's performance under such licenses, leases and contracts on or after the Commencement Date (or, if later, the date on which Provider assumes responsibility for the Services in question in accordance with the Transition Plan). **Operational Responsibility.** To the extent Provider is operationally responsible under **Attachment D.2** for certain Software, Equipment, Equipment leases or related Third Party Contracts, Provider shall be responsible, to the extent relevant to the Services, for (i) the evaluation, procurement, testing, installation, use, support, management, administration, operation and maintenance of such Software, Equipment, Equipment leases and Third Party Contracts and new, substitute or replacement items (including free Upgrades, enhancements, and new versions or releases of Software used for the Services ); (ii) the performance, availability, reliability, compatibility and interoperability of such Software, Equipment, Equipment leases and Third Party Contracts, each in accordance with this Agreement; (iii) the compliance with and performance of all operational, administrative and non-financial contractual obligations specified in such licenses, leases and contracts; (iv) the administration and exercise as appropriate of all rights available under such licenses, leases and contracts; and (v) the payment of any fees, penalties, charges, interest or other expenses resulting from Provider's failure to comply with or perform its obligations under this **Section 6.5(a)** (except to the extent that such failure directly results from a breach by P&G in of its obligations under this Agreement).

(b) **Rights Upon Expiration/Termination.** With respect to all Third Party Software licenses, Equipment leases and Third Party Contracts for which Provider is financially responsible in **Attachment D.2**, Provider shall use all commercially reasonable efforts to (i) obtain for P&G, the other Eligible Recipients and/or their designee(s) the license, sublicense, assignment and other rights specified in **Sections 4.3** and O ensure that the granting of such license, sublicense, assignment and other rights is not subject to subsequent third party approval or the payment by P&G, the other Eligible Recipients and/or their designee(s) of license, assignment or transfer fees, (iii) ensure that the terms, conditions and prices applicable to P&G, the other Eligible Recipients and/or their designee(s) following expiration or termination are no less favorable than those otherwise applicable to Provider, and at least sufficient for the continuation of the activities comprising the Services, and (iv) ensure that neither the expiration/termination of the Agreement nor the assignment of the license, lease or contract will trigger less favorable terms, conditions or pricing. Once the transfer is complete, P&G shall be responsible for all cost. If Provider is unable to obtain any such rights and assurances, it shall notify P&G in advance and shall not use such Third Party Software license,

-9-                                                              P&G Confidential Information

Equipment lease or Third Party Contract without P&G's approval (and absent such approval, Provider's use of any such license, lease or contract shall obligate Provider to obtain or arrange, at no additional cost to P&G, for such license, sublicense, assignment or other right for P&G, the other Eligible Recipients and their designee(s) upon expiration or termination).

(c) **Evaluation of Third Party Software, Equipment**. In addition to its obligations under **Sections 6.5(a)** and **(b)** and in order to facilitate P&G's control of architecture, standards and plans pursuant to **Section 9.5**, Provider shall use commercially reasonable efforts to evaluate any Third Party Software and Equipment selected by or for an Eligible Recipient to determine whether such Software and Equipment will adversely affect their environment or ability to interface with and use the Software, Equipment and Systems and/or Provider's ability to provide the Services. Provider shall complete and report the results of such evaluation to P&G within fifteen (15) days of its receipt of P&G's request; provided that Provider shall use commercially reasonable efforts to respond more quickly in the case of a pressing business need or an emergency situation.

(d) **Retained Rights**. For the avoidance of doubt, it is understood and agreed that P&G and the Eligible Recipients shall retain the right to contract directly during and following the Term with any Subcontractor or third party utilized by Provider, Provider Subcontractors or Provider Affiliates to perform any Services.

**6.6 Assignment of Third Party Contracts**.

(a) **Assignment and Assumption**. Subject to the Parties obtaining any Required Consents/Terminations on a timetable to be agreed upon by the Parties. P&G shall assign to Provider, and Provider shall assume and agree to perform all obligations related to, the Third Party Contracts for which Provider is financially responsible under this Agreement; provided, however, that such assignment shall not include any assignment or transfer of any intellectual property rights in Materials developed under such Third Party Contracts prior to the date of such assignment and, as between the Parties, P&G hereby expressly reserves and retains such intellectual property rights. The Parties shall execute and deliver a mutually satisfactory assignment and assumption agreement evidencing any such assignments.

(b) **Items Not Assignable by Commencement Date**. With respect to any such Software licenses, Equipment leases or Third Party Contracts that cannot, as of the Commencement Date, be assigned to Provider without breaching their terms or otherwise adversely affecting the rights or obligations of P&G thereunder, the performance obligations shall be deemed to be subcontracted or delegated to Provider until any Required Consent/Termination, notice or other prerequisite to assignment can be obtained, given or satisfied by the responsible Party. It is understood that, from and after the Commencement Date, Provider, as a subcontractor or delegatee, shall be financially and operationally responsible for such Third Party Contract as P&G's agent. The Parties shall use all commercially reasonable efforts to satisfy the consent, notice, termination or other prerequisites to assignment and, upon doing so, the Third Party Contracts shall immediately be assigned and transferred to and assumed by Provider, as contemplated by this Agreement.

(c) **Non-Assignable Items**. If, after the Parties have used all commercially reasonable efforts for a reasonable period of time, a Third Party Contract cannot be assigned without breaching its terms or otherwise adversely affecting the rights or obligations of P&G thereunder, the Parties shall take such actions and execute and deliver such documents as may be necessary to cause the Parties to realize the practical effects of the allocation of responsibilities intended to be effected by this Agreement.

(d) **Modification and Substitution**. Provider may terminate, shorten, modify or extend the Third Party Contracts for which Provider is financially responsible and may substitute or change Providers relating to goods or services covered thereby; provided that, except as otherwise disclosed by Provider and agreed to by P&G, such change(s) (i) shall not constitute a breach of any obligation of the Eligible Recipients under such Third Party Contracts and (ii) shall not result in additional operational risk or losses or damages to the Eligible Recipients; (iii) shall not result in any increase to the Eligible Recipients in the cost of receiving the Services; and (iv) shall not provide for less favorable terms, conditions or prices for P&G, the other Eligible Recipients and/or their designee(s) following the expiration or termination of the Term or any applicable Service than would otherwise be applicable to Provider (except for terms, conditions or prices available to Provider because of its volume purchases), unless P&G has otherwise agreed that such Third Party Contract is not assumable. Provider's rights under the immediately preceding sentence are conditioned upon Provider paying all applicable termination or cancellation charges, Losses and other

P&G Confidential Information

amounts due to the applicable Provider associated with such action and indemnifying the Eligible Recipients against any such charges, Losses or other amounts associated therewith; provided, however, that P&G shall be responsible for such charges, Losses and other amounts if the modifications or substitutions are a result of a change requested or required by P&G. Notwithstanding anything to the contrary herein, Provider shall not terminate, shorten or modify without P&G's prior consent any license for Third Party Software that is created exclusively for the Eligible Recipients or otherwise not commercially available. Provider shall reimburse the Eligible Recipient(s) for any termination charges, cancellation charges or other amounts paid by the Eligible Recipient(s) at Provider's direction in connection with obtaining any such modification.

6.7 **Notice of Defaults**. P&G and Provider shall promptly inform the other Party in writing of any breach of, or misuse or fraud in connection with, any Third Party Contract, Equipment lease or Third Party Software license used in connection with the Services of which it becomes aware and shall cooperate with the other Party to prevent or stay any such breach, misuse or fraud.

## 7 KEY MEASUREMENTS

### 7.1 General.

**General Performance Standards**. Beginning on the date on which Provider assumes responsibility for the Services in question in accordance with the Parties' agreement, Provider shall perform the Services (i) at levels of accuracy, quality, completeness, timeliness, responsiveness and resource efficiency applied by leading providers of similar services; and (ii) in accordance with the measures set forth on Schedule C.

7.2 **Continuous Improvement Reviews**. Provider acknowledges that the quality of the Services provided in certain Service areas can and will be improved during the Term and agrees that the Key Measurements in such Service areas will be enhanced periodically in recognition of the anticipated improvement in service quality. In furtherance of this commitment, P&G and Provider shall review the Key Measurements, the performance data collected and reported by Provider and relevant industry data and trends on an annual basis (or more frequently if requested by P&G).

### 7.3 Satisfaction Surveys

(a) **General**. At specified intervals, **Provider** and/or independent third parties engaged by Provider) shall conduct the satisfaction surveys described in **Attachment C.2** or such other survey provided by P&G in accordance with the survey protocols and procedures specified in **Attachment C.2**. To the extent Provider wishes to use an independent third party to perform all or any part of any satisfaction survey, Provider shall provide P&G with reasonable notice of its intention to do so and shall obtain P&G's consent prior to its first use of such third party, which consent shall not be unreasonably withheld. Provider shall be responsible for the expenses of all such surveys conducted pursuant to this **Section 7.4(a)**. The Provider Account Manager shall review the results of all satisfaction surveys conducted pursuant to this **Section 7.4(a)** with the P&G Global Relationship Manager.

(b) **P&G Conducted Surveys**. In addition to the satisfaction surveys to be conducted pursuant to **Section 7.4(a)**, P&G may survey satisfaction with Provider's performance in connection with and as part of broader satisfaction surveys periodically conducted by P&G and/or independent third parties engaged by P&G. , Provider shall cooperate and assist P&G with the formulation of the survey questions, protocols and procedures and the execution and review of such surveys. The Survey shall be based on criteria jointly developed by the Parties.

(c) **Survey Follow-up**. If the results of any satisfaction survey conducted pursuant to **Section 7.4(a)** or **(b)** indicate that the level of satisfaction with Provider's performance is below the scope as set forth in **Attachment C.2**, Provider shall promptly: (i) analyze and report on the root cause of such dissatisfaction; (ii) develop an action plan to address and improve the level of satisfaction; (iii) present such plan to P&G for its review, comment and approval; and (iv) take action in accordance with the approved plan and as necessary to improve the level of satisfaction. P&G and Provider shall establish a schedule for the completion of a Root Cause Analysis and the preparation and approval of an action plan, which shall be reasonable and consistent with the severity and materiality of the problem; provided that, the time for completion of such tasks shall not exceed thirty (30) days from the date such user survey results are finalized and reported. The action plan prepared by Provider shall specify the specific measures to be taken by Provider and the dates by which each shall be completed. Following the completion of the measures described in

-11-                                         P&G Confidential Information

such action plan, Provider shall conduct follow-up surveys to confirm that the cause of any dissatisfaction has been addressed and that the level of satisfaction has improved.

7.3 **Notice of Adverse Impact.** If Provider becomes aware of any failure by Provider to comply with its obligations under this Agreement or any other situation (i) that has materially impacted or reasonably could materially impact the maintenance of P&G's or any Eligible Recipient's financial integrity or internal controls, the accuracy of P&G's or any Eligible Recipient's financial, accounting, safety, security, manufacturing/production quality or human resources records and reports, or (ii) that had impacted or reasonably could impact the compliance with P&G Rules, P&G Standards or applicable Laws, or (ii) that has had or reasonably could have any other material adverse impact on the Services in question or the impacted business operations of P&G or the Eligible Recipients, then Provider shall expeditiously notify P&G of such situation and the impact or expected impact and Provider and P&G shall meet to formulate and implement an action plan to rectify such situation and minimize or eliminate such impact.

# 8 PROJECT PERSONNEL

8.1 **Provider Account Manager.** Provider shall designate a "**Provider Account Manager**" for this P&G engagement, who, unless otherwise agreed by P&G, shall (i) be a full time employee of Provider; (iii) be experienced in delivering solutions similar to the Services and with managing similar accounts; (iv) devote the required level of effort to managing the Services; (v) remain in this position for a minimum period of two (2) years from the initial assignment (except as a result of voluntary resignation, involuntary termination for cause, illness, disability, or death); (vi) serve as the single point of accountability for the Services, (vii) be the single point of contact to whom all P&G communications concerning this Agreement may be addressed; (viii) have authority to act on behalf of Provider in all day-to-day matters pertaining to this Agreement; (ix) have day-to-day responsibility for service delivery, billing and relationship management; and (x) have day-to-day responsibility for customer satisfaction.

8.2 **Provider Personnel Are Not P&G Employees.** Except as otherwise expressly set forth in this Agreement, the Parties intend to create an independent contractor relationship and nothing in this Agreement shall operate or be construed as making P&G (or the Eligible Recipients) and Provider partners, joint venturers, principals, joint employers, agents or employees of or with the other. No officer, director, employee, agent, Affiliate, contractor or subcontractor retained by Provider to perform work on P&G's behalf hereunder shall be deemed to be an officer, director, employee, agent, Affiliate, contractor or subcontractor of P&G or the Eligible Recipients for any purpose. Neither P&G nor the Eligible Recipients, has the right, power, authority or duty to supervise or direct the activities of the Provider Personnel or to compensate such Provider Personnel for any work performed by them pursuant to this Agreement. Provider, and not P&G or the Eligible Recipients, shall be responsible and liable for the acts and omissions of Provider Personnel, including acts and omissions constituting negligence, willful misconduct and/or fraud.

8.3 **Replacement, Qualifications, and Retention of Provider Personnel.**

(a) **Sufficiency and Suitability of Personnel.** Provider shall assign (or cause to be assigned) sufficient Provider Personnel to provide the MSP Services in accordance with this Agreement and such Provider Personnel shall possess suitable competence, ability, qualifications, education and training for the Services they are to perform.

(b) **Requested Replacement.** In the event that P&G determines in good faith and not for an unlawful purpose that the continued assignment to P&G of any individual Provider Personnel (including Key Provider Personnel) is not in the best interests of P&G or the Eligible Recipients, then P&G shall give Provider notice to that effect requesting that such Provider Personnel be replaced. Provider shall have ten (10) business days following P&G's request for removal in which to investigate the matters forming the basis of such request, correct any deficient performance and provide P&G with assurances that such deficient performance shall not recur (provided that, if requested to do so by P&G for actual or suspected violations of P&G Rules, Provider shall immediately remove (or cause to be removed) the individual in question from all P&G Facilities and P&G sites pending completion of Provider's investigation and discussions with P&G). If, following such period, P&G is not reasonably satisfied with the results of Provider's efforts to correct the deficient performance and/or to ensure its non-recurrence, Provider shall, as soon as possible, permanently remove and replace such Provider Personnel with an individual of suitable ability and qualifications, without cost to P&G. In such event, P&G shall not be obligated to pay any Charges or other fees relating to the replacement of such Provider Personnel, including any training or other knowledge transfer activities or overlaps in periods of employment. Nothing in this provision shall operate or be construed to limit.

P&G Confidential Information

(c) **Turnover Rate and Data**. Provider shall use commercially reasonable efforts to keep the turnover rate of Provider Personnel to a level comparable to or better than the industry average for well-managed service providers in the applicable country performing services similar to the Services. If P&G believes that the turnover rate of Provider Personnel may be excessive and so notifies Provider, Provider shall, within ten (10) business days, (i) provide P&G with data concerning Provider's turnover rate, (ii) meet with P&G to discuss the reasons for the turnover rate, (iii) submit a proposal for reducing the turnover rate for P&G's review and approval, and (iv) agree to a program for reducing the turnover rate, all at no additional cost to P&G. Notwithstanding any transfer or turnover of Provider Personnel, Provider shall remain obligated to perform the Services without degradation and in accordance with the Service Levels.

(d) **Background Check**. Provider shall use commercially reasonable efforts to verify (i) that Provider Personnel are authorized to work in any country in which they are assigned to perform Services; and (ii) that Provider Personnel have not been convicted of or accepted responsibility for a felony or a misdemeanor involving a dishonest act, do not use illegal drugs, and are not otherwise disqualified from performing the assigned work under applicable Laws. To the extent permitted under applicable Laws, Provider shall perform or have performed a reasonable background check, which shall include a criminal history background check, on all Provider Personnel assigned to work hereunder, provided that, if a satisfactory background check, including a criminal history background check, was completed in connection with the hiring of such Provider Personnel, it need not be repeated.

(e) **Drug screening    Substance Abuse and Drug Testing**

Provider shall cause its personnel and subcontractors' personnel not to use, possess, or distribute any drug or drug-like substance whose sale, use, or possession is unlawful, or any prescribed substance used without a prescription ("Controlled Substance ") or alcoholic beverage on any of P&G's premises or while Provider's personnel representing P&G on third party premises. In addition to Provider's obligation to indemnify P&G hereunder and to the other rights P&G may have under this Agreement or at law, in equity or otherwise, personnel not complying with this subsection shall be banned from P&G's premises.

Any employee who is assigned to work on P&G's premises for more than 30 work days in any 12 month period or is assigned to P&G for more than 10 consecutive work days must be tested before being sent to P&G's premises for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids (marijuana, THC, hashish), cocaine, opiates (Codeine, Morphine, Oxycodone, Hydromophone, Hydrocodone), methadone, methaqualone, and phencyclidine (PCP) by a qualified laboratory using initial screening and confirmation of any positive results. Provider will re-perform drug tests every two years for those individuals working at P&G's premises. Any individual who has been tested once but has not worked on P&G's premises or represented P&G on another's premises for more than six (6) previous months must be re-tested in accordance with this section. Anyone who confirms positive for any such substance or Controlled Substance or without a legitimate medical reason will not be assigned to work on P&G's premises. Furthermore, Provider will control the work assignments of anyone taking a prescription drug for a legitimate medical reason so the person does not present a safety risk to himself/herself, other personnel, or P&G's property. Provider shall have a written policy on substance abuse to assure compliance with the criteria set forth herein. A qualified laboratory must follow the standards of the College of American Pathologists, meet any Laws, and use a cutoff limit within the detection ranges specified:

DRUG DETECTION THRESHOLDS (ng/ml)

| Drug, Drug Group or Drug Metabolites | Typical Detection Threshold, ng/ml |
|---|---|
| Amphetamines | 500-1000 |
| Barbiturates | 150-300 |
| Benzodiazepines | 150-300 |
| Cannabinoids (marijuana) | 15-50 |
| Cocaine metabolites | 150-300 |
| Opiates (Codeine, Morphine, Oxycodone, Hydromophone, Hydrocodone) | 2000 |
| Methadone | 300 |
| Phencyclidine (PCP) | 25 |
| Propoxyphene | 150-300 |

-13-                                                                P&G Confidential Information

**(f) Security**

Provider acknowledges and agrees that parcels, packages, briefcases, bags, and similar items carried by Provider's employees or subcontractors' employees shall be subject to inspection by security representatives of P&G.

Provider shall immediately inform P & G's site security contact of any credible threat made against anyone on P&G's premises and/or against P&G's property by any of Provider's employees.

Provider shall cause all Provider's employees not to possess firearms or any other weapons while on any of P&G's premises, including the parking lots.

Provider shall provide security training to Provider's personnel, including review of P&G's confidentiality leaflet "Information for the Temporary Agency Personnel and Contract Person". Provider shall obtain Provider's personnel's signature on the leaflet documenting completion of the review P&G's confidentiality leaflet prior to Provider personnel being assigned to P&G's premises and after the last of such assignments. The leaflet with its signatures shall be kept in Provider personnel's file and shall be accessible for P&G's inspection.

**[Optional]** Provider shall cause all of its employees that are assigned to P&G's premises to attend P&G's Site Information Security Presentation once per annum. P&G shall provide Provider notice of scheduled presentations.

**(g) Identification of Provider Personnel.** Provider Personnel shall clearly identify themselves as Provider Personnel and not as employees or representatives of P&G and/or the Eligible Recipients. This shall include any and all communications, whether oral, written or electronic, unless and to the extent authorized by P&G in connection with the performance of specific Services. Look at Supplemental Agreement #2

## 9  PROVIDER RESPONSIBILITIES

### 9.1  Policy and Procedures Manual.

(a) **Delivery and Contents.** As part of the Services, and at no additional cost to P&G, Provider shall deliver to P&G for its review, comment and approval (i) a reasonably complete draft of the Policy and Procedures Manual within thirty (30) days after the Effective Date, and (ii) a final draft of the Policy and Procedures Manual within sixty (60) days after the Effective Date. P&G shall have at least fifteen (15) days to review the draft Policy and Procedures Manual and provide Provider with comments and revisions. Provider shall then incorporate any comments or changes of P&G into the Policy and Procedures Manual and shall deliver a final revised version to P&G within fifteen (15) days of its receipt of such comments and changes for P&G's final approval.

The Policy and Procedures Manual shall include business continuity plans, operational procedures, software manuals and processes. Provider shall incorporate P&G's then current policies and procedures in the Policy and Procedures Manual to the extent it is directed to do so by P&G. For avoidance of doubt, Provider shall prepare and maintain a single Policy and Procedures Manual for this Agreement . The Policy and Procedures Manual shall constitute a P&G Owned Material.

(b) **Compliance.** Provider shall perform the Services in accordance with the terms of this Agreement and P&G's then current policies and procedures until the Policy and Procedures Manual is finalized and agreed upon by the Parties. Thereafter, Provider shall perform the Services in accordance with the Policy and Procedures Manual. In the event of a conflict between this Agreement and the Policy and Procedures Manual, this Agreement shall control unless the Parties expressly agree otherwise and such agreement is set forth in the relevant portion of the Policy and Procedures Manual.

(c) **Maintenance, Modification and Updating.** Provider shall maintain the Policy and Procedures Manual so as to be accessible electronically to P&G management and Authorized Users via a secure web site in a manner consistent with P&G's security policies. Provider shall promptly modify and update the Policy and Procedures Manual to reflect changes in the operations or procedures described therein and to comply with P&G Standards, the Technology and Business Process Plan and Strategic Plans as described in **Section 9.5**. Provider shall provide the proposed changes in the manual to P&G for review, comment and approval.

P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

**9.2** **Governance Model; Meetings.**

(a) **Governance.** The governance model to be employed by the Parties in connection with this Agreement shall include global and regional level governance teams and shall be set forth in the Policy and Procedures Manual.

(b) **Meetings.** During the Term, representatives of the Parties shall meet periodically or as reasonably requested by either Party to discuss matters arising under this Agreement, including any such meetings provided for in this Agreement, the Transition Plan or the Policy and Procedures Manual. Each Party shall bear its own costs in connection with the attendance and participation of such Party's representatives in such meetings.

**9.3** **Quality Assurance and Internal Controls.**

(a) Provider shall develop, implement, and document Quality Assurance and internal control (e.g., financial and accounting controls, organizational controls, input/output controls, system modification controls, processing controls, system design controls, and access controls) processes and procedures, including implementing tools and methodologies, to ensure that the Services are performed in an accurate and timely manner, in accordance with (i) the Key Measurements and other requirements in this Agreement, (ii) generally accepted accounting principles, (iii) the practices of contracted labor services providers, (iv) subject to **Section 15.7**, Laws applicable to P&G, the Eligible Recipients and/or the Services, and (v) industry standards applicable to the performance of the Services.

(b) Without limiting the foregoing, the processes, procedures and controls developed and implemented by Provider shall require Provider to:

(i) Maintain a strong control environment for day-to-day operations, so that the following fundamental control objectives are met: (1) financial and operational information is valid, complete and accurate; (2) operations are performed efficiently and achieve effective results, consistent with the requirements of this Agreement; (3) assets are safeguarded; and (4) actions and decisions of Provider are in compliance with Laws in accordance with **Section 15.7**;

(ii) Perform, at least annually, an annual internal control self-assessments with respect to all Services;

(iii) Conduct investigations of suspected fraudulent activities within Provider's organization that impact or could impact P&G or the Eligible Recipients. Provider shall promptly notify P&G of any such suspected fraudulent activity and the results of any such investigation as they relate to P&G or the Eligible Recipients. At Provider's request, P&G shall provide reasonable assistance to Provider in connection with any such investigation;

(iv) Comply with all applicable requirements and guidelines established by P&G in order to assist P&G to meet the requirements of the Sarbanes-Oxley Act of 2002 and implementing regulations promulgated by the United States Securities and Exchange Commission and Public Company Accounting Oversight Board;

(v) Comply with the P&G Code of Conduct; and

(vi) Work with P&G, and with P&G's prior approval, implement compliance measures to satisfy P&G's reasonable requirements relating to its compliance with Sarbanes-Oxley requirements, including, without limitation, P&G's certification as to internal controls (provided that the foregoing will not alter the allocation of the Parties' respective responsibilities under **Section 15.7**).

(c) Provider shall implement such processes, procedures and controls on or before the Commencement Date. No failure or inability of the quality assurance procedures to disclose any errors or problems with the Services shall excuse Provider's failure to comply with the Key Measurements and other terms of this Agreement.

**9.4** **P&G Standards.**

P&G Confidential Information

(a) **P&G Standards.** P&G has developed (A) the standards, policies, practices, processes, procedures and controls to be adhered to and enforced by Provider in the performance of the Services as set forth in this Agreement; and (B) the associated technologies, architectures, standards, products and systems to be provided, operated, managed, supported and/or used by Provider in connection therewith (collectively, the **"P&G Standards"**). P&G may promulgate Strategic Plans on an annual basis and modify and update such Strategic Plans on a periodic basis as appropriate. Only P&G shall have the authority to modify or grant waivers from such P&G Standards or Strategic Plans. Provider shall (i) comply with and implement the P&G Standards and Strategic Plans set forth in this Agreement in providing the Services, (ii) work with P&G to enforce the P&G Standards and Strategic Plans, (iii) subject to **Section 4.4**, modify the Services as and to the extent necessary to conform to such P&G Standards and Strategic Plans, and (iv) obtain P&G's prior written approval for any deviations from such P&G Standards and Strategic Plans. Any changes requested by P&G to the P&G Standards and Strategic Plans that affect the Services shall be made in writing in advance to Provider, and Provider's consent to such changes shall not be unreasonably withheld.

(b) **Provider Support.** At P&G's request, Provider shall assist P&G on an ongoing basis in developing P&G Standards, annual Strategic Plans and short-term implementation plans.

**9.5** **Change Control.**

(a) **Compliance with Change Control Procedures.** In making any change in the standards, processes, procedures or controls or associated technologies, architectures, standards, products, Software, Equipment, Systems, Services or Materials provided, operated, managed, supported or used in connection with the Services, Provider shall comply with the change control procedures and change control standards specified in **Attachment B.3** and the Policy and Procedures Manual (the **"Change Control Procedures"**).

(b) **Financial Responsibility for Changes.** Unless otherwise set forth in this Agreement or approved in accordance with **Sections 4.5**, Provider shall bear all charges, fees and costs associated with any change desired by Provider, including all charges, fees and costs associated with (i) the design, installation, implementation, testing and rollout of such change, (ii) any modification or enhancement to, or substitution for, any impacted business process or associated Software, Equipment, System, Services or Materials, and (iii) any increase in the cost to P&G or the Eligible Recipients of operating, maintaining or supporting any impacted business process or associated Software, Equipment, System, Services or Materials.

(c) **P&G Approval – Cost, Adverse Impact.** Provider shall make no change which may (i) increase P&G's or an Eligible Recipient's total cost of receiving the Services; (ii) require material changes to, or have an adverse impact on, P&G's or an Eligible Recipient's businesses, operations, environments, facilities, business processes, systems, software, utilities, tools or equipment (including those provided, managed, operated, supported and/or used on their behalf by Third Party Contractors); (ii) require P&G, the Eligible Recipients or Provider to install a new version, release, upgrade of, or replacement for, any Software or Equipment or to modify any Software or Equipment, (iii) have a material adverse impact on the functionality, interoperability, performance, accuracy, speed, responsiveness, quality or resource efficiency of the Services; (iv) have an adverse impact on the cost to P&G of terminating all or any part of the Services; (v) require changes to or have an adverse impact on the functionality, interoperability, performance, accuracy, speed, responsiveness, quality, cost or resource efficiency of P&G's Retained Systems and Business Processes or (vi) violate or be inconsistent with P&G Standards or Strategic Plans as specified in **Section 9.5**, without first obtaining P&G's approval, which approval P&G shall not be unreasonably withheld. Notwithstanding the foregoing, Provider may make any of the foregoing changes if Provider reasonably determines that such change is required by Law.

(d) **Temporary Emergency Changes.** Notwithstanding the foregoing, Provider may make temporary changes required by an emergency if it has been unable to contact the P&G Global Relationship Manager or his or her designee to obtain approval after making reasonable efforts. Provider shall document and report such emergency changes to P&G not later than the next business day after the change is made. Such changes shall not be implemented on a permanent basis unless and until approved by P&G.

(e) **Implementation of Changes.** Provider shall schedule and implement all changes to the extent reasonably possible so as not to (i) disrupt or adversely impact the business or operations of P&G or the Eligible Recipients, (ii) degrade the Services then being received by them, or (iii) interfere with their ability to obtain the full benefit of the Services.

P&G Confidential Information

9.6     **Software Currency.**

(a) **Software Currency.** Subject to and in accordance with **Sections 6.5, 9.5, 9.6, 9.7(b)** and **Schedule D**, Provider shall maintain reasonable currency for Provider Owned Software and Provider licensed Third Party Software and provide maintenance and support for new releases and versions of such Software. At P&G's direction, Provider shall operate, maintain and support multiple releases or versions of such Software, if permitted to do so, on a temporary basis for a reasonable period of time during a technology or business transition (e.g., a software upgrade or business unit acquisition) and, subject to **Sections 4.4** and **11.1(d)**, shall do so without any increase in the applicable Charges. For purposes of this **Section 9.7(a)**, "**reasonable currency**" means that, unless otherwise directed by P&G, Provider shall (i) maintain Provider Owned Software at the then current Major Release, (ii) maintain Third Party Software within one Major Release of the then current Major Release, and ii) install Minor Releases promptly or, if earlier, as requested by P&G.

(b) **Evaluation, Testing and Approval.** Prior to installing a new Major Release or Minor Release, Provider shall evaluate and test such Release to verify that it will perform in accordance with this Agreement, the P&G Standards and Strategic Plans and that it will not (i) increase P&G's total cost of receiving the Services; (ii) have a material adverse impact or require changes as described in **Section 9.6(c)**, or (iii) violate or be inconsistent with P&G Standards, Strategic Plans, or, subject to **Section 15.7**, applicable Laws.

(c) **Updates by P&G.** P&G and the Eligible Recipients shall have the right, but not the obligation, to install new releases of, replace, or make other changes to Applications Software or other Software for which P&G is financially responsible under this Agreement.

9.7     **Maintenance.**

(a) **Out of Support Third Party Equipment and Software.** For third party Equipment and Software no longer supported by the licensor or manufacturer for which Provider has operational responsibility under this Agreement, Provider shall use all commercially reasonable efforts to perform maintenance for such Equipment or Software or find a reasonable replacement for such Equipment or Software as required to meet its obligations under this Agreement.

9.8     **Efficiency and Cost Effectiveness.** Provider shall use commercially reasonable efforts to provide the Services in a cost-effective and efficient manner consistent with the required level of quality and performance.

9.9     **Malicious Code.** Each Party shall cooperate with the other Party and shall take commercially reasonable actions and precautions consistent with **Schedule B** to prevent the introduction and proliferation of Malicious Code into P&G's or an Eligible Recipient's environment or any System used by Provider to provide the Services. Without limiting Provider's other obligations under this Agreement, if Malicious Code is found in Equipment, Software or Systems provided, managed or supported by Provider, and such Malicious Code was introduced by Provider or its Provider Personnel, Provider shall, at no additional charge to P&G, eliminate and reduce the effects of such Malicious Code and, if the Malicious Code causes a loss of operational efficiency or loss of data, to mitigate such losses and restore such data with generally accepted data restoration techniques. If Malicious Code is found in Equipment, Software or Systems provided, managed or supported by a Party, and the other Party's Personnel are determined to have caused or materially contributed to the introduction or proliferation of such Malicious Code, such Party that caused the Malicious Code shall reimburse the other Party for any costs incurred to eliminate and reduce the effects of such Malicious Code and, if the Malicious Code causes a loss of operational efficiency or loss of data, mitigating such losses and restoring such data with generally accepted data restoration techniques.

9.10    **Audit Rights.**

(a) **Contract Records.** Provider shall, and shall cause its Subcontractors to, maintain complete and accurate records of and supporting documentation for all Charges, all P&G Data, Materials, Applications, Software, Developed Materials, and all transactions, authorizations, changes, implementations, soft document accesses, reports, filings, returns, analyses, procedures, controls, records, data or information created, generated, collected, processed or stored by Provider in the performance of its obligations under this Agreement (the "**Contract Records**"). Provider shall maintain such Contract Records in accordance with applicable Laws and retain Contract Records in accordance with

-17-                                          P&G Confidential Information

P&G's record retention policy (as such policy may be modified from time to time and provided to Provider in writing) during the Term and any Termination Assistance Services period and thereafter through the end of the second full calendar year after the calendar year in which Provider ceased performing the Services (including Termination Assistance Services requested by P&G under **Section 4.3(b)(2)**) (the "**Audit Period**").

(b) **Operational Audits.** During the Audit Period, Provider shall, and shall cause its Subcontractors to, provide to P&G (and internal and external auditors, inspectors, regulators and other representatives that P&G may designate from time to time, including customers, vendors, licensees and other third parties to the extent P&G or the Eligible Recipients are legally or contractually obligated to submit to audits by such entities and to the extent such other third parties are not competitors of Provider (collectively, "**Permitted Auditors**")) access at reasonable hours to Provider Personnel, to the facilities at or from which Services are then being provided and to Provider records and other pertinent information, all to the extent relevant to the Services and Provider's obligations under this Agreement.

(c) **Financial Audits.** During the Audit Period, Provider shall, and shall cause its Subcontractors to, provide to P&G and Permitted Auditors access at reasonable hours to Provider Personnel and to Contract Records and other pertinent information to conduct financial audits, all to the extent relevant to the performance of Provider's financial obligations under this Agreement. If any such audit reveals an overcharge by a Subcontractor, and Subcontractor does not successfully dispute the amount questioned by such audit in accordance with **Article 19**, Provider shall contact Subcontractor to promptly pay to P&G the amount of such overcharge, together with interest from the date of Subcontractor's receipt of such overcharge

(d) **Audit Assistance.** Provider shall (i) provide any assistance reasonably requested by P&G or a Permitted Auditor in conducting any such audit, including installing and operating audit software, (ii) make requested personnel, records and information available to P&G or a Permitted Auditor in response to an audit or request for information, and (iii) in all cases, provide such assistance, personnel, records and information in an expeditious manner to facilitate the timely completion of such audit. P&G shall be given adequate private workspace in which to perform an audit, plus access to photocopiers, telephones, facsimile machines, computer hook-ups, and any other facilities or equipment needed for the performance of the audit.

(e) **Provider Internal Audit.** If Provider determines as a result of its own internal audit that a Subcontractor has overcharged P&G, then Provider shall contact Subcontractor to promptly pay to P&G the amount of such overcharge.

(f) **Provider Response to Audits.** Provider and P&G shall meet promptly upon the completion of any audit conducted pursuant to this **Section 9.10** (i.e., an exit interview) and/or the issuance of an interim or final report following such an audit. Provider and P&G shall review and escalate such audit findings as and to the extent required in **Schedule I**. Provider shall respond to each exit interview and/or audit report in writing within thirty (30) days, unless a shorter response time is agreed upon by the Parties. Provider and P&G shall develop and agree upon an action plan to expeditiously address and resolve any deficiencies, concerns and/or recommendations identified in such exit interview or audit report. Provider, at its own expense, shall then undertake remedial action in accordance with such action plan and the dates specified therein to the extent necessary to comply with Provider's obligations under this Agreement; provided, however, that any concerns or recommendations that require a change or addition to Services constituting New Services shall require the Parties to follow the requirements of Section 4.4.

(g) **Audit Costs.** Provider and its Subcontractors and Providers shall provide the Services described in this **Section 9.10** at no additional charge to P&G.

**9.11 Subcontractors.**

(a) **Right to Replace Subcontractor.** P&G shall have the right during the Term to direct Provider to promptly replace any Subcontractor, at no additional cost to P&G, if the Subcontractor's performance is materially deficient or if there are other reasonable grounds for removal. If directed to do so, Provider shall remove and replace such Subcontractor as soon as possible. Provider shall continue to perform its obligations under the Agreement notwithstanding the removal of the Subcontractor. P&G shall have no responsibility for any termination charges or cancellation fees that Provider may be obligated to pay to a Subcontractor as a result of the removal of such Subcontractor at P&G's

P&G Confidential Information

request or the withdrawal or cancellation of the Services then performed by such Subcontractor as permitted under this Agreement unless P&G's request is the result of Provider's breach of this Agreement.

(b) **Provider Responsibility.** Unless otherwise approved by P&G, the terms of any subcontract must be consistent with this Agreement. Notwithstanding the terms of the applicable subcontract, the availability or unavailability of Subcontractor insurance, Provider shall be and remain responsible and liable for any failure by any Subcontractor or Subcontractor personnel to perform in accordance with this Agreement or to comply with any duties or obligations imposed on Provider under this Agreement to the same extent as if such failure to perform or comply was committed by Provider or Provider employees.

**9.12 Technology and Business Process Evolution.**

(a) **Obligation to Evolve.** Provider acknowledges and agrees that its current technologies and business processes shall continue to evolve and change over time, and at a minimum, shall remain consistent with the generally accepted practices of leading providers of contracted labor services and the business objectives and competitive needs of P&G and the Eligible Recipients. Subject to **Sections 4.4** and **9.5**, Provider shall provide the Services using current technologies and business processes that will enable P&G and the Eligible Recipients to take advantage of the advances in the industry and support their efforts to maintain competitiveness in the markets in which it competes.

(b) **Obligation to Propose Technology and Business Process Evolutions.** Provider shall identify and propose the implementation of Technology and Business Process Evolutions that will improve the efficiency and effectiveness of the Services (including cost savings). Subject to its non-disclosure obligation under other customer contracts, Provider shall obtain information regarding Technology and Business Process Evolutions from other customer engagements and shall communicate such information to P&G on an ongoing basis.

**9.13 Network Configuration Data.** Provider (i) shall provide P&G (and Third Party Contractors) with network configuration data with respect to the network provided and used by Provider to provide the Services; and (ii) hereby grants P&G (and Third Party Contractors) the right to use such data in connection with the exercise of P&G's rights under this Agreement.

# 10   P&G RESPONSIBILITIES

**10.1 Responsibilities.** In addition to P&G's responsibilities as expressly set forth elsewhere in this Agreement, P&G shall be responsible for the following:

(a) **P&G Global Relationship Manager.** P&G shall designate one (1) individual to whom all Provider communications concerning this Agreement may be addressed (the **"P&G Global Relationship Manager"**), who shall have the authority to act on behalf of P&G and the Eligible Recipients in all day-to-day matters pertaining to this Agreement. P&G may change the designated P&G Global Relationship Manager from time to time by providing written notice to Provider. Additionally, P&G will have the option, but will not be obligated, to designate additional representatives who will be authorized to make certain decisions (e.g., regarding emergency maintenance) if the P&G Global Relationship Manager is not available.

(b) **P&G Regional Relationship Managers.** P&G shall designate one (1) individual for each region to which the Services are provided to whom initial communications concerning this Agreement in such region may be addressed, prior to escalating such communications to the P&G Global Relationship Manager. P&G may change the designated P&G Regional Relationship Managers from time to time by providing written notice to Provider. P&G shall notify Provider of what decisions and actions the P&G Regional Relationship Managers are authorized to decide or perform.

(c) **Cooperation.** P&G shall cooperate with Provider by, among other things, making available, as reasonably requested by Provider, management decisions, information, approvals and acceptances so that Provider may accomplish its obligations and responsibilities hereunder.

P&G Confidential Information

(d) **Requirement of Writing.** To the extent Provider is required under this Agreement to obtain P&G's approval, consent, authorization or agreement, such approval, consent, authorization or agreement shall be in writing and shall be signed by or directly transmitted by electronic mail from the P&G Global Relationship Manager or an authorized P&G representative. Notwithstanding the preceding sentence, the P&G Global Relationship Manager may agree in advance in writing that as to certain specific matters oral approval, consent, authorization or agreement will be sufficient.

(e) **Cooperation by Sites.** Should a site fail to cooperate with the implementation of the Services, within the time frame set forth in the Transition Plan, P&G agrees to use all internal measures to insure cooperation as soon as possible.

**10.2 Savings Clause.** Provider's failure to perform its responsibilities under this Agreement or to meet the Key Measurements shall be excused if and to the extent Provider non-performance is caused by (i) the wrongful, tortious actions or inactions of P&G, an Eligible Recipient or a Third Party Contractor performing obligations on behalf of P&G under this Agreement (unless and to the extent, as to Third Party Contractors, such failure is attributable to Provider's failure to properly manage such Third Party Contractor), (ii) the failure of P&G, an Eligible Recipient or a Third Party Contractor to perform P&G's expressly specified obligations under this Agreement, or (iii) P&G or an Eligible Recipient's directive or request, but only if (A) Provider expeditiously notifies P&G of such wrongful, tortious action or failure to perform and its inability to perform under such circumstances, (B) Provider provides P&G with every reasonable opportunity to correct such wrongful or tortious action or failure to perform and thereby avoid such Provider non-performance, (C) Provider identifies and pursues commercially reasonable means to avoid or mitigate the impact of such wrongful or tortious action or failure to perform. Provider's inability to meet certain savings measurements shall be excused to the extent P & G fails to deliver the spend as described in the RFP, as described in Schedule D.

## 11  CHARGES, GUARANTEED SAVINGS AND GAIN SHARE

**11.1 General.**

(a) **Payment of Charges.** In consideration of Provider's performance of the Services, P&G agrees to pay Provider the applicable Charges set forth in **Schedule D**. Provider acknowledges and agrees that there are no separate or additional charges for such Services. Any costs incurred by Provider prior to the Effective Date are included in the Charges set forth in **Schedule D** and are not to be separately paid or reimbursed by P&G. Provider shall continually seek to identify methods of reducing such Charges and will notify P&G of such methods and the estimated potential savings associated with each such method.

(b) **Incidental Expenses.** Provider acknowledges that, except as expressly provided otherwise in this Agreement, expenses that Provider incurs in performing the Services (including management, travel and lodging, document reproduction and shipping, and long-distance telephone) are included in Provider's Charges. Accordingly, such Provider expenses are not separately reimbursable by P&G unless P&G has agreed in writing in advance to reimburse Provider for the expense.

(c) **Charges for Contract Changes.** Unless otherwise agreed, changes in the Services (including changes in the P&G Standards, Strategic Plans, Technology and Business Process Plans, business processes, Software, Equipment and Systems) and changes in the rights or obligations of the Parties under this Agreement (collectively, "**Contract Changes**") shall result in changes in the applicable Charges only if and to the extent (i) the Agreement expressly provides for a change in the Provider Charges in such circumstances; (ii) the agreed upon Charges or pricing methodology expressly provides for a price change in such circumstances (for example, **Schedule D** specifies the number of FTEs or hours of coverage to be provided for the quoted price); or (iii) the Contract Change meets the definition of billable Project or New Service and additional Charges are applicable in accordance therewith.

(d) **Eligible Recipient Services.**

(i) **Eligible Recipients.** Provider shall provide the Services to Eligible Recipients designated by P&G. To the extent a designated Eligible Recipient will receive less than all of the Services, P&G shall identify the categories of Services to be provided by Provider to such Eligible Recipient.

P&G Confidential Information

     (ii)   **New Eligible Recipients.** From time to time P&G may request that Provider provide Services to Eligible Recipients not previously receiving such Services. Except as provided in **Section 4.4** or otherwise agreed by the Parties, such Services shall be performed in accordance with the terms, conditions and prices (excluding any non-recurring transition or start-up activities specific to such Eligible Recipients) then applicable to the provisions of the same Services to existing Eligible Recipients.

**11.2 Administered Expenses.**

    (a) **Procedures and Payment.** With respect to Administered Expenses, if any, identified in **Schedule D**, Provider shall:

       (i)   Review and validate the invoiced charges, identify any errors or omissions, and communicate with the applicable vendor to correct any errors or omissions, resolve any questions or issues and obtain any applicable credits, rebates, discounts or other incentives for P&G;

      (ii)   Deliver the original vendor invoice to P&G, together with any documentation supporting such invoice and a statement that Provider has reviewed and validated the invoiced charges, within ten (10) days after Provider's receipt thereof (provided that, if earlier, Provider shall use commercially reasonable efforts to deliver such invoice, documentation and statement to P&G at least five (5) business days prior to the due date, and, if that is not possible, shall promptly notify P&G and, at P&G's option, either request additional time for review and validation or submit the invoice for payment subject to subsequent review and validation);

     (iii)   If the vendor offers a discount for payment prior to a specified date, deliver such invoice and associated documentation to P&G at least five (5) days prior to such date; and

     (iv)   During the last month of each calendar quarter, deliver all such invoices and associated documentation to P&G by the end of the month and, to the extent that is not possible, provide P&G with information sufficient to accrue the applicable expenses on or before the end of such month.

Unless otherwise agreed by the Parties, P&G shall pay all Administered Expenses directly to the applicable vendors following review, validation and approval of such Administered Expenses by Provider. No new Administered Expenses may be added without P&G's prior consent, which it may withhold in its sole discretion.

    (b) **Efforts to Minimize.** Provider shall seek on an ongoing basis to identify methods of reducing and minimizing P&G's retained and Administered Expenses and will notify P&G of such methods and the estimated potential savings associated with each such method.

**11.3 Procurement.** Provider may procure certain products and services for which P&G will be financially responsible on an Out-of Pocket Expense basis, as further described in **Schedule D**, and, at P&G's request, shall participate with P&G in the procurement of certain products and services for which P&G will be financially responsible on a Administered Expense basis, as further described in **Schedule D** and **Attachment D.4**.

In procuring such products and services, Provider shall comply with the following:

    (a) Provider shall: (i) give P&G and the Eligible Recipients the benefit of Provider's most favorable vendor arrangements where permitted by such vendors; (ii) use commercially reasonable efforts to obtain the most favorable pricing and terms and conditions then available from any source for such products and services; (iii) to the extent practicable, use the aggregate volume of Provider's procurements on behalf of itself, P&G, the Eligible Recipients and other customers as leverage in negotiating such pricing or other terms and conditions; and (iv) adhere to the procurement procedures specified in the Policy and Procedures Manual, as such procedures may be modified from time to time by the Parties. Provider shall adhere to P&G's product and services standards as specified by P&G or set forth in the Policy and Procedures Manual and as applicable to Provider's obligations under this **Section 11.3** and shall not deviate from such standards without P&G's prior approval. To the extent an authorized P&G representative specifies the vendor, pricing and/or terms and conditions for a procurement, Provider shall not deviate from such instructions without P&G's prior approval. Unless otherwise agreed by the Parties, the procurement price of such products and services shall be treated as an Out-of-Pocket Expense and shall be passed through to P&G without Provider markup.

       P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

(b) Provider may, with P&G's prior approval, use master agreements existing as of the Commencement Date between P&G and various third party vendors to procure products and services requested by P&G. Provider's use of such P&G master agreements shall be conditioned on and subject to the following: (i) P&G obtaining any Required Consents/Terminations to the use of such master agreements; (ii) Provider complying with the terms and conditions of such master agreements; and (iii) Provider accepting responsibility for curing any breaches by Provider of such master agreements.

(c) Provider also may use existing agreements between Provider and third party vendors if permitted by such agreement or enter into new agreements with third party vendors to procure such products and services. Provider's use of such agreements shall be conditioned on and subject to the following: (i) P&G approving in advance the terms, conditions and pricing of such agreements and any financial or other commitments made therein by or on behalf of P&G or the Eligible Recipients; (ii) Provider complying with the terms and conditions of such agreements and accepting responsibility for meeting any minimum volumes; (iii) Provider passing through to P&G any refunds, credits, discounts or other rebates to the extent such amounts are directly allocable to P&G or the Eligible Recipients; (iv) Provider retaining responsibility for curing any breaches of such agreements; and (v) such agreements offering more favorable pricing and equivalent or better terms and conditions for the requested product or service than the master agreements existing as of the Commencement Date between P&G and third party vendors.

(d) If, at any time, P&G determines that the pricing and terms and conditions available through Provider are not as favorable as those P&G could obtain on its own, P&G reserves the right to select and negotiate with the provider of such third party products and services and Provider shall comply with P&G's decision with respect thereto. P&G shall be responsible for all termination, cancellation or other charges incurred by Provider as a result of such decision.

(e) With respect to all products and services procured by Provider for P&G and/or the Eligible Recipients pursuant to this **Section 11.3**, Provider shall pass through, or otherwise provide, to P&G and/or the applicable Eligible Recipient(s) all benefits offered by the manufacturers and/or vendors of such products and services (including all warranties, refunds, credits, rebates, discounts, training, technical support and other consideration offered by such manufacturers and vendors) except to the extent otherwise agreed by P&G. If Provider is unable to pass through any such benefit to P&G and/or the applicable Eligible Recipient(s), it shall notify P&G in advance and shall not procure such product or service without P&G's prior approval.

**11.4 Taxes.** The Parties' respective responsibilities for taxes arising under or in connection with this Agreement shall be as follows:

(a) **Income Taxes.** Each Party shall be responsible for its own Income Taxes.

(b) **Sales, Use and Property Taxes.** Each Party shall be responsible for any sales, lease, use, personal property, stamp, duty or other such taxes on Equipment, Software or property it owns or leases from a third party, including any lease assigned pursuant to this Agreement, and/or for which it is financially responsible under this Agreement.

(c) **Recoverable Taxes.** All sums payable under or in connection with this Agreement shall be exclusive of Recoverable Taxes, and each Party shall, in addition to such sums, pay any Recoverable Taxes properly chargeable thereon on receipt of a valid invoice.

(d) **Taxes on Goods or Services Used by Provider.** Provider shall be responsible for all sales, service, value-added, lease, use, personal property, excise, consumption, and other taxes, tariffs and duties (including Recoverable Taxes) payable by Provider on any goods or services used or consumed by Provider in providing the Services (including services obtained from Subcontractors) where the tax is imposed on Provider's acquisition or use of such goods or services and the amount of tax is measured by Provider's costs in acquiring or procuring such goods or services and not by P&G's cost of acquiring such goods or services from Provider.

(e) **Service Taxes.** Provider shall be financially responsible for all Service Taxes assessed against either Party on the Services as a whole, or on any particular Service. If required under applicable Laws, Provider shall invoice P&G for the full amount of such Service Taxes and then credit or reimburse P&G for that portion of such Service Taxes for which Provider is financially responsible under this provision.

P&G Confidential Information

(f) **Withholding.** Any withholding tax or other tax of any kind that P&G is required by applicable Law to withhold and pay on behalf of Provider with respect to amounts payable to Provider under this Agreement shall be deducted from said amount prior to remittance to Provider. P&G will provide to Provider reasonable assistance, which shall include the provision of documentation as required by revenue authorities, to enable Provider to claim exemption from or obtain a repayment of such withheld taxes and will, upon request, provide Provider with a copy of the withholding tax certificate or equivalent documentation.

(g) **Efforts to Minimize Taxes.** Provider shall cooperate fully with P&G to enable P&G to more accurately determine its own tax liability and to minimize such liability to the extent legally permissible. Provider's invoices shall separately state the Charges that are subject to taxation and the amount of taxes included therein. Each Party will provide and make available to the other any resale certificates, information regarding out-of-state or out-of-country sales or use of equipment, materials, or services, and other exemption certificates or information reasonably requested by either Party.

(h) **Tax Audits or Proceedings.** Each Party shall promptly notify the other Party of, and coordinate with the other Party, the response to and settlement of, any claim for taxes asserted by applicable Tax Authorities for which the other Party is financially responsible hereunder. With respect to any claim arising out of a form or return signed by a Party to this Agreement, such Party will have the right to elect to control the response to and settlement of the claim, but the other Party will have the right to participate in the responses and settlements to the extent appropriate given its potential responsibilities or liabilities. Each Party also shall have the right to challenge the imposition of any tax liability for which it is financially responsible under this Agreement or, if necessary, to direct the other Party to challenge the imposition of any such tax liability. If either Party requests the other to challenge the imposition of any tax liability, such other Party shall do so (unless and to the extent it assumes financial responsibility for the tax liability in question), and, the requesting Party shall reimburse the other for all fines, penalties, interest, additions to taxes or similar liabilities imposed in connection therewith, plus the reasonable legal, accounting and other professional fees and expenses it incurs. Each Party shall be entitled to any tax refunds or rebates obtained with respect to the taxes for which such Party is financially responsible under this Agreement.

(i) **Tax Filings.** Provider represents, warrants and covenants that it is registered to and will collect and remit Service Taxes in all applicable jurisdictions. At P&G's request, Provider shall provide P&G with (i) written confirmation that Provider has filed all required tax forms and returns and has collected and remitted all applicable amounts in connection with Service Taxes, and (ii) such other information pertaining to applicable Taxes as P&G may reasonably request.

**11.5 Refunds and Credits.** If Provider should receive a refund, credit, discount or other rebate for goods or services paid for by P&G and/or the Eligible Recipients on a Administered Expense, Retained Expense, cost-plus or cost-reimbursement basis, then Provider shall (i) notify P&G of such refund, credit, discount or rebate and (ii) promptly pay the full amount of such refund, credit, discount or rebate to P&G or such Eligible Recipient.

**11.6 P&G Benchmarking Reviews.**

(a) **Benchmarking Review.** From time to time during the Term, P&G may, at its expense and subject to this **Section 11.6**, engage the services of an independent third party (a "**Benchmarker**") to compare the quality and cost of all or any portion of the Services against the quality and cost of other well managed professional service providers performing similar services to ensure that P&G is receiving from Provider pricing and levels of service that are competitive with market rates, prices and service levels, given the nature, quality, volume and type of Services provided by Provider hereunder ("**Benchmarking**").

(b) **General.** The Benchmarker engaged by P&G shall be a recognized firm with experience in benchmarking similar services (e.g., Gartner Group or Compass) and shall execute a non-disclosure agreement substantially in the form attached hereto as **Schedule R**. Provider shall cooperate fully with P&G and the Benchmarker during such effort, and shall (i) provide the Benchmarker reasonable access to any premises, equipment, personnel or documents; and (ii) provide any reasonable assistance required by the Benchmarker to conduct the Benchmarking, all at P&G's cost and expense. The Benchmarking shall be conducted so as not to unreasonably disrupt Provider's operations under this Agreement.

  P&G Confidential Information

(c) **Result of Benchmarking.** If, after making the comparison described in <u>**Section 11.6(a)**</u> above, the Benchmarker finds that the Charges paid by P&G for all Services or for any service element are greater than the lowest twenty-five percent (25%) of the prices charged by other well managed professional service providers for work of a similar nature, type and volume, (the **"Benchmark Standard"**), the Benchmarker shall submit a written report setting forth such findings and conclusions. The Parties shall then meet and negotiate in good faith as to reductions in the Charges to eliminate any such unfavorable variance. If the Parties are unable to agree upon such reductions, P&G may, at its option, terminate the Agreement in its entirety or any portion impacted by such unfavorable variance; provided, however, that such termination shall constitute termination for convenience by P&G

**11.7 Guaranteed Savings and Gain Share:**

**Committed Savings Enhanced Performance Commitment**

Committed and Gain Share Savings is a process whereby VSTX will deliver defined savings to Procter & Gamble (P&G) facilities that are covered by the MSA over the two (2) year nine (9) month term of the Addendum.

VSTX will target to identify and execute over the term of the Addendum a minimum 2% up to a 4% stretch target committed Savings per year based on the incremental increases in the baseline spend as set forth in the chart below, and measured on a P&G fiscal year basis (July 1 -June 30) provided the baseline spend has been under VSTX management for at least twelve (12) months. VSTX may also identify and execute Cost Avoidance and other Value Creation initiatives incremental to the committed Savings, as defined in P&G's Cost Savings Tracking System (CSTS) reference material shown later in this section.
VSTX's Hard Savings, cost avoidance and other value add creation initiatives will contribute to the minimum 2% commitment, while only hard executed savings will count towards gain share. In all cases, an authorized P&G manager must approve all CSTS Value Creation submissions by VSTX; this will typically be Plant F&A or Purchasing. P&G Sites and Purchasing will provide reasonable cooperation to VSTX as required in order to execute Value Creation initiatives. Should P&G manager fail to approve Value Creation initiatives within ten (10) business days, approval of Value Creation initiatives may be escalated to Corporate Purchasing and / or Finance for approval.

| Measurement Period | Committed Savings Goal | Stretch Target (includes all other Value Creation by VSTX in addition to Hard Savings thru June 30, 2017) |
|---|---|---|
| Oct 1, 2014 – June 30, 2015 | 1.5%** | 3% |
| July 1, 2015 – June 30, 2016 | 2%(*) | 4%(*) |
| July 1, 2016 – June 30, 2017 | 2% | 4% |
| TOTAL | 5.5% | 11% |

*(\*) Assumes new base will be $98MM ($100MM less $2MM executed savings), excluding any volume fluctuations*

*(\*\*) 2% adjusted to 1.5% to reflect prorating based on 9 month spend.*

**Stretch Target**

-24-

DCDB01 20932031.1 14-Jul-09 09:51

| Tiered Gainshare Structure | | | | | |
|---|---|---|---|---|---|
| Base Spend: | $ 100,000,000 | | | | |
| Committed Percent | 2% | | | | |
| Additonal Commited % | | 0.25% | 0.50% | 0.75% | 1.00% |
| Additonal Incremental Spend | | $ 25,000,000 | $ 50,000,000 | $ 75,000,000 | $ 100,000,000 |
| Total Spend | | $ 125,000,000 | $ 150,000,000 | $ 175,000,000 | $ 200,000,000 |

•	The Savings calculation at each facility will take effect immediately upon VSTX assuming management responsibility.  Committed Savings are only due the client for those sites VSTX has held management responsibility for at least 12 months as of the end of each fiscal year.

•	P&G will track savings projects as a basis for scheduled QBR to assess committed/gain share savings performance.

•	VSTX will determine which approved projects are committed Savings or Gain Share after the 2% commitment has been executed to allow for carryover to the following P&G fiscal year of the amount in excess of the committed savings  During the current QBR, VSTX will inform client of the classification of the prior quarters' project classifications for P&G's concurrence. The minimal 2% committed hard savings target must be achieved before projects are eligible for gain share.  Projects selected for carryover must satisfy these conditions:  It is a project where the return does not end in the current  P&G fiscal year.  It is a project that will ONLY be designated for the next year's commitment level.  The  current year's commitment has been met without this project.  A project can only be carried over to the next year.   Projects may not be carried over into following years.

•	For Gain Share projects the benefits will be shared P&G 50% and VSTX 50% up to the first $1 million dollars in savings.  Upon reaching $1million dollars, Gain Share projects will be shared 70% P&G and 30% VSTX The official record of savings will be tracked in CSTS for P&G

**Baseline Spend**

Baseline spend will be determined by each annual actual invoice spend.  VSTX will provide the invoice spend and BBS and Site Management will separately verify and align to that spend.

BBS will be notified of site bill rate changes.

**Site Project Savings**

•	VSTX will present BBS and Site Managers with a portfolio of projects on a site-by-site basis for locations under VSTX management

•	BBS and Site Managers will have 7 business days after the presentation of the portfolio of projects to review and accept or reject the projects.

•	The projects will be reviewed and accepted or rejected by BBS and the Site, for inclusion in P&G project management system (CSTS).

•	Accepted Projects will be entered into the CSTS system by project name, a site identifier and a Site/VSTX tab for easy reference and reporting.

•	Project progress will be measured each quarter.  The last Fiscal update must be June 8 or earlier to coincide with P&G fiscal year close.  The last update will be adjusted to reflect the short quarter.

•	Once the parties have determined that a project is approved, and execution has begun, the acceptance document will be signed and the annualized value of the resulting savings will be added into the Site Master Savings Tracking Sheet .

P&G Confidential Information

Projects rejected by BBS and the Site Managers cannot be implemented by P&G for a period of one year after the 2 year 9 month contract, or any subsequent addendums, whichever is later. If implemented during this time, benefits will be credited as an approved VSTX project. Site Managers and BBS will be presented with a document for acceptance or rejection and these conditions will be included.

**Site Committed Savings Tracking** The Site Savings balance shall be published by VSTX each quarter, reconciled by both Parties, and filed by both Parties for record keeping.

•     VSTX will track and report all Value Creation results to P&G as requested, utilizing worksheets provided by P&G or reporting tools and documents with which P&G has agreed in writing to accept. VSTX and P&G will review and reconcile at least quarterly the All Savings actual results versus the Hard Savings goal and stretch targets. This reconciliation review will be documented on the MSP KPI scorecard.

•     In the event that VSTX executes Hard Savings projects in excess of the committed Hard Savings goal during the measurement period and subject to P&G approval, P&G and VSTX will share in these incremental savings on a 50/50 basis, with fifty percent (50%) of the incremental savings accruing to P&G and fifty percent (50%) accruing to the VSTX (Gain Share) for the first $1 million in Gain Share savings as described in the Committed Savings Enhanced Performance section of this document. After reaching $1 million in Gain Share, P&G and VSTX will share in the additional incremental savings on a 70/30 basis with seventy per cent (70%) of the incremental savings accruing to P&G and thirty (30%) accruing to VSTX. The Gain Share will be paid to VSTX via invoices issued by VSTX to BBS upon execution of the Accepted Project(s) and these invoices for Gain Share will be due Net 75 days. VSTX will attach the P&G-signed project acceptance form(s) as supporting documentation to the Gain Share invoices. If needed, the total Gain Share amount will be paid in twelve (12) equal payments to coincide with the site's realization of benefits.

•     The scope and the sites under this Agreement are the existing P&G Global Business Services North American contracted labor spend, with the exception of changes resulting from divestiture and/or spin offs.

## DEFINING AND CATEGORIZING P&G VALUE CREATION UNDER P&G'S COST SAVINGS TRACKING SYSTEM

The following represent examples of qualifying Value Creation initiatives, based on guidance from P&G Finance & Accounting. P&G F&A recognizes that initiative results are subject to interpretation, often on a case-by-case basis; where questions or disagreement arise, P&G F&A will make final determination whether an initiative or intervention qualifies as Value Creation, and into which category it falls. Categories include hard savings, cost avoidance, value add, iNOS and asset utilization.

**Hard Savings**

P&G Definition: Bottom line cost or price reduction compared to previous or current operations. This includes cost/price reductions and Payment Terms discounts. Examples:

•     Lowering prices (e.g., passing on lower manufacturer prices)

•     Offering more favorable Payment Terms (e.g., discounts)

•     Receiving a P&G PO for a set price, then providing the item or service at a lower cost

•     If budget approved to buy "new", but repair is agreed to and provided less expensively

•     Training* – if P&G budget was set for training, and supplier/vendor did not charge for training

•     Process or productivity improvements resulting in reduction in FTE's and /or non-value add activities. (P&G: Only if this translates to hard dollars the site can take to their bottom line).

**Cost Avoidance**

DCDB01 20932031.1 14-Jul-09 09:51

P&G Definition: Maintenance of the current level of spending (offsetting inflation and/or manufacturer increases), certain pre-deployment reductions in future spending or initial cost of a new initiative or project. Examples:

• Supplier/vendor absorbs manufacturer price increases, supplier absorbs cost to expedite shipping on a one-off basis

• Reducing "line" down time (P&G F&A must approve calculation methodology and result)

• "Watchdog": supplier/vendor determined that PO price/cost was incorrect, and notified P&G to reduce PO price/cost, prior to purchase of item or service

• Technical training* – provided at a reduced rate versus benchmark charge, or at no charge where normally billed (note: also, in this case, P&G had not budgeted for training). NOTE: Training and/or presentations associated with a sales rep or manufacturer presenting or demonstrating new products does not apply toward GVC goals.

### Incremental NOS (Net Outside Sales)

iNOS is generated when Purchases plays a direct role in an actionable intervention, concurred to by the business, (i.e., project would not have achieved project commitment without Purchases contribution) in enabling the successful development and launch of an initiative or service intervention, that results in incremental sales (revenue). The amount of qualified iNOS should be the "Going incremental NOS" as stated in the BU's official "project commitment" document, effective in year one at start of ship. If iNOS is claimed against a project, no other value contribution element should be claimed, i.e. no double counting.

Asset Utilization

P&G Definition: Creating cash value through:

• The sale of obsolete/surplus equipment or supplies

• Refunds, negotiation of past due balances, etc.

• Cash flow improvements through reductions in inventory or change in payment timing; examples:

o Buy back of inventory, refunds/rebates

• Inventory Reduction:

o Supplier assumes responsibility for separately managing P&G inventory needs, which in turn reduces P&G's book inventory prior to transition of IR responsibility

o In formal consignment agreement, supplier stocks inventory on P&G's behalf and a fee is charged; Asset Utilization can be claimed for the difference between the value of the inventory reduced and the fee charged

### Final Committed Savings Balance

• The final Committed Savings balance will be calculated annually, based on the P&G fiscal year, after the "effective date" of the P&G/VSTX extension October 1, 2014. These final balances will be the sum total of all the sites' savings projects since the effective date, and used to determine committed savings performance. Any project Executed after October 1, 2014 will count toward this agreement.

• The final balance shall contain the following adjustments.

1. Adjustments to final invoicing due to any inconsistency determined by the parties

2. Adjustments due to any timing of invoicing and reported savings.

-27-                                                    P&G Confidential Information

**Committed Savings Post 3 Year Term of the Addendum**

The parties agree to negotiate a new Committed Savings framework and targets for the any subsequent two year terms of the MSA. Once a new framework for a new Committed Savings agreement has been agreed to, the parties will publish a new Principles Agreement to govern the process.

## 12  INVOICING AND PAYMENT

### 12.1  Invoicing.

(a) **Invoice.  Provider shall** present P&G with an invoice weekly for any Charges due and owing for the preceding week (the "**Weekly Invoice**"). At P&G's request, Provider shall provide separate Weekly Invoices for each Eligible Recipient then receiving Services, with the Charges allocated among such Eligible Recipients based on the chargeback data generated by Provider and/or the allocation formula provided by P&G. In such event, Provider shall, contemporaneous with the delivery of such Weekly Invoices, provide a summary of all such invoices to P&G. Provider shall not invoice P&G for any advance or concurrent charges or other amounts, except as expressly set forth on Schedule D.

(b) **Form and Data.** Each invoice shall be in the form specified in **Schedule T** and shall (i) comply with all applicable legal, regulatory and accounting requirements, (ii) allow P&G to validate volumes and fees, (iii) comply with the chargeback and other billing requirements defined in **Schedule T**, and (iv) meet P&G's and the Eligible Recipient's business, accounting and billing requirements previously provided to Provider in writing. Each invoice shall include the pricing calculations and related data utilized to establish the Charges and sufficient information to validate the service volumes and associated Charges. The data underlying each invoice shall be delivered to P&G electronically in a form and format compatible with P&G's accounting systems.

(c) **Credits.** To the extent a credit may be due to P&G pursuant to this Agreement, Provider shall provide P&G with an appropriate credit against amounts then due and owing; if no further payments are due to Provider, Provider shall pay such amounts to P&G within fifteen (15) days. If this is at the end of the contract, Versatex will have 90 days to make final payment.

(d) **Time Limitation.** If Provider fails to provide an invoice to P&G for any amount within ninety (90) days after the month in which the Services in question are rendered or the expense incurred (or, if later, the month in which Provider is first entitled to invoice for such amount), Provider shall waive any right it may otherwise have to invoice for and collect such amount.

**Currency.** Unless otherwise specified in **Schedule D**, Charges for all Services shall be invoiced and paid in the local currency of the country to which the Services are delivered.

### 12.2  Payment Due.  Subject to the other provisions of this **Article 12,** each Weekly Invoice provided for under Section
12.1 shall be due and payable net seventy-five(75) days after receipt by P&G of such invoice unless the amount in questions is in dispute in accordance with Section 12.4. "Receipt" shall be verified in one of the following manners:
  i. Through Versatex entries to "my purchases"
  ii. By the date Versatex delivers invoices to the P&G scanning station in Cincinnati, OH:
  iii Utilization of e-invoicing.
Any undisputed amount due under this Agreement for which a time for payment is not otherwise specified also shall be due and payable net seventy-five (75) days of receipt. Should there be a dispute as to an invoice, or should P&G fail to pay an invoice within the applicable time period, then the Parties will escalate resolution through the identified P&G accounts payable resource.

### 12.3  Set Off.  With respect to any amount to be paid or reimbursed by P&G hereunder, P&G may set off against such amount any undisputed amount that Provider is obligated to pay P&G hereunder.

### 12.4  Disputed Charges.  P&G may withhold payment of particular Charges that P&G reasonably disputes in good faith subject to the following:

-28-

(a) **Notice of Dispute.** If Provider's invoice includes sufficient detail and supporting documentation to enable P&G to reasonably determine whether Provider's Charges are in accordance with this Agreement, P&G shall notify Provider before the payment due date if it disputes any of the Charges in such invoice. If Provider's invoice does not include sufficient detail and supporting documentation, P&G shall so notify Provider before the payment due date. Provider shall promptly provide such reasonable detail and supporting documentation, and P&G shall notify Provider within ten (10) business days after receipt (or, if later, the payment due date) whether it disputes any of the Charges in Provider's invoice.

(b) **Description and Explanation.** If P&G disputes any Charges, P&G shall so notify Provider and provide a description of the particular Charges in dispute and an explanation of the reason why P&G disputes such Charges.

(c) **Continued Performance.** Each Party agrees to continue performing its obligations under this Agreement while any dispute is being resolved unless and until such obligations are terminated by the termination or expiration of this Agreement.

(d) **No Waiver.** Neither the failure to dispute any Charges or amounts prior to payment nor the failure to withhold any amount shall constitute, operate or be construed as a waiver of any right P&G may otherwise have to dispute any Charge or amount or recover any amount previously paid.

## 13  P&G DATA AND OTHER CONFIDENTIAL INFORMATION

### 13.1  Confidential Information.

Nothing in this **Section 13.1** is intended to limit the obligations of Provider under **Section 13.2** of this Agreement with respect to the P&G Data addressed in such Sections and, to the extent the provisions of **Section 13.2** conflict with the provisions of this **Section 13.1** as they pertain to P&G Data, the provisions of **Sections 13.2** shall control over the provisions of **Section 13.1**, as applicable.

(a) **Confidential Information.** Provider and P&G each acknowledge that the other possesses and will continue to possess information that has been developed or received by it, has commercial value in its or its customers' business and is not generally available to the public. Except as otherwise specifically agreed in writing by the Parties, "**Confidential Information**" means (i) this Agreement and the terms hereof and thereof, (ii) all information marked confidential, proprietary or similar legend by either Party, and (iii) any other information that is treated as confidential by the disclosing Party and would reasonably be understood to be confidential, whether or not so marked (which  shall include Software, Developed Materials, P&G Data, Authorized User information, attorney-client privileged materials, attorney work product, customer lists, customer contracts, customer information, rates and pricing, information with respect to competitors, strategic plans, account information, customer information, research information, information that contains trade secrets, financial/accounting information (including assets, expenditures, mergers, acquisitions, divestitures, billings collections, revenues, finances, forecasts and budgets), human resources and personnel information, marketing/sales information, information regarding businesses, plans, operations, mergers, acquisitions, divestitures, third party contracts, licenses, internal or external audits, law suits, regulatory compliance or, in the case of P&G and the Eligible Recipients, other information or data obtained, received, transmitted, processed, stored, archived, or maintained by Provider under this Agreement.

(b) **Disclosure of Confidential Information.**

(i) The Disclosing Party represents and warrants that it has the right to disclose its Confidential Information to the Receiving Party, subject to the confidentiality obligations contained in this **Section 13.1**.

(ii) During the term of this Agreement and at all times thereafter as specified in **Section 13.5**, each Receiving Party (A) shall hold Confidential Information received from a Disclosing Party in confidence and shall use such Information only for the purposes of fulfilling its obligations or exercising its rights under this Agreement and for no other purposes, and (B) shall not disclose, provide, disseminate or otherwise make available any Confidential Information of the Disclosing

DCDB01 20932031.1 14-Jul-09 09:51

Party to any third party without the express written permission of the Disclosing Party, unless expressly permitted by **Sections 13.1(b)(iii)** and **13.1(b)(iv)** below or elsewhere in this Agreement. Each Receiving Party shall use at least the same degree of care to safeguard and to prevent unauthorized access by, storage, disclosure, publication, dissemination to, destruction, loss, alteration and/or use by third parties of the Disclosing Party's Confidential Information as the Receiving Party employs to avoid unauthorized access, storage, disclosure, publication, dissemination, destruction, loss, alteration or use of its own information (or information of its customers) of a similar nature, but not less than reasonable care.

(iii)    A Receiving Party may disclose Confidential Information of the Disclosing Party to its employees, directors, attorneys, financial advisors, contractors and agents provided that (A) such person or entity has a need to know the Confidential Information for purposes of performing his or her obligations under or with respect to this Agreement or as otherwise naturally occurs in such person's scope of responsibility, (B) such disclosure is made pursuant to an obligation of confidentiality upon such person or entity that is no less stringent than that set forth in this **Section 13.1**, and (C) such disclosure is not in violation of Law. The Receiving Party assumes full responsibility for the acts or omissions of any person or entity to whom it discloses Confidential Information of the Disclosing Party regarding their use of such Confidential Information and must take commercially reasonable measures to protect the Confidential Information from disclosure or use in contravention of this Agreement.

(iv)    A Receiving Party may disclose Confidential Information of a Disclosing Party as required to satisfy any legal requirement of a competent government body, provided that, promptly upon receiving any such request, the Receiving Party, to the extent it may legally do so, gives notice to the Disclosing Party of the Confidential Information to be disclosed and the identity of the third party requiring such disclosure prior to the making such disclosure in order that the Disclosing Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information. The Receiving Party shall use commercially reasonable efforts to cooperate with the Disclosing Party in its efforts to seek a protective order or other appropriate remedy or, in the event such protective order or other remedy is not obtained, to obtain assurance that confidential treatment will be accorded such Confidential Information.

(v)    Unless expressly permitted by this Agreement, neither Party shall (A) make any use or copies of the Confidential Information of the other Party except as expressly contemplated by this Agreement, (B) possess or acquire any right in or assert any lien against the Confidential Information of the other Party, (C) sell, assign, transfer, lease, encumber, or otherwise dispose of or disclose the Confidential Information of the other Party to third parties or commercially exploit, or permit a third party to commercially exploit, such Information, or (D) refuse for any reason (including a default or material breach of this Agreement by the other Party) to promptly provide the other Party's Confidential Information (including any copies thereof) to the other Party if requested to do so.

(vi)    Notwithstanding the foregoing, P&G may disclose Confidential Information relating to the operational terms of this Agreement, the applicable Work Statement and/or Provider's performance hereunder (e.g., applicable Key Measurements) in connection with a benchmarking under **Section 11.7** or the solicitation of proposals for or the procurement of the same or similar services from prospective P&G Third Party Contractors; provided, however, P&G may not divulge Provider's pricing for the Services in connection with any such solicitation or procurement.

(c)    **Exclusions.** Notwithstanding the above, **Section 13.1(b)** shall not apply to any particular information which the receiving Party can demonstrate (i) is, at the time of disclosure to it, generally available to the public other than through a breach of the Receiving Party's or a third party's confidentiality obligations; (ii) after disclosure to it, is published by the Disclosing Party or otherwise becomes generally available to the public other than through a breach of the Receiving Party's or a third party's confidentiality obligations; (iii) was lawfully in the possession of the Receiving Party immediately prior to the time of disclosure to it; (iv) is

    P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

received from a third party having a lawful right to disclose such information; or (v) is independently developed by the Receiving Party without reference to the Disclosing Party's Confidential Information.

(d) **Loss of Confidential Information.** Each Party shall (i) immediately notify the other Party of any possession, use, knowledge, disclosure, or loss of such other Party's Confidential Information in contravention of this Agreement, (ii) promptly furnish to the other Party all known details and assist such other Party in investigating and/or preventing the reoccurrence of such possession, use, knowledge, disclosure, or loss, (iii) cooperate with the other Party in any investigation or litigation deemed necessary by such other Party to protect its rights, and (iv) promptly use commercially reasonable efforts to prevent further possession, use, knowledge, disclosure, or loss of Confidential Information in contravention of this Agreement. Each Party shall bear any costs it incurs in complying with this **Section 13.1(d)**.

(e) **No Implied Rights** Nothing contained in this **Section 13.1** shall be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to any Confidential Information of the other Party.

(f) **Return or Destruction of Confidential Information.** Each Party shall securely store the other Party's Confidential Information until such Confidential Information is returned or destroyed as described in this Section. Except as provided below with respect to Contract Records, each Party shall destroy all information and data in any medium that contains, refers to, or relates to the other Party's Confidential Information (or the portion of such Confidential Information specified by the other Party) or shall return such information and data to the other Party or its designee, in the format and on the media reasonably requested by the other Party, (i) within thirty (30) days of the expiration or termination of this Agreement and completion of each Party's obligations hereunder, including, with respect to Provider, all periods of Termination Assistance Services requested by P&G, and (ii) with respect to P&G Confidential Information, at any time P&G requests such Information or, with respect to particular Confidential Information, within thirty (30) days of the date that such Confidential Information is no longer required by Provider to perform its obligations under this Agreement. Such information and data shall include all copies of a Party's Confidential Information in the other Party's possession or under the other Party's control. The Party returning or destroying the other Party's Confidential Information shall deliver to the other Party written certification of its compliance with this paragraph signed by an authorized representative of such Party and shall confirm in such certification that the media and/or device on which such information or data was stored has been securely erased.

Notwithstanding the foregoing, either Party may retain one copy of the other Party's Confidential Information in its legal department as and to the extent required to comply with applicable Laws or enforce its rights under this Agreement; provided that such Confidential Information shall be returned or destroyed in accordance with this provision upon the expiration of the period specified in the applicable Law, the expiration of the applicable statute of limitations and the final resolution of any pending dispute.

Subject to the preceding paragraph, Contract Records shall be retained by Provider for the audit period specified in **Section 9.11(a)** unless and to the extent Provider is directed by P&G to deliver such Contract Records to P&G prior to the expiration of such Audit Period.

(b) In no event shall a party withhold any Confidential Information of the other party as a means of resolving any dispute.

**13.2 P&G Data.** Nothing in this **Section 13.2** is intended to limit the obligations of Provider under **Section 13.1** with respect to the Confidential Information addressed in such Sections. To the extent that the provisions of **Section 13.1** pertaining to P&G Data conflict with the provisions of this **Section 13.2**, the provisions of **Section 13.2** shall control over the provisions of **Section 13.1**.

(a) **Ownership of P&G Data.** P&G Data shall be and remain, as between the Parties, the property of P&G and/or the relevant Eligible Recipient regardless of whether Provider or P&G is in possession of the P&G Data. P&G Data shall be made available to P&G, upon its request, in the form and format as reasonably requested by P&G.

-31-

P&G Confidential Information

(b) **Safeguarding of P&G Data.** Provider shall maintain a comprehensive data security program, which shall include reasonable and appropriate technical, organizational and security measures against the destruction, loss, unauthorized access or alteration of P&G Data in the possession of Provider. The data security program and associated technical, organizational and security measures shall comply in all material respects with the following:

    (A) Subject to **Section 15.7**, all applicable Laws;

    (B) P&G technology, IT processes and network security requirements and other applicable policies as described in **Attachment B.1**;

    (C) P&G Standards, including information technology, security, privacy and record retention policies, standards, protocols, requirements and specifications, including P&G's requirements for Provider's utilization of secure infrastructure and data encryption methods;

    (D) ISO 17799 and BS 7799, as each may be modified or replaced from time to time.

The content and implementation of the data security program and associated technical, organizational and security measures shall be fully documented in writing by Provider. Provider shall permit P&G to review such documentation and/or to inspect Provider's compliance with such program in accordance with **Section 9.11**.

(c) **No Material Change or Weakness.** Under no circumstances shall Provider make any changes that materially weaken any technical, organizational or security measures in place to safeguard P&G Data, or result in Provider's failure to meet any of the minimum standards set forth above without P&G's prior approval. Under no circumstances shall Provider or Provider Personnel attempt to access P&G Data that is not required for the performance of Provider's obligations or otherwise permitted under this Agreement.

(d) **Security Breach.** In the event Provider discovers or is notified of a breach or potential breach of security relating to P&G Data in the possession or control of Provider or its Subcontractors or Affiliates, Provider shall, in addition to its obligations pursuant to **Section 6.3**, expeditiously (i) notify P&G of such breach or potential breach, (ii) investigate (with P&G's participation if so desired by P&G) such breach or potential breach and perform a risk assessment, Root Cause Analysis and corrective action plan thereon, (iii) provide a written report to P&G of such risk assessment, Root Cause Analysis and action plan, (iv) remediate such breach or potential breach of security to the extent within Provider's or its Subcontractor's or Affiliate's areas of control, (v) to the extent such breach or potential breach is within Provider's or its Subcontractor's or Affiliate's areas of control, take commercially reasonable actions to prevent the recurrence of such breach or potential breach of security.

(e) **Media.** To the extent Provider removes P&G Data from any media that is taken out of service that is under Provider's control, Provider shall destroy or securely erase such media in accordance with the Policy and Procedures Manual. Under no circumstances shall Provider use or re-use media on which P&G Data has been stored to store data of any other customer of Provider or to deliver data to a third party, including another Provider customer, unless such P&G Data has been securely erased in accordance with the Policy and Procedures Manual.

**13.3** **File Access.** P&G shall have secure access to, and the right to review and retain the entirety of, all P&G Confidential Information in the possession or control of Provider or its Affiliates or Subcontractors. Such access shall be provided to P&G in real time and by the means and in the format reasonably requested by P&G. At no time shall P&G's Confidential Information be stored or held by Provider in a form or manner not readily accessible to P&G in this manner.

**13.4** **P&G Data -- Correction and Restoration.**

(a) **Corrections.** The correction of any errors or inaccuracies in or with respect to P&G Data shall be performed by the Party that has operational responsibility for inputting such P&G Data into the applicable System. To the extent (i) Provider is operationally responsible for inputting such data, or (ii) such errors or inaccuracies are attributable to the failure of Provider or Provider Personnel to comply with Provider's obligations under this Agreement, Provider shall bear the cost of correcting such errors or inaccuracies.

         P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

(b) **Re-running of Corrected Data.** If the correction of errors or inaccuracies as described above necessitates the re-running of corrected P&G Data , P&G shall bear the cost of re-running of corrected data , unless the underlying errors or inaccuracies are attributable to the failure of Provider or Provider Personnel to comply with Provider's obligations under this Agreement (including, to the extent applicable, the failure of Provider or Provider Personnel to adhere to applicable processes and controls that, if adhered to, would have enabled Provider or Provider Personnel to identify and timely correct such errors or inaccuracies, even if caused by P&G), in which case Provider shall bear the cost of re-running of corrected data.

(c) **Restoration of Data.** The restoration of any destroyed, lost or altered P&G Data shall be performed by the Party that has operational responsibility for maintaining the System on which such P&G Data resides and for creating and maintaining backup copies of such P&G Data. To the extent (i) Provider is operationally responsible for performing such restoration or (ii) such destruction, loss or alteration is attributable to the failure of Provider or Provider Personnel to comply with Provider's obligations under this Agreement, Provider shall bear the cost of restoring such data.

13.5 **Survival.** The Parties' obligations under this Article with respect to Confidential Information shall survive the expiration or termination of this Agreement for a period of seven (7) years from the later of (i) the expiration or termination of this Agreement (including all periods of Termination Assistance Services), or (ii) the return or destruction of Confidential Information in accordance with **Sections 13.1**; provided, however, that the passage of this seven (7) year period shall not absolve either Party of responsibility for any breach of this **Article 13** occurring prior to the expiration of such seven (7) year period.

## 14 OWNERSHIP OF MATERIALS

### 14.1 P&G Owned Materials.

(a) **Ownership of P&G Owned Materials.** For purposes of this Agreement, P&G shall be the sole and exclusive owner of (i) all intellectual property, Software and other Materials owned by P&G or the Eligible Recipients as of the Effective Date, including P&G Owned Software and other Materials owned by P&G and the Eligible Recipients, (ii) all enhancements and Derivative Works of such intellectual property, Software and Materials, including all United States and foreign patent, copyright and other intellectual property rights in such Materials, and (iii) certain Developed Materials, as provided in **Section 14.2(a)** (collectively, "**P&G Owned Materials**").

(b) **License to P&G Owned Materials.** As of the Commencement Date, P&G hereby grants Provider and, to the extent necessary for Provider to provide the Services, to Subcontractors designated by Provider that sign a written agreement to be bound by terms at least as protective as the terms in this Agreement applicable to such Materials, a non-exclusive, non-transferable, royalty-free limited right and license during the Term (and thereafter to the extent necessary to perform any Termination Assistance Services requested thereunder by P&G) to access, use, execute, reproduce, display, perform, modify, distribute and create Derivative Works of the P&G Owned Materials for the express and sole purpose of providing the Services. Provider and its Subcontractors shall have no right to the source code to any such P&G Owned Materials unless and to the extent approved in advance by P&G. P&G Owned Materials remain the property of P&G. Provider and its Subcontractors shall not (i) use any P&G Owned Materials for the benefit of any person or Entity other than P&G, the Eligible Recipients or the Authorized Users, (ii) separate or uncouple any portions of the P&G Owned Materials, in whole or in part, from any other portions thereof unless and to the extent such separation or uncoupling is necessary for Provider to provide the Services, or (iii) reverse assemble, reverse engineer, translate, disassemble, decompile or otherwise attempt to create or discover any source code, underlying algorithms, ideas, file formats or programming interfaces of the P&G Owned Materials by any means whatsoever, without the prior approval of P&G, which may be withheld at P&G's sole discretion. Except as otherwise requested or approved by P&G, Provider and its Subcontractors shall cease all use of P&G Owned Materials upon the end of the Term and the completion of any Termination Assistance Services requested hereunder by P&G pursuant to **Section 4.3(b)(2)**. THE P&G OWNED MATERIALS ARE PROVIDED BY P&G TO PROVIDER AND ITS SUBCONTRACTORS ON AN AS-IS, WHERE-IS BASIS. P&G EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH P&G OWNED MATERIALS, OR THE CONDITION OR SUITABILITY OF SUCH MATERIALS FOR USE BY PROVIDER OR ITS SUBCONTRACTORS TO PROVIDE THE SERVICES, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

P&G Confidential Information

(c) **License to Third Party Materials**. Subject to Provider having obtained any Required Consents/Terminations , P&G hereby grants to Provider, during the Term (and thereafter to the extent necessary to perform any Termination Assistance Services requested thereunder by P&G), for the sole purpose of performing the Services and solely to the extent of P&G's underlying rights, the same rights of access and use as P&G possesses under the applicable software licenses with respect to P&G licensed Third Party Materials. P&G also shall grant such rights to Subcontractors designated by Provider if and to the extent necessary for Provider to provide the Services; provided that, Provider shall pay all fees, costs and expenses associated with the granting of such rights to such Subcontractors. Provider and its Subcontractors shall comply with the duties, including use restrictions and nondisclosure obligations, imposed on P&G by such licenses. In addition, each Subcontractor shall sign a written agreement to be bound by terms consistent with the terms in this Agreement applicable to such Third Party Materials. Except as otherwise requested or approved by P&G (or the relevant licensor), Provider and its Subcontractors shall cease all use of such Third Party Materials upon the end of the applicable Term and the completion of any Termination Assistance Services requested thereunder by P&G pursuant to **Section 4.3(b)(2)**. THE P&G LICENSED THIRD PARTY MATERIALS ARE PROVIDED BY P&G TO PROVIDER AND ITS SUBCONTRACTORS ON AN AS-IS, WHERE-IS BASIS. P&G EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH P&G LICENSED THIRD PARTY MATERIALS, OR THE CONDITION OR SUITABILITY OF SUCH MATERIALS FOR USE BY PROVIDER OR ITS SUBCONTRACTORS TO PROVIDE THE SERVICES, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**14.2 Developed Materials**.

(a) **Ownership by P&G**. Except as provided in **Sections 14.2(c)** and **(d)** or otherwise agreed by the Parties, P&G shall be the sole and exclusive owner of all Developed Materials, including all United States and foreign patent, copyright and other intellectual property rights in such Materials. Such Developed Materials shall be considered works made for hire (as that term is used in Section 101 of the United States Copyright Act, 17 U.S.C. § 101, or in analogous provisions of other applicable Laws) owned by P&G. If any such Developed Materials may not be considered a work made for hire under applicable Law, Provider hereby irrevocably assigns, and shall assign, to P&G in perpetuity without further consideration, all of Provider's worldwide rights, title and interest in and to such Developed Materials, including United States and foreign intellectual property rights. Provider acknowledges that P&G and the successors and assigns of P&G shall have the right to obtain and hold in their own name any intellectual property rights in and to such Developed Materials. Provider agrees to execute any documents and take any other actions reasonably requested by P&G to effectuate the purposes of this **Section 14.2(a)**. P&G hereby grants to Provider a license to such Developed Materials on the same terms as described in **Section 14.1(b)**.

(b) **Source Code and Documentation**. Provider shall, promptly as it is developed by Provider, provide P&G with all of the source code and object code and documentation for all P&G owned Developed Materials. Such source code and technical documentation shall be sufficient to allow a reasonably knowledgeable and experienced programmer to maintain and support such Materials and the user documentation for such Materials shall accurately describe in terms understandable by a typical end user the functions and features of such Materials and the procedures for exercising such functions and features.

(c) **Provider Owned Developed Materials**. Notwithstanding **Section 14.2(a)**, unless the Parties agree otherwise, Provider shall be the sole and exclusive owner of all Developed Materials that are Derivative Works of Provider Owned Materials, including all United States and foreign patent, copyright and other intellectual property rights in such Materials. P&G acknowledges that Provider and the successors and assigns of Provider shall have the right to obtain and hold in their own name any intellectual property rights in and to such Provider owned Developed Materials. P&G agrees to execute any documents and take any other actions reasonably requested by Provider to effectuate the purposes of this **Section 14.2(c)**. Provider hereby grants P&G and the Eligible Recipients certain license and other rights with respect to such Developed Materials, as described in **Sections 14.3(b)**.

(d) **Third Party Materials**. The ownership of Derivative Works of Third Party Materials created by Provider in connection with the Services shall, as between Provider and P&G, be considered Developed Materials owned by the Party that is the licensee of such Third Party Materials. For purposes of the foregoing, Provider shall be deemed the licensee of Third Party Materials licensed by its Subcontractors or Affiliates and P&G shall be deemed the licensee of Third Party Materials licensed by P&G Affiliates or any Eligible Recipients. Each Party acknowledges and

P&G Confidential Information

agrees that its ownership of such Derivative Works may be subject to or limited by the terms of the underlying agreement with the owner of the underlying Third Party Materials; provided, that if a Derivative Work is to be made of Third Party Materials provided by Provider, Provider shall notify P&G in advance and obtain P&G's consent prior to proceeding with such Derivative Work if the terms of any such agreement will preclude or limit, as applicable, P&G's license rights in and to such Derivative Work as contemplated in **Sections 14.3**.

(e) **Disclosure by Provider of Developed Materials**.  Provider shall promptly disclose in writing to P&G each Developed Material that is developed in connection with the Services.  With respect to each disclosure, Provider shall indicate the features or concepts that it believes to be new or different.

(f) **Waiver of Moral Rights**.  To the extent permitted by Law, Provider hereby waives any moral rights in the P&G owned Developed Materials, such as the right to be named as author, the right to modify, the right to prevent mutilation and the right to prevent commercial exploitation, whether arising under the Berne Convention or otherwise.

**14.3  Provider Owned Materials**.

(a) **Ownership of Provider Owned Materials**.  For purposes of this Agreement, as between the Parties, Provider shall be the sole and exclusive owner of the (i) intellectual property, Software and Materials lawfully owned by it prior to the Effective Date, (ii) intellectual property, Software and Materials acquired by Provider on or after such date other than acquisitions for P&G or an Eligible Recipient in connection with the performance of the Services, (iii) Developed Materials that are Derivative Works of Provider owned intellectual property, Software and Materials created by or for Provider as provided in **Section 14.2(c)**, and (iv) except as provided in **Sections 14.2(a)** and **(d)**, intellectual property, Software and Materials developed by or on behalf of Provider, including all United States and foreign intellectual property rights in such Materials ("**Provider Owned Materials**").

(b) **License to Provider Owned Materials**.  As of the Commencement Date, Provider hereby grants to P&G and the Eligible Recipients (and at P&G's request, Third Party Contractors that sign a written agreement with P&G to be bound by terms at least as protective as the terms contained herein applicable to such Materials), at no additional charge, a non-exclusive, world-wide, royalty-free right and license, to access, use, execute, reproduce, display, perform, modify, enhance, distribute and create Derivative Works of the Provider Owned Materials (including all modifications, replacements, Upgrades, enhancements, methodologies, tools, documentation, materials and media related) as necessary to receive the Services, during the Term and any Termination Assistance Services period, for the benefit of P&G and the Eligible Recipients.

(c) **License to Provider Third Party Materials**.  As of the Commencement Date and subject to Provider having obtained any Required Consents/Terminations , Provider hereby grants to P&G and the Eligible Recipients (and at P&G's request, Third Party Contractors that sign a written agreement with P&G to be bound by terms at least as protective as the terms contained herein applicable to such Materials), at no additional charge, a non-exclusive, world-wide, royalty-free right and license to access and/or use the Third Party Materials as to which Provider holds the license or for which Provider is financially responsible under this Agreement (including all available modifications, substitutions, Upgrades, enhancements, methodologies, tools, documentation, materials and media related thereto) as necessary to receive the Services, during the Term and any Termination Assistance Services period, for the benefit of P&G, the Eligible Recipients.

(d) **Embedded Materials**.  To the extent that Provider Owned Materials are embedded in any Developed Materials owned by P&G, Provider shall not be deemed to have assigned its intellectual property rights in such Provider Owned Materials to P&G, but Provider hereby grants to P&G and the Eligible Recipients (and at P&G's request, Third Party Contractors that sign a written agreement with P&G to be bound by terms at least as protective as the terms contained herein applicable to such Materials) a worldwide, perpetual, irrevocable, non-exclusive, fully paid-up license, with the right to grant sublicenses, to use, execute, reproduce, display, perform, modify, enhance, distribute and create Derivative Works of such Provider Owned Materials (including all modifications, replacements, Upgrades, enhancements, methodologies, tools, documentation, materials and media related thereto) for the benefit of P&G, the Eligible Recipients and their respective Affiliates for so long as such Provider Owned Materials remain embedded in such Developed Materials and are not separately commercially exploited.  Following the expiration or termination of the Term and the termination of the Service(s) for which such Materials were used, if requested by

DCDB01 20932031.1 14-Jul-09 09:51

P&G, Provider shall, in its discretion, either enter into a separate contract with P&G for Upgrades, maintenance, and support services or provide to P&G the source code and object code for such embedded Provider Owned Materials.

**14.4 Other Materials.** This Agreement shall not confer upon either Party intellectual property rights in Materials of the other Party (to the extent not covered by this **Article 14**) unless otherwise so provided elsewhere in this Agreement.

**14.5 General Rights.**

   (a) **Copyright Legends.** Each Party agrees to reproduce copyright legends which appear on any portion of the Materials which may be owned by the other Party or third parties.

   (b) **No Implied Licenses.** Except as expressly specified in this Agreement, nothing in this Agreement shall be deemed to grant to one Party, by implication, estoppel or otherwise, license rights, ownership rights or any other intellectual property rights in any Materials owned by the other Party or any Affiliate of the other Party (or, in the case of Provider, any Eligible Recipient).

   (c) **Incorporated Materials.** Should either Party incorporate into Developed Materials any intellectual property subject to third party patent, copyright or license rights, any ownership or license rights granted herein with respect to such Materials shall be limited by and subject to any such patents, copyrights or license rights; provided that, prior to incorporating any such intellectual property in any Materials, the Party doing so discloses this fact and obtains the prior approval of the other Party.

**14.6 P&G Rights to Materials and Software Upon Expiration or Termination of Agreement.**

As part of the Termination Assistance Services, Provider shall provide the following to P&G, P&G Affiliates and the other Eligible Recipients with respect to Materials and Software:

   (a) **P&G Owned Materials and Developed Materials.** With respect to P&G Owned Materials (including P&G owned Developed Materials), Provider shall, at no cost to P&G:

      (i) Deliver to P&G all P&G Owned Materials and all copies thereof in the format and medium in use by Provider in connection with the Services as of the date of such expiration or termination; and

      (ii) Following confirmation by P&G that the copies of the P&G Owned Materials delivered by Provider are acceptable and the completion by Provider of any Termination Assistance Services for which such P&G Owned Materials are required, destroy or securely erase all other copies of such P&G Owned Materials then in Provider's possession and cease using such P&G Owned Materials and any information contained therein for any purpose.

   (b) **Provider Owned Materials.** With respect to Materials owned by Provider, Provider Affiliates or Subcontractors and used by them to provide the Services (and any modifications, enhancements, Upgrades, methodologies, tools, documentation, materials and media related thereto), unless P&G otherwise agrees prior to Provider's first use of such Materials in the performance of the Services:

      (i) Provider hereby grants to the Eligible Recipients (and, at Provider and P&G's election, to Third Party Contractor(s) that sign a written agreement with P&G and Provider to be bound by terms at least as protective as the terms contained herein applicable to such Materials) a worldwide, perpetual, non-exclusive, non-transferable, irrevocable, fully paid-up license to use, execute, reproduce, display, perform, distribute, modify, enhance and create Derivative Works of each such Materials, in each case solely for the benefit of P&G, P&G Affiliates and the other Eligible Recipients upon the expiration or termination of the Term with respect to the Services for which such Materials were used;

      (ii) Provider shall deliver to the Eligible Recipients (and, at Provider and P&G's election, to Third Party Contractor(s) that sign a written agreement with P&G and Provider to be bound by terms at least as protective as the terms contained herein applicable to such Materials) (A) a copy of such Provider Owned Materials and related documentation, (B) the source code and object code for such Provider Owned Materials to the extent

DCDB01 20932031.1 14-Jul-09 09:51

such code is reasonably necessary to permit them to use such Provider Owned Materials, (C) the source code and the object code for Provider Owned Materials that are not commercial off-the-shelf products, and (D) the source code and object code for Provider Owned Materials that are commercial off-the-shelf products if Provider does not offer or provide Upgrades, maintenance, support and other services for such Materials as provided in **Section 14.6**(b)**(iii)**; and

(iii)   Provider shall offer to provide to the Eligible Recipients (and, at Provider and P&G's election, to Third Party Contractor(s) that sign a written agreement with P&G and Provider to be bound by terms at least as protective as the terms contained herein applicable to such Materials) Upgrades, maintenance, support and other services for commercial off-the-shelf Materials on Provider's then-current standard terms and conditions for such services.

Unless P&G otherwise agrees prior to Provider's first use of such Materials in the performance of the Services, the Eligible Recipients (and, at P&G's election, Third Party Contractor(s)) shall not be obligated to pay any license or transfer fees in connection with its receipt of the licenses and other rights above.

(c)   **Third Party Materials**. Unless P&G otherwise agrees in advance, with respect to Third Party Materials licensed by Provider or Provider Affiliates or Subcontractors and used by them to provide the Services, Provider hereby grants to the Eligible Recipients and, at Versatex's election, to Third Party Contractor(s) that sign a written agreement with P&G to be bound by terms at least as protective as the terms contained herein applicable to such Third Party Materials) a sublicense offering the same rights and warranties with respect to such Third Party Materials available to Provider (or the applicable Provider Affiliates or Subcontractors), on terms and conditions that are at least as favorable in all material respects as those applicable to Provider (or the applicable Provider Affiliate or Subcontractor), for the benefit of P&G, P&G Affiliates and the other Eligible Recipients upon the expiration or termination of the Term with respect to the Services for which such Materials were used. Provider may, with P&G's approval, substitute one of the following for such sublicense: (i) the assignment to P&G, the other Eligible Recipients and such Third Party Contractor(s), of the underlying license for such Third Party Materials; or (ii) the procurement for P&G, the other Eligible Recipients and such Third Party Contractor(s) of either a (a) new license (with terms at least as favorable as those in the license held by Provider or its Affiliates or Subcontractors and with the right to grant sublicenses) to such Third Party Materials for the benefit of P&G, P&G Affiliates and the other Eligible Recipients, or (b) substitute license for Third Party Materials sufficient to perform, without additional cost, support or resources and at the levels of performance and efficiency required by this Agreement, the functions of the Third Party Materials necessary to enable P&G or its designee to provide the Services for which such Third Party Materials were used.

Unless P&G has otherwise agreed in advance, the Eligible Recipients (and, to the extent applicable, Third Party Contractors) shall not be obligated to pay any license or transfer fees in connection with its receipt of the licenses, sublicenses and other rights specified in this **Section** OO. In addition, unless P&G has otherwise agreed in advance, Provider shall deliver to the Eligible Recipients (and, to the extent applicable, Third Party Contractor(s)) a copy of such Third Party Materials (including source code, to the extent it has been available to Provider) and related documentation and shall cause maintenance, support and other services to continue to be available to the Eligible Recipients (and, at P&G's election, to their designee(s)) to the extent it has been available to Provider. P&G, however, shall be obligated to make monthly or annual payments attributable to periods after the expiration or termination of the Term with respect to the Services for which such Third Party Materials were used, for the right to use and receive maintenance or support related thereto, but only to the extent Provider would have been obligated to make such payments if it had continued to hold the licenses in question or P&G has agreed in advance to make such payments.

To the extent P&G has agreed in advance to pay any fees in connection with its receipt of such licenses, sublicenses or other rights, Provider shall, at P&G's request, identify the licensing and sublicensing options available to the Eligible Recipients and the license or transfer fees associated with each. Provider shall use commercially reasonable efforts to obtain the most favorable options and the lowest possible transfer, license, relicense, assignment or termination fees for Third Party Materials. Provider shall not commit any Eligible Recipient to paying any such fees or expenses without P&G's prior approval. If the licensor offers more than one form of license, P&G (not Provider) shall select the form of license to be received by P&G, the other Eligible Recipients or their designee(s).[TBD]

P&G Confidential Information

## 15 REPRESENTATIONS, WARRANTIES AND COVENANTS

**15.1 Work Standards.** Provider represents, warrants and covenants that: (i) the Services shall be rendered with promptness, due care, skill and diligence; (ii) the Services shall be executed in a workmanlike manner, in accordance with the Key Measurements and the generally accepted practices of leading providers of contracted labor services; (iii) Provider shall use adequate numbers of qualified individuals with suitable training, education, experience, know-how, competence and skill to perform the Services; (iv) Provider shall provide such individuals with training as to new products and services prior to their implementation in the P&G's and/or the Eligible Recipients' environment; and (v) Provider shall have the resources, capacity, expertise and ability in terms of Equipment, Software, know-how and personnel to provide the Services.

**15.2 Software.**

    (a) **Ownership and Use.**

        (i) Provider represents, warrants and covenants that it is either the owner of, or authorized to use, any and all Software provided and used by Provider in providing the Services. As to any such Software that Provider does not own but is authorized to use, Provider shall advise P&G as to the ownership and extent of Provider's rights with regard to such Software to the extent any limitation in such rights would impair Provider's performance of its obligations under this Agreement.

        (ii) P&G represents, warrants and covenants that it is either the owner of, or authorized to use, any and all Software provided and used by Provider in providing the Services. As to any such Software that P&G does not own but is authorized to use, P&G shall advise Provider as to the ownership and extent of P&G's rights with regard to such Software to the extent any limitation in such rights would impair Provider's performance of its obligations under this Agreement.

    (b) **Performance.**

        (i) Provider represents, warrants and covenants that any Provider Owned Software will perform in Compliance with its Specifications and will provide the functions and features and operate in the manner described therein.

        (ii) P&G represents, warrants and covenants that any P&G Owned Software will perform in Compliance with its Specifications and will provide the functions and features and operate in the manner described therein.

    (c) **Developed Materials Compliance.** Provider warrants and covenants that Developed Materials shall be free from material errors in operation and performance, shall Comply with the applicable documentation and the Specifications in all respects, and shall provide the functions and features and operate in the manner described in this Agreement or otherwise agreed by the Parties. Provider shall repair, replace or correct any failure to Comply at no additional charge to P&G and shall use commercially reasonable efforts to do so as expeditiously as possible. In the event that Provider fails or is unable to repair, replace or correct such nonconforming Developed Materials, P&G shall, in addition to any and all other remedies available to it hereunder, be entitled to obtain from Provider a copy of the source code and/or object code to such Developed Material.

    (d) **Nonconformity of Provider Owned Software.** In addition to the foregoing, if Provider Owned Software (excluding Provider owned Developed Materials, which are addressed in **Section 15.2(c)**) does not Comply with the Specifications and criteria set forth in this Agreement, and/or materially adversely affects the Services provided hereunder, Provider shall expeditiously repair or replace such Software with conforming Software.

**15.3 Non-Infringement.**

    (a) **Performance of Responsibilities.** Except as otherwise provided in this Agreement, each Party represents, warrants and covenants that it shall perform its responsibilities under this Agreement in a manner that does not infringe, or constitute an infringement or misappropriation of, any patent, copyright, trademark, trade secret or other proprietary or privacy rights of any third party; provided, however, that the performing Party shall not have any obligation or

-38-

DCDB01 20932031.1 14-Jul-09 09:51

liability to the extent any infringement or misappropriation is caused by (i) modifications made by the other Party or its contractors or subcontractors, without the knowledge or approval of the performing Party, (ii) the other Party's combination of the performing Party's work product or Materials with items not furnished, specified or reasonably anticipated by the performing Party or contemplated by this Agreement, (iii) a breach of this Agreement by the other Party, (iv) the failure of the other Party to use corrections or modifications provided by the performing Party offering equivalent features and functionality, or (v) Third Party Software, except to the extent that such infringement or misappropriation arises from the failure of the performing Party to obtain the necessary licenses or Required Consents/Terminations or to abide by the limitations of the applicable Third Party Software licenses. Each Party further represents, warrants and covenants that it will not use or create materials in connection with the Services which are libelous, defamatory or obscene.

(b) **Third Party Software Indemnification.**

    (i)    In addition, with respect to Third Party Software provided by Provider pursuant to this Agreement, Provider covenants that it shall obtain and provide intellectual property indemnification for P&G and the Eligible Recipients (or obtain intellectual property indemnification for itself and enforce such indemnification on behalf of P&G and the Eligible Recipients) from the Providers of such Software. Unless otherwise approved in advance by P&G, such indemnification shall be (i) comparable to the intellectual property indemnification provided by Provider to P&G and the Eligible Recipients under this Agreement, or (ii) the best indemnification available in the industry for the same or substantially similar types of software products.

    (ii)    In addition, with respect to Third Party Software provided by P&G pursuant to this Agreement, P&G covenants that it shall obtain and provide intellectual property indemnification for Provider and its Subcontractors (or obtain intellectual property indemnification for itself and enforce such indemnification on behalf of Provider and its Subcontractors) from the Providers of such Software. Unless otherwise approved in advance by Provider, such indemnification shall be (i) comparable to the intellectual property indemnification provided by P&G to Provider and its Subcontractors under this Agreement, or (ii) the best indemnification available in the industry for the same or substantially similar types of software products

**15.4 Authorization.** Each Party represents, warrants and covenants to the other that:

(a) **Corporate Existence.** It is a corporation duly incorporated, validly existing and in good standing under the Laws of its state of incorporation;

(b) **Corporate Power and Authority.** It has the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement;

(c) **Legal Authority.** It has obtained all licenses, authorizations, approvals, consents or permits required to perform its obligations under this Agreement under all applicable Laws of all authorities having jurisdiction over the Services, except to the extent the failure to obtain any such license, authorizations, approvals, consents or permits is, in the aggregate, immaterial;

(d) **Due Authorization.** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite corporate action on the part of such Party; and

(e) **No Violation or Conflict.** The execution, delivery, and performance of this Agreement shall not constitute a violation of any judgment, order, or decree; a material default under any material contract by which it or any of its material assets are bound; or an event that would, with notice or lapse of time, or both, constitute such a default.

**15.5 Inducements; P&G Code of Conduct.**

(a) **Inducements.** Provider represents, warrants and covenants that it has not given and will not give commissions, payments, kickbacks, lavish or extensive entertainment, or other inducements to any employee or agent of P&G in connection with this Agreement. Provider also represents, warrants and covenants that, to the best of its knowledge,

-39-

no officer, director, employee, agent or representative of Provider has given any such payments, gifts, entertainment or other thing of value to any employee or agent of P&G. Provider also acknowledges that the giving of any such payments, gifts, entertainment, or other thing of value is strictly in violation of P&G policy on conflicts of interest, and may result in the cancellation of this Agreement and all other existing and future contracts between the Parties.

(b) **P&G Code of Conduct.** Provider represents, warrants and covenants that, in the performance of the Services and its other contractual obligations hereunder, it shall comply, and shall cause Provider Subcontractors and Provider Personnel to comply, with the P&G Code of Conduct, as set forth in **Attachment B.2**, as such Code of Conduct may be reasonably modified from time to time.

15.6 **Disabling Code.** Provider represents, warrants and covenants that, without the prior written consent of P&G, Provider shall not insert into the Software any code that could be invoked to disable or otherwise shut down all or any portion of the Services. Provider further represents, warrants and covenants that, with respect to any disabling code that may be part of the Software, Provider shall not invoke or cause to be invoked such disabling code at any time, including upon expiration or termination of this Agreement for any reason, without P&G's prior written consent. Provider also represents, warrants and covenants that it shall  not use Third Party Software containing disabling code without the prior approval of P&G. For purposes of this provision, code that serves the function of ensuring software license compliance (including passwords) shall not be deemed disabling code, provided that Provider notifies P&G in advance of all such code and obtains P&G's approval prior to installing such code in any Software, Equipment or System.

15.7 **Compliance with Laws.**

(a) **Compliance by Provider.** Subject to **Section 15.7(b)**, **(e)**, **(f)** and **(g)**, Provider represents, warrants and covenants that, with respect to the provision of the Services and the performance of any of its other legal and contractual obligations hereunder, it is and shall be in compliance in all material respects with all applicable Laws during the Term and any Termination Assistance Services period, including identifying and procuring applicable permits, certificates, approvals and inspections required under such Laws. If a charge of non-compliance by Provider with any such Laws occurs and such non-compliance has or would reasonably be expected to have a material adverse impact on the receipt or use of the Services by P&G, Provider shall promptly notify P&G of such charge.

(b) **Compliance by P&G.** Subject to **Section 15.7(a)**, **(e)** and **(f)**, P&G represents and warrants that, with respect to the performance by P&G and the Eligible Recipients of P&G's legal and contractual obligations under this Agreement, it is and shall be in compliance in all material respects with all applicable Laws for the Term and any Termination Assistance Services period.

(c) **Compliance Data and Reports.** At no additional charge, Provider shall provide P&G with data and reports in Provider's possession necessary for P&G to comply with, all Laws applicable to the Services.

(d) **Notice of Laws.** Provider shall be and remain familiar with all Laws and changes in Laws applicable to the Services or the performance of Provider's obligations under this Agreement, including Laws applicable to the employment of Provider Personnel and the provision of Services from jurisdictions in which Provider Facilities are located, and shall notify P&G of such Laws and changes in Laws to the extent they relate to P&G's or the Eligible Recipients' receipt or use of the Services.

(e) **Interpretation of Laws or Changes in Laws.** Provider shall be responsible, with P&G's cooperation and assistance, for interpreting applicable Laws and changes in such Laws and for identifying the impact of such Laws or changes in Laws on Provider's performance of the Services. To the extent the impact of any Law or change in Law cannot be readily identified by Provider, the Parties shall cooperate in interpreting such Law or change in Law and shall seek in good faith to identify and agree upon the impact on Provider's performance and P&G's and/or the Eligible Recipients' receipt and use of the Services. If the Parties are unable to agree upon such impact, P&G shall retain the right, in its sole discretion, to interpret such Law or change in Law and determine its impact. In addition, if Provider reasonably concludes, after due inquiry, that the compliance obligations associated with any Law or change in Law is unclear or that there is more than one reasonable approach to achieving compliance, Provider may escalate the issue to P&G for a final decision. P&G shall be fully responsible for any violation of the Law that is due to P&G's incorrect interpretation thereof.

P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

(f) **Implementation of Changes in Laws.** In the event of any changes in Laws, Provider shall implement any necessary modifications to the Services prior to the deadline imposed by the regulatory or governmental body having jurisdiction for such requirement or change. If the modifications to the Services increase the costs associated with Provider providing the Services, the Parties shall negotiate in good faith to modify the Charges. If the Parties cannot agree upon revised Charges, Provider may terminate this Agreement without penalty hereunder and will not be required to provide the Termination Assistance Services. Provider shall bear the costs associated with compliance with any such changes in Laws.

(g) **Export Control.** The Parties acknowledge that certain products, technology, technical data and software (including certain services and training) and certain transactions may be subject to export controls and/or sanctions under the Laws of the United States and other countries and jurisdictions. No Party shall directly or indirectly export or re-export any such items or any direct product thereof or undertake any transaction or service in violation of any such Laws. To the extent within Provider's control, Provider shall be responsible for, and shall coordinate and oversee, compliance with such export laws in respect of such items exported or imported hereunder.

(h) **Responsibility.** Subject to **Section 15.7(e)**, Provider shall be responsible for any liability imposed on Provider, P&G or the Eligible Recipients resulting from any failure of Provider or its Subcontractors or third party product or service providers to comply with Provider's obligations under this **Section 15.7**, unless and to the extent such failure directly results from the acts or omissions of P&G, an Eligible Recipient or a Third Party Contractor in contravention of P&G's obligations under this **Section 15.7**.

**15.8 Interoperability; Currency.**

(a) **Interoperability.** Provider represents, warrants and covenants that the Software, Equipment and Systems used by Provider to provide the Services and for which Provider is financially or operationally responsible under this Agreement, are and, subject to **Sections 4.4** and **9.6**, will remain during the Term and any Termination Assistance Services period, compatible and interoperable with the Retained Systems and Business Processes (including the software, equipment and systems used by P&G or the Eligible Recipients to provide the same or similar services and/or which may deliver records to, receive records from, or otherwise interact with the Software, Equipment and/or Systems used by Provider to receive the Services) as and to the extent necessary to provide the Services.

(b) **Monetary Currencies.** Provider represents, warrants and covenants that the Software, Equipment, Systems and Services provided and/or used by Provider will be able to receive, transmit, process, store, archive, maintain and support all applicable currencies, including those specified in **Schedule B**.

**15.9 Disclaimer.** EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS, CONDITIONS OR WARRANTIES TO THE OTHER PARTY, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 16 INSURANCE AND RISK OF LOSS

**16.1 Insurance.** During the Term, Provider shall keep in full force and effect and maintain at its sole cost and expense the policies of insurance set forth in **Attachment D.4**, with the specified minimum limits of liability specified therein.

**16.2 Risk of Loss.**

(a) **General.** Subject to **Section 17.3**, Provider and P&G each shall be responsible for damage, destruction, loss, theft or governmental taking of their respective tangible property or real property (whether owned or leased) and each Party agrees to look only to its own insuring arrangements with respect to such damage, destruction, loss, theft, or governmental taking. Each Party shall promptly notify the other Party of any such damage, destruction, loss, theft, or governmental taking of such other Party's tangible property or real property (whether owned or leased) in the possession or under the control of such Party.

(b) **Waiver.** Provider and P&G hereby waive, on behalf of themselves and shall cause their respective insurers to issue appropriate waivers of subrogation rights for, any claims that either may have against the other for loss or damage

P&G Confidential Information

resulting from perils covered by the All Risk Property Damage insurance policy. It is understood that this waiver is intended to extend to all such loss or damage whether or not the same is caused by the fault or neglect of either Provider or P&G and whether or not insurance is in force. If required by policy conditions, each Party shall secure from its property insurer a waiver of subrogation endorsement to its policy, and deliver a copy of such endorsement to the other party to this Agreement if requested.

## 17 INDEMNITIES

17.1 **Indemnity by Provider.** Provider agrees to indemnify, defend and hold harmless P&G and its Affiliates and the Eligible Recipients and their respective officers, directors, employees, agents, representatives, successors, and assigns from any and all Losses and threatened Losses due to non-Party claims arising from or in connection with any of the following:

(a) **Representations, Warranties and Covenants.** Provider's breach of any of the representations, warranties and covenants set forth herein.

(b) **Licenses, Leases and Contracts.** Provider's failure to observe or perform any duties or obligations to be observed or performed on or after the Commencement Date by Provider under Third Party Software licenses, Equipment leases or Third Party Contracts used by Provider to provide the Services.

(c) **P&G Data or Confidential Information.** Provider's breach of its obligations with respect to P&G Data or P&G Confidential Information.

(d) **Infringement.** Infringement or misappropriation or alleged infringement or alleged misappropriation of a patent, trade secret, copyright or other proprietary rights in contravention of Provider's representations, warranties and covenants in **Sections 15.2** and **15.3**.

(e) **Compliance with Laws.** Losses, including government fines, penalties, sanctions, interest or other remedies resulting from Provider's failure to perform its responsibilities under this Agreement.

(f) **Taxes.** Taxes, together with interest and penalties, that are the responsibility of Provider under **Section 11.4**.

(g) **Shared Facility Services.** Services, products or systems provided by Provider to a third party from any shared Provider facility or using any shared Provider resources and not constituting Services provided to an Eligible Recipient pursuant to this Agreement.

(h) **Affiliate, Subcontractor or Assignee Claims.** Any claim, other than an indemnification claim under this Agreement, initiated by (i) a Provider Affiliate or Subcontractor asserting rights under this Agreement or (ii) any entity to which Provider assigned, transferred, pledged, hypothecated or otherwise encumbered its rights to receive payments from P&G under this Agreement.

(i) **Employment Claims.** Any claim relating to any: (i) violation by Provider, Provider Affiliates or Subcontractors, or their respective officers, directors, employees, representatives or agents, of any Laws or any common law protecting persons or members of protected classes or categories, including Laws prohibiting discrimination or harassment on the basis of a protected characteristic; (ii) liability arising or resulting from the employment of Provider Personnel by Provider, Provider Affiliates or Subcontractors (including liability for any social security or other employment taxes, workers' compensation claims and premium payments, and contributions applicable to the wages and salaries of such Provider Personnel); (iii) payment or failure to pay any salary, wages, pensions, benefits or other compensation due and owing to any Provider Personnel, or (iv) other aspects of the employment relationship of Provider Personnel with Provider, Provider Affiliates or Subcontractors or the termination of such relationship, including claims for wrongful discharge, claims for breach of express or implied employment contract and claims of co-employment or joint employment, except, in each case, to the extent resulting from the wrongful actions of P&G, the Eligible Recipients, or Third Party Contractors or the failure of P&G, the Eligible Recipients, or Third Party Contractors to comply with P&G's responsibilities under this Agreement.

17.2 **Indemnity by P&G.** P&G agrees to indemnify, defend and hold harmless Provider and its officers, directors, employees, agents, representatives, successors, and assigns, from any Losses and threatened Losses due to non- Party

P&G Confidential Information

claims arising from or in connection with any of the following:

(a) **Representations, Warranties and Covenants**. P&G breach of any of the representations, warranties and covenants set forth herein.

(b) **Licenses, Leases or Contracts**. P&G's failure to observe or perform any duties or obligations to be observed or performed by P&G under any of the applicable Third Party Software licenses, Equipment leases or Third Party Contracts to the extent P&G is financially or operationally responsible under this Agreement.

(c) **Provider's Confidential Information**. P&G breach of its obligations with respect to Provider's Confidential Information.

(d) **Infringement**. Infringement or misappropriation or alleged infringement or alleged misappropriation of a patent, trade secret, copyright or other proprietary rights in contravention of P&G's representations, warranties and covenants in **Section 15.3**.

(e) **Taxes**. Taxes, together with interest and penalties, that are the responsibility of P&G under **Section 11.4**.

(f) **P&G Affiliate, Eligible Recipient or Third Party Contractor Claims**. Any claim, other than an indemnification claim or insurance claim under this Agreement, initiated by a P&G Affiliate, an Eligible Recipient (other than P&G) or a P&G Third Party Contractor asserting rights under this Agreement.

(g) **Compliance with Laws**. Losses, including government fines, penalties, sanctions, interest or other remedies resulting from P&G's failure to perform its responsibilities under this Agreement.

(h) **Compliance with P&G Directives**. Losses resulting from Provider's compliance with P&G's decisions or directives, P&G Standards or P&G Rules.

17.3 **Additional Indemnities**. Provider and P&G each agree to indemnify, defend and hold harmless the other, and the Eligible Recipients and their respective Affiliates, officers, directors, employees, agents, representatives, successors, and assigns, from any and all Losses and threatened Losses to the extent they arise from or in connection with any of the following: (a) the death or bodily injury of any agent, employee, customer, business invitee, business visitor or other person caused by the negligence or other tortious conduct of the indemnitor or the failure of the indemnitor to comply with its obligations under this Agreement; and (b) the damage, loss or destruction of any real or tangible personal property caused by the negligence or other tortious conduct of the indemnitor or the failure of the indemnitor to comply with its obligations under this Agreement.

17.4 **Infringement**. In the event that (1) any Materials, Equipment, Software, or Services provided by Provider or its Affiliates or Subcontractors pursuant to this Agreement or used by them in the performance of the Services are found, or in P&G's reasonable opinion are likely to be found, to infringe upon the patent, copyright, trademark, trade secrets, intellectual property or proprietary rights of any third party in any country in which Services are to be performed or received under this Agreement, or (2) the continued use of such Materials, Equipment, Software or Services is enjoined, Provider shall, in addition to defending, indemnifying and holding harmless P&G as provided in **Section 17.1(d)** and to the other rights P&G may have under this Agreement, promptly and at its own cost and expense and in such a manner as to minimize the disturbance to P&G and the Eligible Recipients do one of the following: (i) obtain for P&G and the Eligible Recipients the right to continue using such Materials, Equipment, Software or Services; (ii) modify the item(s) in question so that it is no longer infringing (provided that such modification does not degrade the performance or quality of the Services or adversely affect P&G's and the Eligible Recipients' intended use as contemplated by this Agreement); or (iii) replace such item(s) with a non-infringing functional equivalent acceptable to P&G.

17.5 **Indemnification Procedures**. With respect to non-Party claims which are subject to indemnification under this Agreement (other than as provided in **Section 17.6** with respect to claims covered by **Section 17.1(f)**), the following procedures shall apply:

(a) **Notice**. Promptly after receipt by any person or entity entitled to indemnification under this Agreement of notice of the commencement or threatened commencement of any civil, criminal, administrative, or investigative action or

-43-

proceeding involving a claim in respect of which the indemnitee will seek indemnification hereunder, the indemnitee shall notify the indemnitor of such claim. No delay or failure to so notify an indemnitor shall relieve it of its obligations under this Agreement except to the extent that such indemnitor has suffered actual prejudice by such delay or failure. Within fifteen (15) days following receipt of notice from the indemnitee relating to any claim, but no later than five (5) days before the date on which any response to a complaint or summons is due, the indemnitor shall notify the indemnitee that the indemnitor elects to assume control of the defense and settlement of that claim (a "Notice of Election").

(b) **Procedure Following Notice of Election.** If the indemnitor delivers a Notice of Election within the required notice period, the indemnitor shall assume sole control over the defense and settlement of the claim; provided, however, that (i) the indemnitor shall keep the indemnitee fully apprised at all times as to the status of the defense, and (ii) the indemnitor shall obtain the prior written approval of the indemnitee before entering into any settlement of such claim imposing financial or non-financial obligations or restrictions on the indemnitee or constituting an admission of guilt or wrongdoing by the indemnitee or ceasing to defend against such claim. The indemnitor shall not be liable for any legal fees or expenses incurred by the indemnitee following the delivery of a Notice of Election; provided, however, that (i) the indemnitee shall be entitled to employ counsel at its own expense to participate in the handling of the claim, and (ii) the indemnitor shall pay the fees and expenses associated with such counsel if there is a conflict of interest with respect to such claim which is not otherwise resolved or if the indemnitor has requested the assistance of the indemnitee in the defense of the claim or the indemnitor has failed to defend the claim diligently and the indemnitee is prejudiced or likely to be prejudiced by such failure. The indemnitor shall not be obligated to indemnify the indemnitee for any amount paid or payable by such indemnitee in the settlement of any claim if (x) the indemnitor has delivered a timely Notice of Election and such amount was agreed to without the written consent of the indemnitor, (y) the indemnitee has not provided the indemnitor with notice of such claim and a reasonable opportunity to respond thereto, or (z) the time period within which to deliver a Notice of Election has not yet expired.

(c) **Procedure Where No Notice of Election Is Delivered.** If the indemnitor does not deliver a Notice of Election relating to any claim for which it is obligated to indemnify the other Party hereunder within the required notice period, the indemnitee shall have the right to defend the claim in such manner as it may deem appropriate. The indemnitor shall promptly reimburse the indemnitee for all such reasonable costs and expenses incurred by the indemnitee, including reasonable attorneys' fees.

17.6 **Special Indemnification Procedures.** With respect to claims covered by **Section 17.1(f)**, the following procedures shall apply:

(a) **Notice.** Promptly after receipt by P&G of notice of the commencement or threatened commencement of any action or proceeding involving a claim in respect of which the indemnitee will seek indemnification pursuant to **Section 17.1(f)**, P&G shall notify Provider of such claim. No delay or failure to so notify Provider shall relieve Provider of its obligations under this Agreement except to the extent that Provider has suffered actual prejudice by such delay or failure.

(b) **Procedure for Defense.** P&G shall be entitled, at its option, to have the claim handled pursuant to **Section 17.5** or to retain sole control over the defense and settlement of such claim; provided that, in the latter case, P&G shall (i) consult with Provider on a regular basis regarding claim processing (including actual and anticipated costs and expenses) and litigation strategy, (ii) reasonably consider any Provider settlement proposals or suggestions, and (iii) use commercially reasonable efforts to minimize any amounts payable or reimbursable by Provider.

17.7 **Subrogation.** Except as otherwise provided in **Section 16.1** or **16.2**, in the event that an indemnitor shall be obligated to indemnify an indemnitee pursuant to any provision of this Agreement, the indemnitor shall, upon payment of such indemnity in full, be subrogated to all rights of the indemnitee with respect to the claims to which such indemnification relates.

# 18 LIABILITY

18.1 **General Intent.** Subject to the specific provisions and limitations of this **Article 18**, it is the intent of the Parties that each Party shall be liable to the other Party for any actual damages incurred by the non-breaching Party as a result of the

P&G Confidential Information

breaching Party's failure to perform its obligations in the manner required by this Agreement.

**18.2 Force Majeure.**

(a) **General.** Subject to **Section 18.2(d)**, no Party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature, acts of God; war, terrorist acts, site-specific terrorist threats, riots, civil disorders, rebellions or revolutions; strikes, lockouts or labor disputes; or any other similar cause beyond the reasonable control of such Party; except to the extent that the non-performing Party is at fault in failing to prevent or causing such default or delay, and provided that such default or delay can not reasonably be circumvented by the non-performing Party through the use of alternate sources, workaround plans or other means. A strike, lockout or labor dispute involving Provider Personnel shall not excuse Provider from its obligations hereunder. In addition, the refusal of Provider Personnel to enter a facility that is the subject of a labor dispute shall excuse Provider from its obligations only if and to the extent such refusal is based upon a clear and present danger of physical harm.

(b) **Duration and Notification.** In the event of a force majeure event, the non-performing Party shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent possible without delay. Any Party so prevented, hindered or delayed in its performance shall, as quickly as practicable under the circumstances, notify the Party to whom performance is due by telephone (to be confirmed in writing within one (1) day of the inception of such delay) and describe at a reasonable level of detail the circumstances of the force majeure event, the steps being taken to address such force majeure event, and the expected duration of such force majeure event.

(c) **Substitute Services.** If any event described in **Section 18.2(a)** has substantially prevented, hindered or delayed or is reasonably expected to substantially prevent, hinder or delay the performance by Provider's s Subcontractors of Services necessary for the performance of critical P&G or Eligible Recipient functions for longer than the recovery period specified in the applicable disaster recovery plan, or if there is no such recovery period, Provider shall, unless and until otherwise directed by P&G, use commercially reasonable efforts to procure such Services from an alternate source at Provider's expense for so long as the delay in performance shall continue, up to the Charges actually paid to Provider for the Services with respect to the period of non-performance. If Provider is unable to procure such substitute services on an expedited basis or P&G elects to contract directly for such services, P&G may procure such Services from an alternate source at P&G's expense. Provider shall not have the right to additional payments as a result of any force majeure occurrence affecting Provider's ability to perform.

(d) **Termination.** If any event described in **Section 18.2(a)** substantially prevents, hinders or delays the performance by Provider or one of its Subcontractors of Services necessary for the performance of critical P&G functions (i) for more than five (5) days, P&G, at its option, may terminate any portion of this Agreement so affected; or (ii) for more than ten (10) days, P&G, at its option, may terminate this Agreement in whole or part. If, in either event, P&G elects to terminate less than all Services, the Charges payable under this Agreement shall be equitably adjusted, in accordance with the pricing methodology set forth in **Schedule D**, to reflect such partial termination.

(e) **Disaster Recovery Services.** Upon the occurrence of a force majeure event that constitutes a disaster under the applicable disaster recovery/business continuity plan, Provider shall implement promptly, as appropriate, such disaster recovery/business continuity plan and provide disaster recovery and business continuity services as described in such plan and in **Schedule B**. The occurrence of a force majeure event shall not relieve Provider of its obligation to implement the applicable disaster recovery/business continuity plan and provide disaster recovery and business continuity services.

(f) **Payment Obligation.** If Provider fails to provide Services in accordance with this Agreement due to the occurrence of a force majeure event, all amounts payable to Provider hereunder shall be equitably adjusted in a manner such that P&G is not required to pay any amounts for Services that it is not receiving whether from Provider or from an alternate source at Provider's expense pursuant to **Section 18.2(c)**.

(g) **Allocation of Resources.** Without limiting Provider's obligations under this Agreement, whenever a force majeure event or disaster causes Provider to allocate limited resources between or among Provider's customers and

-45-

Affiliates, P&G and the Eligible Recipients shall receive at least the same treatment as comparable Provider customers. In no event will Provider re-deploy or re-assign any Key Provider Personnel to another customer or account in the event of the occurrence of a force majeure event.

**18.3  Limitation of Liability.**

(a)  **Exclusions from Limitations.**  EXCEPT AS PROVIDED IN THIS **SECTION 18.3**, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, CONSEQUENTIAL, INCIDENTAL, COLLATERAL, EXEMPLARY, OR PUNITIVE DAMAGES, INCLUDING LOST PROFITS, REGARDLESS OF THE FORM OF THE ACTION OR THE THEORY OF RECOVERY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)  **Liability Cap.**  Additionally, except as provided below, the total aggregate liability of either Party, for claims asserted by the other Party under or in connection with this Agreement, regardless of the form of the action or the theory of recovery, shall be limited to total Charges payable to Provider during the twelve (12) month period preceding the last act or omission giving rise to such liability. For avoidance of doubt, this liability cap is an aggregate liability cap for the Master Agreement and all Companion Agreements.

(c)  **Exceptions to Limitations of Liability.**  The limitations of liability set forth in **Sections 18.3(a)** and **(b)** shall not apply with respect to:

  (i)  Losses occasioned by the fraud, willful misconduct, or gross negligence of a Party.

  (ii)  Losses that are the subject of indemnification under this Agreement.

  (iii)  Losses occasioned by Provider's refusal to provide Services or Termination Assistance Services. For purposes of this provision, "refusal" shall mean the intentional cessation by Provider, in a manner impermissible under this Agreement, of the performance of all or a material portion of the Services or Termination Assistance Services then required to be provided by Provider under this Agreement.

  (iv)  Amounts paid under **Section 17.3** with respect to death or bodily injury of an agent, employee, customer, business invitee, business visitor or other person or damage, loss or destruction of real or tangible personal property.

  (v)  Losses occasioned by any breach of a Party's representations or warranties under this Agreement.

  (vi)  Losses occasioned by any breach of a Party's obligations under **Article 13**.

(d)  **Items Not Considered Damages.**  The following shall not be considered damages subject to, and shall not be counted toward the liability exclusion or cap specified in, **Section 18.3(a)** or **(b)**:

  (i)  Amounts withheld or paid and subsequently recovered by P&G in accordance with this Agreement due either to incorrect Charges by Provider or non-conforming Services.

  (ii)  Invoiced Charges and other amounts that are due and owing to Provider for Services under this Agreement.

(e)  **Waiver of Liability Cap.**  If, at any time, the total aggregate liability of one Party for claims asserted by the other Party under or in connection with this Agreement exceeds eighty percent (80%) of the liability cap specified in **Section 18.3(b)** and, upon the request of the other Party, the Party incurring such liability refuses to waive such cap and/or increase the available cap to an amount at least equal to the original liability cap, then the other Party may terminate this Agreement.

(f)  **Eligible Recipient Damages.**  The Parties acknowledge and agree that, to the extent an Eligible Recipient has suffered Losses for which Provider may be liable under this Agreement, P&G may seek recovery of such Losses on

-46-

P&G Confidential Information

behalf of such Eligible Recipient in the same manner and to the same extent it would be entitled to do so on its own behalf if it had suffered such Losses.

(g) **Acknowledged Direct Damages.** The following shall be considered direct damages and neither Party shall assert that they are indirect, incidental, collateral, consequential or special damages or lost profits to the extent they result from either Party's failure to perform in accordance with this Agreement:

    (i)    Costs and expenses of recreating or reloading any lost, stolen or damaged P&G Data.

    (ii)   Costs and expenses of implementing a work-around in respect of a failure to provide the Services or any part thereof.

    (iii)  Costs and expenses of replacing lost, stolen or damaged Equipment, Software, and Materials.

    (iv)  Cover damages, including the costs and expenses incurred to procure the Services or corrected Services from an alternate source, to the extent in excess of Provider's Charges under this Agreement.

    (v)   Incremental costs and expenses incurred to bring the Services in-house or to contract to obtain the Services from an alternate source, including the costs and expenses associated with the retention of external consultants and legal counsel to assist with any re-sourcing.

    (vi)  Straight time, overtime or related expenses incurred by either Party, including overhead allocations for employees, wages and salaries of additional employees, travel expenses, overtime expenses, telecommunication charges and similar charges.

    (vii)  Subject to **Section 15.7**, damages, fines, penalties, interest or other monetary remedies resulting from a failure to comply with applicable Laws.

    (viii) Lost discounts, late fees and/or interest charges resulting from Provider's breach of its obligations under **Section 11.2**.

    (ix)  Lost funds (including interest on such lost funds) resulting from a Party's failure to provide correct instructions for funds transfers, or failure to properly execute funds transfers.

    (x)   Lost funds (including interest on such lost funds) resulting from a Party's failure to make payments in accordance with the instructions of the other Party or in compliance with applicable Laws.

    (xi)  Lost funds (including interest on such lost funds) resulting from Provider's extension of credit in violation of the policy or instructions of P&G and/or the Eligible Recipients.

## 19  DISPUTE RESOLUTION

**19.1  Dispute Resolution Procedures.** Any dispute arising out of or relating to this Agreement and/or the Services provided by Provider pursuant thereto shall be resolved in accordance with the dispute resolution procedures set forth in **Schedule M**.

**19.2  Jurisdiction.** Each Party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively in state or federal courts located in Cincinnati, Ohio, and each Party irrevocably submits to the sole and exclusive jurisdiction of these courts in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other Party. Notwithstanding the foregoing, P&G may seek injunctive or other equitable relief or seek to enforce an arbitration award or other judgment in any court of competent jurisdiction.

**19.3  Continued Performance.**

           P&G Confidential Information

(a) **General.** Each Party agrees that it shall, unless otherwise directed by the other Party, continue performing its obligations under this Agreement while any dispute is being resolved; provided, that this provision shall not operate or be construed as extending the Term of this Agreement or prohibiting or delaying a Party's exercise of any right it may have to terminate the Term as to all or any part of the Services. For purposes of clarification, P&G Data may not be withheld by Provider pending the resolution of any dispute.

(b) **Non-Interruption of Services.** Provider acknowledges and agrees that any interruption to the Service may cause irreparable harm to P&G and/or the Eligible Recipients, in which case an adequate remedy at law may not be available. Provider expressly acknowledges and agrees that, pending resolution of any dispute or controversy, it shall not deny, withdraw, or restrict Provider's provision of the Services to P&G and/or the Eligible Recipients under this Agreement, except as specifically and expressly agreed in writing by P&G and Provider.

**19.4 Governing Law.** This Agreement and performance under it shall be governed by and construed in accordance with the applicable Laws of the State of Ohio, without giving effect to any choice-of-law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of the Laws of any other jurisdiction; provided, however, the Uniform Computer Information Transactions Act whether now or hereafter enacted in Ohio ("UCITA"), shall not apply to the Agreement or any performance hereunder and the Parties expressly opt-out of the applicability of UCITA to the Agreement. The application of the United Nations Convention on Contracts for the International Sale of Goods is expressly excluded.

## 20 TERMINATION

### 20.1 Termination for Cause.

(a) **By P&G.** If Provider:

   (i) commits a material breach of this Agreement, which breach is not cured within thirty (30) days after notice of the breach from P&G;

   (ii) commits a material breach of this Agreement which is not capable of being cured within the period specified pursuant to **Section 20.1(a)(i)**; or

   (iii) commits numerous breaches of its duties or obligations which collectively constitute a material breach of this Agreement;

   then P&G may, by giving notice to Provider, terminate the Agreement with respect to all or any part of the Services as of a date specified in the notice of termination. If P&G chooses to terminate this Agreement in part, the Charges payable under this Agreement will be equitably adjusted in accordance with the pricing methodology set forth in **Schedule D**, to reflect such partial termination. For avoidance of doubt, the Parties acknowledge and agree that a material breach under this Master Agreement or any Companion Agreement shall be deemed a material breach under this Master Agreement and all Companion Agreements for purposes of this provision.

(b) **By Provider.** If P&G or any of the Eligible Recipients:

(c) Fails to pay undisputed Charges then due and owing under this Agreement by the specified due date, and the total of all such overdue undisputed Charges equals or exceeds, in the aggregate, two times the average monthly Charges, then, if P&G fails to cure such default within five (5) days of notice from Provider of its intention to terminate, Provider may, by notice to P&G, terminate this Agreement.

   (i) commits a material breach of this Agreement, which breach is not cured within thirty (30) days after notice of the breach from Provider;

   (ii) commits a material breach of this Agreement which is not capable of being cured within the period specified pursuant to **Section 20.1(b)(ii)**; or

P&G Confidential Information

(iii) commits numerous breaches of its duties or obligations which collectively constitute a material breach of this Agreement. .

**20.2 Termination for Convenience.** P&G may terminate the Agreement (and/or any Companion Agreement) for convenience and without cause by giving Provider at least ninety (90) days prior notice designating the termination date.

**20.3 Termination for Insolvency.** In the event that any Party (i) files for bankruptcy, (ii) becomes or is declared insolvent, or is the subject of any bona fide proceedings related to its liquidation, administration, provisional liquidation, insolvency or the appointment of a receiver or similar officer for it, (iii) passes a resolution for its voluntary liquidation, (iv) has a receiver or manager appointed over all or substantially all of its assets, (v) makes an assignment for the benefit of all or substantially all of its creditors, (vi) enters into an agreement or arrangement for the composition, extension, or readjustment of substantially all of its obligations or any class of such obligations, (vii) fails or become incapable of paying its debts as they become due or is otherwise in default under material contracts and fails to promptly cure such defaults, or (viii) experiences an event analogous to any of the foregoing in any jurisdiction in which any of its assets are situated, then the other Party may terminate this Agreement as of a date specified in a termination notice; provided, however, that Provider will not have the right to terminate under this Section so long as P&G pays for the Services to be received hereunder in advance on a month-to-month basis. If any Party elects to terminate this Agreement due to the insolvency of the other Party, such termination will be deemed to be a termination for cause hereunder.

**20.4 P&G Rights Upon Provider's Bankruptcy.**

(a) **General Rights.** In the event of Provider's bankruptcy or other formal procedure referenced in **Section 20.3** or the filing of any petition under bankruptcy laws affecting the rights of Provider which is not stayed or dismissed within thirty (30) days of filing, in addition to the other rights and remedies set forth herein, to the maximum extent permitted by Law, P&G will have the immediate right to retain and take possession for safekeeping all P&G Data, P&G Confidential Information, P&G licensed Third Party Software, P&G owned Equipment, P&G owned Materials, P&G owned Developed Materials, and all other Software, Equipment, Systems or Materials to which P&G and/or the Eligible Recipients are or would be entitled during the Term or upon the expiration or termination of this Agreement. Provider shall cooperate fully with P&G and the Eligible Recipients and assist P&G and the Eligible Recipients in identifying and taking possession of the items listed in the preceding sentence. P&G will have the right to hold such P&G Data, Confidential Information, Software, Equipment, Systems and Materials until such time as the trustee or receiver in bankruptcy or other appropriate insolvency office holder can provide adequate assurances and evidence to P&G that they will be protected from sale, release, inspection, publication, or inclusion in any publicly accessible record, document, material or filing. Provider and P&G agree that without this material provision, P&G would not have entered into this Agreement or provided any right to the possession or use of P&G Data, P&G Confidential Information, or P&G Software covered by this Agreement.

(b) **P&G Rights in Event of Bankruptcy Rejection.** Notwithstanding any other provision of this Agreement to the contrary, in the event that Provider becomes a debtor under the United States Bankruptcy Code (11 U.S.C. §101 et. seq. or any similar Law in any other country (the "**Bankruptcy Code**")) and rejects this Agreement pursuant to Section 365 of the Bankruptcy Code (a "**Bankruptcy Rejection**"), (i) any and all of the licensee and sublicensee rights of P&G and the Eligible Recipients arising under or otherwise set forth in this Agreement, including without limitation the rights of P&G and/or the Eligible Recipients referred to in **Section 14.6**, shall be deemed fully retained by and vested in P&G and/or the Eligible Recipients as protected intellectual property rights under Section 365(n)(1)(B) of the Bankruptcy Code and further shall be deemed to exist immediately before the commencement of the bankruptcy case in which Provider is the debtor; (ii) P&G shall have all of the rights afforded to non-debtor licensees and sublicensees under Section 365(n) of the Bankruptcy Code; and (iii) to the extent any rights of P&G and/or the Eligible Recipients under this Agreement which arise after the termination or expiration of this Agreement are determined by a bankruptcy court not to be "intellectual property rights" for purposes of Section 365(n), all of such rights shall remain vested in and fully retained by P&G and/or the Eligible Recipients after any Bankruptcy Rejection as though this Agreement were terminated or expired. P&G shall under no circumstances be required to terminate this Agreement after a Bankruptcy Rejection in order to enjoy or acquire any of its rights under this Agreement, including without limitation any of the rights of P&G referenced in **Section 14.6**.

**20.5 Termination for Provider Degraded Financial Condition.** If (i) Provider has a substantial reduction in its long term credit rating as determined by Moody's Investors Service or Standard & Poor's, or (ii) Provider receives a "going

-49-
P&G Confidential Information

concern" explanation or qualification from its external auditor, then P&G may, in its sole discretion, terminate this Agreement by giving Provider at least sixty (60) days prior notice.

## 21 GENERAL

### 21.1 Binding Nature, Assignment.

(a) **Binding Nature.** This Agreement will be binding on the Parties and their respective successors and permitted assigns.

(b) **Assignment.** Neither Party may, or will have the power to, assign this Agreement without the prior written consent of the other, except in the following circumstances:

(i) P&G may assign its rights or obligations under this Agreement, without the approval of Provider, to an Affiliate which expressly assumes P&G's obligations and responsibilities hereunder, provided P&G remains fully liable for and is not relieved from the full performance of its obligations under this Agreement; and

(ii) P&G may assign its rights and obligations under this Agreement without the approval of Provider to an Entity acquiring, directly or indirectly, Control of P&G, an Entity into which P&G is merged, or an Entity acquiring all or substantially all of P&G's assets, provided the acquirer or surviving Entity agrees in writing to be bound by the terms and conditions of this Agreement.

(c) **Impermissible Assignment.** Any attempted assignment that does not comply with the terms of this Section shall be null and void.

### 21.2 Entire Agreement; Amendment.
This Agreement, including any Schedules and Attachments referred to herein and attached hereto, each of which is incorporated herein for all purposes, constitutes the entire agreement between the Parties with respect to the subject matter hereof. There are no agreements, representations, warranties, promises, covenants, commitments or undertakings other than those expressly set forth herein. This Agreement supersedes all prior agreements, representations, warranties, promises, covenants, commitments or undertaking, whether written or oral, with respect to the subject matter contained in this Agreement. No amendment, modification, change, waiver, or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, modification, change, waiver, or discharge is sought to be enforced.

### 21.3 Notices.

(a) **Primary Notices.** Any notice, notification, request, demand or determination provided by a Party pursuant to the following:

Section 4.3 (Termination Assistance Services);
Section 4.6(a) (Use of Third Parties – Right of Use);
Section 6.6 (Notice of Defaults);
Section 7.5 (Notice of Adverse Impact);
Section 10.2 (Savings Clause);
Section 11.5 (Refunds and Credits);
Section 13.1(e) (Loss of Confidential Information);
Article 16 (Insurance and Risk of Loss);
Sections 17.5 (Indemnification Procedures);
Section 17.6 (Special Indemnification Procedures;
Section 18.3(e) (Waiver of Liability Cap);
Section 19.1 (Informal Dispute Procedures);
Article 20 (Termination for Cause); and
Section 21.1 (Binding Nature, Assignment);

P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

shall be in writing and shall be delivered in hard copy using one of the following methods and shall be deemed delivered upon receipt: (i) by hand, (ii) by an express courier with a reliable system for tracking delivery, or (iii) by registered or certified mail, return receipt requested, postage prepaid.  Unless otherwise notified, the foregoing notices shall be delivered as follows:

In the case of P&G:

P&G
Mario Perezcastillo, Purchases Group Manager
One Procter & Gamble Plaza
Cincinnati, Ohio 45201
_____

In the case of Provider:

_*Versatex*
Gerald Sparkman, President/COO
324 West Eighth Street
Cincinnati, Ohio 45202
_____

With a copy to:

*General Counse*
Constance Hill

(b) **Other Notices**. All notices, notifications, requests, demands or determinations required or provided pursuant to this Agreement, other than those specified in **Section 21.3(a)**, may be sent in hard copy in the manner specified in **Section 21.3(a)**, or by e-mail transmission (where receipt is acknowledged by the recipient) or facsimile transmission (with acknowledgment of receipt from the recipient's facsimile machine) to the addresses set forth below:

In the case of P&G:

P&G
_Mario Perezcastillo_____

E-mail Address:  Perezcastillo.m@pg.com
Facsimile Number: _____

In the case of Provider:

Versatex_____
__Gerald Sparkman_____

E-mail Address: Gerald.sparkman@versatexmsp.com_
Facsimile Number: _____

(c) **Service of Process**. Notwithstanding the above, for the purpose of service of legal process and receipt of notice or pleadings in judicial proceedings before the federal or state courts of Cincinnati, Ohio,, as selected by the Parties under **Section 19.2**, both Parties to this Agreement and all parties to all Companion Agreements irrevocably appoint the company below as their agent for service of process and receipt of such notice or notification, and further elect domicile at the address of said company in Cincinnati, Ohio,  as follows:

In the case of P&G:

_____
_____
_____
_____

In the case of Provider:
Versatex
Constance A. Hill
324  W. Ninth Street
Cincinnati, Ohio  45202
Attention: General Counsel

(d) **Notice of Change**. A Party may from time to time change its address or designee for notification purposes by giving the other prior notice of the new address or designee and the date upon which it shall become effective.

(e) **Counterparts, Headings, Language**. This Agreement may be executed in several counterparts, all of which taken together shall constitute one single agreement between the Parties.  The Article and Section headings and the table of contents used herein are for reference and convenience only and shall not be considered in the interpretation of this Agreement.  All Schedules, Attachments, documents, materials, deliverable items, notices and communications of

-51- P&G Confidential Information

any kind between the Parties and their representatives relating to this Agreement shall be made in the English language.

**21.4 Relationship of Parties.** Provider, in furnishing services to P&G and the Eligible Recipients hereunder, is acting as an independent contractor, and Provider has the sole obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by Providers or Providers' Personnel under this Agreement. The relationship of the Parties under this Agreement shall not constitute a partnership or joint venture for any purpose. Except as expressly provided in this Agreement, Provider is not an agent of P&G or the Eligible Recipients and has no right, power or authority, expressly or impliedly, to represent or bind P&G or the Eligible Recipients as to any matters.

**21.5 Severability.** In the event that any provision of this Agreement conflicts with applicable Law or is held invalid or unenforceable by a court with jurisdiction over the Parties, such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable Law. The remaining provisions of this Agreement and the application of the challenged provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each such provision shall be valid and enforceable to the full extent permitted by applicable Law.

**21.6 Consents and Approval.** Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, confirmation, notice or similar action by either Party is required under this Agreement, such action shall not be unreasonably delayed or withheld. An approval or consent given by a Party under this Agreement shall not relieve the other Party of responsibility for complying with the requirements of this Agreement, nor shall it be construed as a waiver of any rights under this Agreement, except as and to the extent expressly provided in such approval or consent.

**21.7 Waiver of Default; Cumulative Remedies.**

(a) **Waiver of Default.** A delay or omission by either Party hereto to exercise any right or power under this Agreement shall not be construed to be a waiver thereof. A waiver by either of the Parties hereto of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant herein contained. All waivers must be in writing and signed by the Party waiving its rights.

(b) **Cumulative Remedies.** All remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise. The election by a Party of any remedy provided for in this Agreement or otherwise available to such Party shall not preclude such Party from pursuing any other remedies available to such Party at law, in equity, by contract or otherwise.

**21.8 Survival.** Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect. Additionally, all provisions of this Agreement will survive the expiration or termination of this Agreement to the fullest extent necessary to give the Parties the full benefit of the bargain expressed herein.

**21.9 Publicity.** Neither Party shall use the other Party's names, logos, service marks, trade names or trademarks or refer to the other Party directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional, advertising or marketing materials, customer lists or business presentations without the prior written consent of the other Party prior to each such use or release. Provider shall not make any public statements about this Agreement, the Services or its relationship with P&G and/or the Eligible Recipients without P&G's prior approval.

**21.10 Third Party Beneficiaries.** Except as expressly provided herein, this Agreement is entered into solely between, and may be enforced only by, P&G and Provider. This Agreement shall not be deemed to create any rights or causes of action in or on behalf of any third parties, including without limitation employees, Providers and customers of a Party, or to create any obligations of a Party to any such third parties.

**21.11 Order of Precedence.** In the event of a conflict, this Agreement shall take precedence over the Schedules, and the Schedules shall take precedence over the Attachments.

P&G Confidential Information

**21.12  Hiring of Employees**.

(a) **Solicitation and Hiring**.  During the Term and for a period of twelve (12) months thereafter, Provider will not solicit for employment directly or indirectly, nor employ, any employees of P&G or an Eligible Recipient without the prior approval of P&G.  This prohibition on solicitation and hiring shall extend ninety (90) days after the termination of the employee's employment.  This provision shall not operate or be construed to prevent or limit any employee's right to practice his or her profession or to utilize his or her skills for another employer or to restrict any employee's freedom of movement or association.

(b) **Publications**.  Neither the publication of classified advertisements in newspapers, periodicals, Internet bulletin boards, or other publications of general availability or circulation nor the consideration and hiring of persons responding to such advertisements shall be deemed a breach of this **Section 21.12**, unless the advertisement and solicitation is undertaken as a means to circumvent or conceal a violation of this provision and/or the hiring party acts with knowledge of this hiring prohibition.

**21.13  Liens**.  Provider shall not file, or by its action or inaction permit, any liens to be filed on or against property or realty of P&G or any Eligible Recipient or Authorized User without P&G's prior approval.  In the event that any such liens arise as a result of Provider's action or inaction, Provider shall obtain a bond to fully satisfy such liens or otherwise remove such liens at its sole cost and expense within ten (10) business days.

**21.14  Covenant of Cooperation and Good Faith**.  Each Party agrees that, in its respective dealings with the other Party under or in connection with this Agreement, it shall act in good faith.

**21.15  Acknowledgment, Further Assurances**.  The Parties each acknowledge that the terms and conditions of this Agreement have been the subject of active and complete negotiations, and that such terms and conditions should not be construed in favor of or against any Party  by reason of the extent to which any Party or its professional advisors participated in the preparation of this Agreement.  Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement

**Reference**.  The Parties agree that, without the  written consent of the other, neither Party will use the name or trademarks of the other Party or any of its affiliates in any advertising, publicly releases, reference lists, and any kind of media such as but not limited to websites, sales presentations, etc, Notwithstanding the provision in Article 13, the parties may discuss the conceptual aspects of the MSP with prospective customers and/or providers.  However neither party shall discuss the performance of the other party without that party's written consent.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

**P&G**

By: _____

Title: _____

Date: _____5/12/15_____

**Versatex, LLC**

By_____

By:_____

Title: _____

Date: _____

-53-

P&G Confidential Information

21.12  **Hiring of Employees**.

(a) **Solicitation and Hiring**.  During the Term and for a period of twelve (12) months thereafter, Provider will not solicit for employment directly or indirectly, nor employ, any employees of P&G or an Eligible Recipient without the prior approval of P&G.  This prohibition on solicitation and hiring shall extend ninety (90) days after the termination of the employee's employment.  This provision shall not operate or be construed to prevent or limit any employee's right to practice his or her profession or to utilize his or her skills for another employer or to restrict any employee's freedom of movement or association.

(b) **Publications**.  Neither the publication of classified advertisements in newspapers, periodicals, Internet bulletin boards, or other publications of general availability or circulation nor the consideration and hiring of persons responding to such advertisements shall be deemed a breach of this **Section 21.12**, unless the advertisement and solicitation is undertaken as a means to circumvent or conceal a violation of this provision and/or the hiring party acts with knowledge of this hiring prohibition.

21.13  **Liens**.  Provider shall not file, or by its action or inaction permit, any liens to be filed on or against property or realty of P&G or any Eligible Recipient or Authorized User without P&G's prior approval.  In the event that any such liens arise as a result of Provider's action or inaction, Provider shall obtain a bond to fully satisfy such liens or otherwise remove such liens at its sole cost and expense within ten (10) business days.

21.14  **Covenant of Cooperation and Good Faith**.  Each Party agrees that, in its respective dealings with the other Party under or in connection with this Agreement, it shall act in good faith.

21.15  **Acknowledgment, Further Assurances**.  The Parties each acknowledge that the terms and conditions of this Agreement have been the subject of active and complete negotiations, and that such terms and conditions should not be construed in favor of or against any Party  by reason of the extent to which any Party or its professional advisors participated in the preparation of this Agreement.  Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement

**Reference**.  The Parties agree that, without the  written consent of the other, neither Party will use the name or trademarks of the other Party or any of its affiliates in any advertising, publicly releases, reference lists, and any kind of media such as but not limited to websites, sales presentations, etc. Notwithstanding the provision in Article 13, the parties may discuss the conceptual aspects of the MSP with prospective customers and/or providers.  However neither party shall discuss the performance of the other party without that party's written consent.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

| P&G | Versatex, LLC |
|---|---|
| By: _____ | By _____ |
| Title: _____ | By: _____ |
| Date: ___5/12/15___ | Title: ___President___ |
| | Date: ___5/12/15___ |

P&G Confidential Information

DCDB01 20932031.1 14-Jul-09 09:51

# **<u>Exhibit B</u>**

| Company | Customer Number | Invoice Number | Current Trx Amount | Customer PO Number |
|---|---|---|---|---|
| XLC | VLGJBM2 | 76804 | $9,602.00 | 3062420027 |
| XLC | VLGJHF2 | 76806 | $7,799.28 | 3062420027 |
| XLC | VLGJAC2 | 77971 | $554.55 | 3062932732 |
| XLC | VLGJBA1 | 77972 | $442.68 | 3062932725 |
| XLC | VLGJCD1 | 77973 | $663.52 | 3062932729 |
| XLC | VLGJCN1 | 77978 | $431.68 | 3062938126 |
| XLC | VLGJCS1 | 77974 | $663.52 | 3062932741 |
| XLC | VLGJDC1 | 77979 | $682.82 | 3062938161 |
| XLC | VLGJJO1 | 77980 | $528.28 | 3062938156 |
| XLC | VLGJLJ2 | 77970 | $431.68 | 3062853954 |
| XLC | VLGJMC1 | 77977 | $416.64 | 3062935113 |
| XLC | VLGJPT1 | 77975 | $663.52 | 3062932726 |
| XLC | VLGJRD2 | 77969 | $592.16 | 3062840924 |
| XLC | VLGJSB1 | 77976 | $520.80 | 3062932728 |
| XLC | VLGJWL3 | 77981 | $682.82 | 3062938147 |
| XLC | VLGSAAA | 77982 | $1,842.82 | 3062464103 |
| XLC | VLGSBP | 77987 | $9,021.02 | 3062420027 |
| XLC | VLGSDD | 77989 | $1,223.60 | 3062426508 |
| XLC | VLGSLTA | 77988 | $1,151.29 | 3062426513 |
| XLC | VLGSMH | 77984 | $13,587.99 | 4503597144 |
| XLC | VLGSOSM | 77990 | $1,778.40 | 3062428505 |
| XLC | VLGSRCP | 77991 | $532.00 | 3062428469 |
| XLC | VLGSSTR | 77985 | $3,564.62 | 4503596349 |
| XLC | VLGSTST | 77986 | $6,621.63 | 4503597135 |
| XLC | VLGJVS1 | 78316 | $476.00 | 3062648002 |
| XLC | VLGJVS1 | 78578 | $476.00 | 3062648002 |
| XLC | VLGJMF1 | 78725 | $107.92 | 3062988285 |
| XLC | VLGSLTA | 78900 | $1,160.81 | 3062426513 |
| XLC | VLGJEB1 | 79493 | $520.80 | 3063047485 |
| XLC | VLGSPR832 | 79830 | $627.84 | 3062426495 |
| XLC | VLGJDF2 | 79944 | $539.60 | 3063004705 |
| XLC | VLGJVS1 | 79942 | $470.05 | 3062648002 |
| XLC | VLGSPR832 | 79984 | $663.52 | 3062426495 |
| XLC | VLGJMC2 | 80098 | $458.96 | 3063004768 |
| XLC | VLGJMR1 | 80104 | $768.00 | 3063005342 |
| XLC | VLGSPR832 | 80132 | $468.72 | 3062426495 |
| XLC | VLGSR1015 | 82268 | $2,372.81 | 3063292323 |
| XLC | VLGSHS828 | 82306 | $882.11 | 3063050752 |
| XLC | VLGSLA827 | 82305 | $478.80 | 3063048581 |
| XLC | VLGSST830 | 82307 | $747.68 | 3063038485 |
| XLC | VLGSHS828 | 82398 | $651.00 | 3063050752 |
| XLC | VLGSLA827 | 82397 | $577.20 | 3063048581 |
| XLC | VLGSST830 | 82399 | $526.08 | 3063038485 |
| XLC | VLGSHS828 | 82516 | $785.05 | 3063050752 |
| XLC | VLGSLA827 | 82515 | $383.04 | 3063048581 |
| XLC | VLGSST830 | 82517 | $587.73 | 3063038485 |
| XLC | VLGSHS828 | 82647 | $585.90 | 3063050752 |

| XLC | VLGSLA827 | 82646 | $383.04 | 3063048581 |
|-----|-----------|-------|---------|------------|
| XLC | VLGSST830 | 82648 | $591.84 | 3063038485 |
| XLC | VLGSHS828 | 82770 | $468.72 | 3063050752 |
| XLC | VLGSLA827 | 82769 | $478.80 | 3063048581 |
| XLC | VLGSST830 | 82771 | $591.84 | 3063038485 |
| XLC | VLGJVS1 | 82903 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 82908 | $897.04 | 3063050752 |
| XLC | VLGSLA827 | 82907 | $478.80 | 3063048581 |
| XLC | VLGSST830 | 82909 | $591.84 | 3063038485 |
| XLC | VLGJVS1 | 82994 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 82999 | $501.27 | 3063050752 |
| XLC | VLGSLA827 | 82998 | $495.20 | 3063048581 |
| XLC | VLGSST830 | 83000 | $702.64 | 3063038485 |
| XLC | VLGJVS1 | 83108 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 83113 | $1,009.05 | 3063050752 |
| XLC | VLGSLA827 | 83112 | $593.60 | 3063048581 |
| XLC | VLGSST830 | 83114 | $197.28 | 3063038485 |
| XLC | VLGJVS1 | 83222 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 83227 | $371.07 | 3063050752 |
| XLC | VLGSLA827 | 83226 | $281.30 | 3063048581 |
| XLC | VLGJVS1 | 83334 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 83339 | $898.85 | 3063050752 |
| XLC | VLGSLA827 | 83338 | $581.30 | 3063048581 |
| XLC | VLGJVS1 | 83446 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 83450 | $743.80 | 3063050752 |
| XLC | VLGSLA827 | 83449 | $593.60 | 3063048581 |
| XLC | VLGJHB1 | 83556 | $2,654.08 | 3062853955 |
| XLC | VLGJHC1 | 83559 | $2,341.60 | 3063071193 |
| XLC | VLGJHD3 | 83557 | $937.44 | 3063004714 |
| XLC | VLGJHS2 | 83558 | $1,148.52 | 3063005060 |
| XLC | VLGJVS1 | 83555 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 83563 | $334.17 | 3063050752 |
| XLC | VLGJVS1 | 83669 | $476.00 | 3062648002 |
| XLC | VLGSHS828 | 83674 | $260.40 | 3063050752 |
| XLC | VLGSLA827 | 83673 | $466.83 | 3063048581 |
| XLC | VLGJVS1 | 83779 | $119.00 | 3062648002 |
| XLC | VLGSLA827 | 83783 | $115.70 | 3063048581 |
| XLC | VLGSR1015 | 84092 | $525.86 | 3063292323 |
| XLC | VLGJSA2 | 84195 | $364.56 | 3063519486 |
| XLC | VLGJTI1 | 84637 | $475.23 | 3063533703 |
| XLC | VLGJCL1 | 84762 | $416.64 | 3063532502 |
| XLC | VLGJBJ1 | 84873 | $951.03 | 3063554816 |
| XLC | VLGJCL1 | 84866 | $1,166.48 | 3063532502 |
| XLC | VLGJLA1 | 84870 | $734.88 | 3063541045 |
| XLC | VLGJMK2 | 84874 | $455.70 | 3063605459 |
| XLC | VLGJPB1 | 84875 | $351.54 | 3063567841 |
| XLC | VLGJSL2 | 84867 | $364.04 | 3063532496 |
| XLC | VLGJCL1 | 84979 | $520.80 | 3063532502 |
| XLC | VLGJLA1 | 84982 | $877.60 | 3063541045 |

| XLC | VLGJMK2 | 84985 | $663.52 | 3063605459 |
|-----|---------|-------|---------|------------|
| XLC | VLGJCL1 | 85109 | $520.80 | 3063532502 |
| XLC | VLGJLA1 | 85111 | $717.04 | 3063541045 |
| XLC | VLGJMK2 | 85113 | $663.52 | 3063605459 |
| XLC | VLGJCL1 | 85243 | $592.16 | 3063532502 |
| XLC | VLGJLA1 | 85245 | $797.32 | 3063541045 |
| XLC | VLGJMK2 | 85247 | $663.52 | 3063605459 |
| XLC | VLGJCL1 | 85378 | $632.30 | 3063532502 |
| XLC | VLGJLA1 | 85380 | $717.04 | 3063541045 |
| XLC | VLGJMK2 | 85381 | $645.68 | 3063605459 |
| XLC | VLGJCL1 | 85512 | $442.68 | 3063532502 |
| XLC | VLGJLA1 | 85514 | $468.72 | 3063541045 |
| XLC | VLGJMK2 | 85515 | $507.78 | 3063605459 |
| XLC | VLGJBJ1 | 85655 | $1,145.37 | 3063554816 |
| XLC | VLGJCL1 | 85652 | $416.64 | 3063532502 |
| XLC | VLGJCN3 | 85664 | $610.00 | 3063603879 |
| XLC | VLGJMK2 | 85656 | $583.24 | 3063605459 |
| XLC | VLGJCL1 | 85792 | $449.19 | 3063532502 |
| XLC | VLGJCN3 | 85803 | $1,758.64 | 3063603879 |
| XLC | VLGJIH1 | 85800 | $587.70 | 3063596728 |
| XLC | VLGJMJ3 | 85804 | $1,347.75 | 3063605459 |
| XLC | VLGJMK2 | 85796 | $468.72 | 3063605459 |
| XLC | VLGJCL1 | 85928 | $520.80 | 3063532502 |
| XLC | VLGJCN3 | 85934 | $507.78 | 3063603879 |
| XLC | VLGJIH1 | 85931 | $636.76 | 3063596728 |
| XLC | VLGJCN3 | 86073 | $520.80 | 3063603879 |
| XLC | VLGJIH2 | 86078 | $627.84 | 3063662485 |
| XLC | VLGJMK2 | 86071 | $574.32 | 3063605459 |
| XLC | VLGJVS1 | 86066 | $136.85 | 3062648002 |
| XLC | VLGJCN3 | 86215 | $797.32 | 3063603879 |
| XLC | VLGJIH2 | 86219 | $452.45 | 3063662485 |
| XLC | VLGJGE2 | 86363 | $454.01 | 3063666026 |
| XLC | VLGJJC5 | 86365 | $410.13 | 3063667449 |
| XLC | VLGJLA1 | 86354 | $721.95 | 3063541045 |
| XLC | VLGJMK2 | 86356 | $593.85 | 3063605459 |
| XLC | VLGJMM3 | 86364 | $454.01 | 3063666036 |
| XLC | VLGJCN3 | 86504 | $423.15 | 3063603879 |
| XLC | VLGJIH2 | 86508 | $432.92 | 3063662485 |
| XLC | VLGJCN3 | 86645 | $397.11 | 3063603879 |
| XLC | VLGJIH2 | 86648 | $663.52 | 3063662485 |
| XLC | VLGJMS2 | 86642 | $641.23 | 3063329717 |
| XLC | VLGJIH2 | 86792 | $636.76 | 3063662485 |
| XLC | VLGJIH2 | 86925 | $247.38 | 3063662485 |
| XLC | VLGJIH2 | 87059 | $309.23 | 3063662485 |
| XLC | VLGJIH2 | 87183 | $302.72 | 3063662485 |
| XLC | VLGJIH4 | 87314 | $227.85 | 3063756748 |
| XLC | VLGLM1325 | 17782 | $15,888.69 | 3063441002 |
| XLC | VLGLM1325 | 17825 | $15,888.69 | 3063441002 |
| XLC | VLGJBE5 | 90580 | $263.52 | 3064019726 |

| XLC | VLGJGS4 | 93786 | $323.76 | 3064158156 |
| VSTX | DUR-9002-08327 | PNGPI0006974 | $857.99 | 7100001137 |
| XLC | VDUJHB1 | 94790 | $431.68 | 3064276289 |
| XLC | VDUJJA1 | 94791 | $428.31 | 3064201568 |
| VSTX | DUR-9002-08327 | PNGPI0007764 | $857.99 | 7100001137 |
| VSTX | DUR-9002-08327 | PNGPI0007764 | $857.99 | 7100001137 |
| VSTX | DUR-9002-08327 | PNGPI0007928 | $1,304.89 | 7100001179-2 |
| VSTX | DUR-9002-08327 | PNGPI0008054 | $2,090.87 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGIN0007851 | $802.34 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGPI0008106 | $857.99 | 7100001137 |
| VSTX | DUR-9002-08327 | PNGPI0008164 | $1,367.65 | 7100001183 |
| XLC | VDUJJA2 | 96844 | $708.22 | 7100008108 |
| XLC | VDUL2113 | 21013 | $1,767.94 | 3063972840 |
| XLC | VDUJJA2 | 97773 | $689.71 | 7100008108 |
| XLC | VDUJJA2 | 97876 | $671.20 | 7100008108 |
| XLC | VDUJJA2 | 97965 | $763.75 | 7100008108 |
| XLC | VDUJJA2 | 98058 | $702.05 | 7100008108 |
| XLC | VDUJJA2 | 98158 | $751.41 | 7100008108 |
| XLC | VDUJJA2 | 98251 | $739.07 | 7100008108 |
| XLC | VDUJJA2 | 98339 | $677.37 | 7100008108 |
| XLC | VDUJJA2 | 98429 | $677.37 | 7100008108 |
| VSTX | DUR-9002-08327 | PNGIN0008636 | $91.06 | 7100011705 |
| VSTX | DUR-9002-08327 | PNGPI0009472 | $5,870.87 | 7100001225 |
| XLC | VDUT1761 | 99218 | $406.69 | 3063857439 |
| VSTX | DUR-9002-08327 | PNGPI0009597 | $329.40 | 7100001718 |
| VSTX | DUR-9002-08327 | PNGPI0009602 | $5,870.87 | 7100001225 |
| XLC | VDUT1761 | 99310 | $503.81 | 3063857439 |
| XLC | VDUT2592 | 99311 | $534.36 | 3064272213 |
| VSTX | DUR-9002-08327 | PNGPI0009687 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009687 | $1,319.80 | 7100001181 |
| XLC | VDUT1761 | 99398 | $424.90 | 3063857439 |
| VSTX | DUR-9002-08327 | PNGPI0009710 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009710 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009710 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009710 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009710 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009711 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009711 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009712 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009712 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $7,628.62 | 7100001227-3 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,319.80 | 7100001181 |

| | | | | |
|---|---|---|---|---|
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $7,628.62 | 7100001227-3 |
| VSTX | DUR-9002-08327 | PNGPI0009713 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009714 | $1,888.64 | 7100001199 |
| VSTX | DUR-9002-08327 | PNGPI0009714 | $7,628.62 | 7100001227-3 |
| VSTX | DUR-9002-08327 | PNGPI0009714 | $1,319.80 | 7100001181 |
| VSTX | DUR-9002-08327 | PNGPI0009714 | $7,628.62 | 7100001227-3 |
| VSTX | DUR-9002-08327 | PNGPI0009727 | $7,628.62 | 7100001227-3 |
| XLC | VDUT1761 | 99504 | $546.30 | 3063857439 |
| XLC | VDUB03426 | 99539 | $33,684.32 | 7110020540 |
| XLC | VDUT1761 | 99607 | $546.30 | 3063857439 |
| VSTX | DUR-9002-08327 | PNGIN0008636 | $107.92 | 7100018436-3 |
| VSTX | DUR-9002-08327 | PNGIN0008637 | $323.76 | 7100018436-3 |
| VSTX | DUR-9002-08327 | PNGIN0008638 | $766.10 | 7100018436-3 |
| VSTX | DUR-9002-08327 | PNGIN0008861 | $405.04 | 7100019886 |
| VSTX | DUR-9002-08327 | PNGIN0008862 | $411.68 | 7100019886 |
| VSTX | DUR-9002-08327 | PNGIN0009755 | $272.24 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $673.92 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $535.66 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $531.20 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $745.28 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $941.52 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $531.20 | 7100015734 |
| VSTX | DUR-9002-08327 | PNGPI0009756 | $660.54 | 7100015734 |
| XLC | VDUT2592 | 99697 | $472.14 | 3064272213 |
| VSTX | DUR-9002-08327 | PNGIN0008073 | $648.32 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008073 | $522.74 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008119 | $670.97 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008134 | $536.23 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008158 | $539.60 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008226 | $684.56 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008274 | $680.03 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008416 | $666.44 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008441 | $384.47 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008442 | $539.60 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008442 | $539.60 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008442 | $418.19 | 7100001037 |
| VSTX | DUR-9002-08327 | PNGIN0008442 | $53.96 | 7100001037 |
| VSTX | DUR-9002-08327 | PNGIN0008442 | $536.23 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $684.56 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $603.02 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $684.56 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $757.04 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $675.50 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $684.56 | 7100018436-2 |
| VSTX | DUR-9002-08327 | PNGIN0008443 | $684.56 | 7100000995-5 |
| VSTX | DUR-9002-08327 | PNGIN0008444 | $684.56 | 7100018436-2 |

| VSTX | DUR-9002-08327 | PNGIN0008444 | $584.90 | 7100000995-5 |
|------|----------------|--------------|---------|--------------|
| VSTX | DUR-9002-08327 | PNGIN0008482 | $296.78 | 7100001037 |
| VSTX | DUR-9002-08327 | PNGIN0008482 | $779.69 | 7100000873 |
| VSTX | DUR-9002-08327 | PNGIN0008483 | $539.60 | 7100000873 |
| VSTX | DUR-9002-08327 | PNGIN0008506 | $209.10 | 7100001009 |
| VSTX | DUR-9002-08327 | PNGIN0008509 | $424.96 | 7100000939-2 |
| VSTX | DUR-9002-08327 | PNGIN0008903 | $378.48 | 7100018436 |
| VSTX | DUR-9002-08327 | PNGPI0009878 | $7,628.62 | 7100019938 |
| XLC | VDUT1761 | 99788 | $491.67 | 3063857439 |
| XLC | VDUT2592 | 99789 | $527.04 | 3064272213 |
| XLC | VDUL3541 | 21905 | $1,221.32 | 7100019886 |
| XLC | VDUL3522 | 21897 | $1,888.64 | 7100019938 |
| VSTX | DUR-9002-08327 | PNGMI0000141 | $5,870.87 | 7100019938 |
| XLC | VDUT1761 | 99879 | $406.69 | 3063857439 |
| XLC | VDUT2592 | 99880 | $439.20 | 3064272213 |
| VSTX | DUR-9002-08327 | LAGPI00000010 | $6,158.41 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI00000019 | $527.04 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000057 | $527.04 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000063 | $421.64 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000079 | $516.06 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000084 | $421.64 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000100 | $534.36 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000100 | $511.28 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000122 | $362.34 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000128 | $540.12 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000144 | $523.38 | 7100001718 |
| XLC | VDUL3518 | 22181 | $1,243.07 | 7100019829 |
| XLC | VDUL3524 | 22184 | $1,553.68 | 7100019938 |
| XLC | VDUL3522 | 22183 | $951.20 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI00000152 | $395.08 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000153 | $501.32 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000184 | $446.52 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000185 | $428.22 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000194 | $531.20 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000209 | $491.67 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI00000210 | $545.34 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000231 | $515.95 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI00000232 | $552.66 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI00000239 | $408.36 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI00000246 | $1,979.70 | 710001197-3 |
| VSTX | DUR-9002-08327 | LAGPI00000254 | $515.95 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI00000255 | $446.52 | 7100001718 |
| XLC | VDUL2110 | 22339 | $4,659.65 | 3063975689 |
| XLC | VDUL2102 | 22337 | $1,979.70 | 3063984646 |
| XLC | VDUL3519 | 22341 | $5,019.28 | 7100019704 |
| XLC | VDUL3540 | 22349 | $15,469.38 | 7100019741 |
| XLC | VDUL3535 | 22347 | $1,851.08 | 7100019823 |

| | | | | |
|---|---|---|---|---|
| XLC | VDUL3518 | 22340 | $1,281.52 | 7100019829 |
| XLC | VDUL3541 | 22350 | $1,317.12 | 7100019886 |
| XLC | VDUL3528 | 22345 | $2,748.18 | 7100019936 |
| XLC | VDUL3529 | 22346 | $2,665.73 | 7100019936 |
| XLC | VDUL3522 | 22342 | $951.20 | 7100019938 |
| XLC | VDUL3524 | 22343 | $6,158.41 | 7100019938 |
| XLC | VDUL3525 | 22344 | $1,319.80 | 7100019938 |
| XLC | VDUB03402 | 101162 | $378.48 | 7100019886 |
| XLC | VDUJJK1 | 101147 | $446.52 | 7100019574 |
| XLC | VDUJMC1 | 101146 | $415.00 | 7100018436 |
| XLC | VDUT1761 | 101148 | $406.69 | 3063857439 |
| XLC | VDUT2592 | 101149 | $464.82 | 3064272213 |
| XLC | VDUT3526 | 101152 | $2,278.68 | 7100019937 |
| XLC | VDUT3527 | 101150 | $2,776.93 | 7100019887 |
| VSTX | DUR-9002-08327 | LAGPI0000026 | $517.92 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000026 | $951.20 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000026 | $6,158.41 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000026 | $1,319.80 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000027 | $2,748.18 | 7100019936 |
| VSTX | DUR-9002-08327 | LAGPI0000027 | $497.74 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000027 | $549.00 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI0000028 | $540.12 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000028 | $951.20 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000029 | $6,158.41 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000029 | $1,319.80 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000029 | $509.88 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000029 | $519.72 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI0000046 | $68,033.72 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000046 | $424.96 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000047 | $531.20 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000047 | $424.96 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000047 | $504.64 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000047 | $524.56 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000047 | $312.08 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000048 | $276.55 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000048 | $323.76 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000048 | $566.88 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000050 | $515.95 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000050 | $545.34 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI0000050 | $527.88 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000052 | $491.67 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000052 | $538.02 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI0000053 | $408.36 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000054 | $497.74 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000054 | $541.68 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI0000056 | $951.20 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000056 | $6,158.41 | 7100019938 |

| | | | | |
|---|---|---|---|---|
| VSTX | DUR-9002-08327 | LAGPI0000056: | $1,319.80 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000056! | $1,317.12 | 7100019886 |
| VSTX | DUR-9002-08327 | LAGPI0000057( | $503.81 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000057 | $519.72 | 7100001718 |
| VSTX | DUR-9002-08327 | LAGPI0000058: | $951.20 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000058 | $6,158.41 | 7100019938 |
| VSTX | DUR-9002-08327 | LAGPI0000059: | $406.69 | 7100009449 |
| VSTX | DUR-9002-08327 | LAGPI0000059: | $435.54 | 7100001718 |
| | | | **$541,371.15** | |